

131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
fax (312) 460-7000
www.seyfarth.com

Writer's direct phone
312-460-5915

Writer's e-mail
cmcardle@seyfarth.com

April 22, 2013

**VIA E-MAIL (DAVIDENGLER@DAVIDENGLER.COM) AND CERTIFIED MAIL**

David L. Engler
100 DeBartolo Place - Suite 315
Boardman, Ohio 44512

839 Southwestern Run
Youngstown, Ohio 44514

      **Re:**   **Potts v. American Bottling Company, et al.**
           **Case No. 5:12-cv-02688-JRA**

Dear David:

    As you know, we represent The American Bottling Company ("ABC") in connection with the lawsuit filed on behalf of Robert Potts. We are writing this letter pursuant to Federal Rule of Civil Procedure 11. We understand that you will soon receive a similar letter from counsel for Teamsters Local No. 377 ("the Union"). The purpose of this letter is to inform you that the claims against ABC and the Union are without legal or factual basis. As such, if you do not voluntarily dismiss these claims within the next twenty-one (21) days, ABC and the Union may file the attached joint motion, requesting all available sanctions against both Plaintiff and your firm.

    The utter lack of support for Plaintiff's claims is clear. First, Plaintiff's September 2009 temporary layoff was in full compliance with the terms of the applicable collective bargaining agreement. Second, the uncontroverted facts show that ABC offered to convert Plaintiff's layoff to a permanent layoff so that he could "bump" into another position based on plant seniority, but he failed to respond to ABC's offer. Third, Plaintiff waived, released, or withdrew the grievances upon which he has based his claims. Finally, Plaintiff's claims are barred by the six month statute of limitations for hybrid §301 actions. For any or all of these reasons, Plaintiff's lawsuit must be dismissed.

LONDON   WASHINGTON, D.C.   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA



## I. Plaintiff's Grievances Are Baseless

### A. Plaintiff's Temporary Layoff Complied With The CBA

On September 21, 2009, in accordance with the terms of the CBA, ABC placed Plaintiff on temporary layoff due to significant decline in its business. Specifically, Article 14, Section 1 of the applicable CBA provides that "in the event of temporary layoffs **classification seniority** shall prevail." Plaintiff admitted under oath that as of September 21, 2009 he was the least senior employee in the Warehouse Department. (Ex. E to Rule 11 Mot., Plaintiff's July 6, 2011 Deposition ("Pl. Dep."), 209:20-211:2.) As such, his claim that "his temporary lay-off did not conform to the provisions of the collective bargaining agreement" is without merit. (Dkt.1, Cmpl. ¶8.)

Also flawed is Plaintiff's claim that ABC "did not have a lack of work" in September 2009 because "during the one year period after the effective date of Potts' [sic] temporary layoff, [ABC] hired new employees to handle jobs for which Potts was qualified" [and] "[e]ach of those new hires had less plant-wide seniority than did Potts." (Dkt. 1, Cmpl. ¶ 7.) This claim is both immaterial and false. Plant-wide seniority does not govern temporary layoffs, as clearly stated in Article 14 Section 1 of the CBA, classification seniority does. Moreover, Plaintiff admitted under oath (1) that as of September 2010 he remained the least senior employee in his classification and (2) when asked to identify any employee with less classification seniority than Plaintiff but who was hired into the Warehouse Department after his September 21, 2009 temporary layoff, Plaintiff could not identify a single individual.[1] (Ex. E to Rule 11 Mot., Pl. Dep., 194:13-196:21; 209:20-211:2; 210:7-211:21; 220:21-221:16.)

### B. ABC Offered Plaintiff The Opportunity To "Bump By Seniority" Into A Merchandising Position, But Plaintiff Failed To Respond To ABC's Offer

Plaintiff's claim that "[ABC] failed and refused to afford Potts his contractual rights to avoid being placed on permanent lay-off by exercising his plant-wide seniority to return to work for [ABC]" is also without merit. (Dkt. 1, Cmpl. ¶ 8.) No less than four times, ABC offered Plaintiff the opportunity to "bump by seniority" into a Merchandising position based on his plant-wide seniority. Plaintiff admitted under oath that he received ABC's offer and failed to act on it.

Specifically, during a September 14, 2010 grievance meeting, ABC offered Plaintiff a Merchandising position. (Ex. A to Rule 11 Mot., Sept. 14, 2010 grievance meeting notes.) ABC reduced this offer to writing on September 30, 2010, stating that effective October 15, 2010 it would convert Plaintiff's temporary layoff into a permanent layoff to allow him the opportunity to exercise his contractual rights to "bump by seniority" into the Merchandising Department. (Ex. B to Rule 11

---

[1]    In fact, the evidence establishes that the only new hires were for Merchandising positions. Given that Plaintiff also admitted under oath that ABC offered him the opportunity to bump one of these individuals and assume a Merchandising position (see infra Section B), his claim is immaterial for this reason as well.



Mot., September 30, 2010 Correspondence.) ABC requested that Plaintiff respond to this offer in writing within 15 working days, and after not receiving a response from Plaintiff ABC extended this deadline by approximately two months. *Id.* Despite acknowledging receipt of ABC's offer, Plaintiff never communicated his intentions to ABC concerning whether he planned to exercise his bumping rights to move into a new position. (Ex. E to Rule 11 Mot., 197:11-192:2; 228:8-229:14; Ex. F to Rule 11 Mot., October 15, 2010 Correspondence; Ex. C to Rule 11 Mot., October 2, 2010 Correspondence.) Only after Plaintiff failed to respond to ABC's offer despite having three months to consider it, did ABC terminate his employment effective December 1, 2010 in accordance with Article XIV, Section 7, paragraph D of the CBA. (Ex. I to Rule 11 Mot., December 13, 2010 Correspondence.)

Notably, with regard to Plaintiff's failure to respond, the Court stated during the February 5, 2013 Case Management Conference:

> If the plant and the company and the union negotiated a process for a return by the plaintiff to his employment, giving him a right to bump plant-wide back into his old job or to a job period, what are we here about?
>
> . . .
>
> With all due respect, sir, if it becomes readily apparent that there was a process in place to allow the plaintiff to return to his employment in some capacity, it's pretty hard to argue or it will be very difficult to argue the union in some way, shape or form didn't meet its obligation to fairly represent the plaintiff. What is the goal here? The goal would be for any union to try to afford a process for the employee to keep his job. If they did that, and the plaintiff chose, for whatever reason not to avail himself of that, one can be -- it would be very hard pressed to say that the union didn't do their job.
>
> . . .
>
> If, in fact, plaintiff acknowledges his knowledge of that offer and the company has agreed to it, acceded to it, then that puts the case in a very challenging position for the plaintiff. And I would strongly encourage you, sir, because the costs of all this litigation, if it becomes patently clear that this case is -- the merits of the case are not what they should be, then obviously, I will have two defendants here clamoring for costs and maybe fees, so someone better take a careful look.

(Dkt. 24, 17:22-25, 19:22-20:8, 20:19-21:2.)

## II.  Plaintiff Released/Withdrew the Grievances Forming The Basis Of His Claims

Irrespective of the above facts, Plaintiff's claims are barred because he cannot establish that he exhausted the applicable grievance procedure with respect to the grievances forming the basis for

THIS LETTERHEAD IS PRINTED ON RECYCLED STOCK ♻


his claims. Plaintiff expressly relies on Grievance numbers 11823 and 11824 to support his claims. He cannot do so. As to Grievance 11824, the Settlement Agreement that Plaintiff executed in Case No. 4:11-cv-00149-KSM, unambiguously provides that the only grievances that survive are Grievance Nos. 11823 and 4956. As such, Grievance 11824 is a nullity.

As to Grievance 11823, Plaintiff withdrew this grievance. Indeed, in correspondence dated October 2 and 6, 2010 to the Union, Plaintiff requested that the Union withdraw this grievance, and the Union confirmed the withdrawal of this grievance in correspondence dated October 12, 2010. (Exs. C & D to Rule 11 Mot., October 2, 2010, October 6, 2010, and October 12, 2010 Correspondence.) Moreover, Plaintiff admitted under oath that he withdrew this grievance. (Ex. E to Rule 11 Mot., 196:22-198:1; 225:2-226:10; 230:13-22; 233:8-9.) As such, Grievance No. 11823 is also a nullity.

In sum, by virtue of Plaintiff's own conduct, he has no active grievances upon which he can pursue his §301 claim and therefore the claim is barred by his failure to exhaust the grievance procedure. *Delcostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163 (1983); *Winston v. General Drivers, Warehousemen & Helpers, Local 89*, 93 F.3d 251, 255 (6th Cir. 1996); *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983) ("It is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedures in a collective bargaining agreement prior to bringing a §301(a) suit against the employer."); *Aaron v. Ford Motor Company*, 2011 WL 2149419, *2 (N.D. Ohio) (*citing Wiggins v. Chrysler Corp.*, 728 F. Supp. 463, 466 (N.D. Ohio, 1989)).

### III.    Plaintiff's Claims Are Time Barred

Even setting aside the above facts, Plaintiff's claims are without merit for the simple fact that his claims are time barred. The statute of limitations for hybrid §301 claims is six months. It is well settled that the statute begins to run when an employee knew or should of known of the alleged acts given rise to the cause of action. *Garrish v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*, 417 F.3d 590, 594 (6th Cir. 2005).

Here, Plaintiff asserts that the Union breached its duty of fair representation by failing to process his grievances and by only processing grievances for "politically favored individuals." (Dkt. 1, Cmpl. ¶11.) According to his own allegations, Plaintiff knew of this alleged conduct as early as February 2012 - eight months before he filed his Complaint. (Dkt. 1, Cmpl. ¶11.)

However, Plaintiff's own admissions and conduct reveal that he actually knew of the alleged conduct long before this. On October 22, 2010, Plaintiff wrote to the Union accusing the Union of "failing to act solely in the interest of the grievant, and refusing to protect my interest in all dealings with my Employer by way of refusing to process my grievance #11824 . . .." (Ex. H to Rule 11 Mot., October 22, 2010 Correspondence.) Plaintiff also testified under oath that he knew as of November 17, 2010 that the Union had allegedly ceased acting on his behalf. (Ex. E to Rule 11 Mot., Pl. Dep. 243, 249-250.) Furthermore, on May 7, 2011, Plaintiff filed a charge with the

THIS LETTERHEAD IS PRINTED ON RECYCLED STOCK



National Labor Relations Board in which he signed a Declaration asserting, among other things, that the Union had allegedly "failed to represent him." (Ex. J to Rule 11 Mot., Pl. NLRB Charge.) Given these facts, Plaintiff had until either May 2011 or, at the latest, October 2011, to file his action. As he did not file the Complaint until October 26, 2012, his claims are time barred.

### Rule 11 Standard

Rule 11 provides, in relevant part:

(b)     Representation to the Court.  By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -

(1)     it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claim, defenses, and other legal contention therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)     the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)     the denials of factual contentions are warranted on the evidence or, if specifically, so identified, are reasonably based on a lack of information or belief.

As set forth in detail, it is clear that you failed to do a proper factual investigation prior to filing Plaintiff's Complaint.  On February 5, 2013, we advised you of this.  Now there can be no question that you are aware of these facts.  A refusal to dismiss these meritless, factually unsupported claims in light of Plaintiff's own admissions and the undisputed facts would only serve to intensify this sanctionable conduct.

THIS LETTERHEAD IS PRINTED ON RECYCLED STOCK



If you would like to meet to discuss the content of this letter, we are willing to do so; however, if you do not dismiss Plaintiff's claims before the end of the "safe harbor" period, we may file the attached Motion for Sanctions against both Plaintiff and your firm and seek any and all remedies available under Rule 11 (or other available statutory vehicles).

Regards,

SEYFARTH SHAW LLP

Cintra B. McArdle

Cc: George H. Faulkner

Enclosures

THIS LETTERHEAD IS PRINTED ON RECYCLED STOCK

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

## CERTIFIED MAIL



7001 0360 0004 7657 5771

7001 0360 0004 7657 5771



U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

OFFICIAL USE

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Postmark
Here

Sent To

Street, Apt. No;
or PO Box No.

City, State, ZIP+4

PS Form 3800, January 2001          See Reverse for Instructions

From: (312) 460-5000
Cintra B. McArdle
Seyfarth Shaw
131 S Dearborn

Chicago, IL 60603

Origin ID: CHIA




Express

J13111302120326

Ship Date: 22APR13
ActWgt: 6.0 LB
CAD: 103419637/INET3370

Delivery Address Bar Code



**SHIP TO:** (312) 460-6478      **BILL SENDER**

**David L. Engler**

**839 Southwest Run**

**YOUNGSTOWN, OH 44514**

Ref # 58041-000069
Invoice #
PO #
Dept #

**TUE - 23 APR 3:00P**
**STANDARD OVERNIGHT**

TRK# **7995 7957 5210**
0201

**44514**
OH-US
**PIT**



**XH YNGA**



518G1/64BE/93AB



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

| | |
|---|---|
| ROBERT POTTS, | ) |
| | ) |
| Plaintiff, | ) Case No. 5:12-cv-02688-JRA |
| | ) |
| v. | ) Judge John R. Adams |
| | ) |
| AMERICAN BOTTLING COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' JOINT MOTION FOR SANCTIONS UNDER RULE 11

Defendants The American Bottling Company ("ABC") and Teamsters Local No. 377

("the Union" or "Local 377"), pursuant to Rule 11 of the Federal Rules of Civil Procedure,

respectfully move this Court to impose sanctions against Plaintiff and his attorney, David Engler,

for asserting claims without a factual and legal basis. In support of this Motion, ABC and the

Union state as follows:

### FACTUAL BACKGROUND

1.      ABC employed Plaintiff Robert Potts as a Warehouse Loader at its Youngstown,

Ohio facility from July 2007 through December 2010.

2.      Plaintiff was a member of the Union, and therefore his employment at ABC was

governed, in part, by a collective bargaining agreement (the "CBA").

3.      Article 14, Section 1 of the CBA provides that, "in the event of temporary layoffs

classification seniority shall prevail." Classification seniority refers to the department in which

an employee worked, such as warehouse, delivery, merchandising. An employee on temporary

layoff did not lose his or her seniority until after a period of one year from the date of the

temporary layoff. (Dkt. 1, Cmpl. Ex. 4 & 5, Art. 14, Sec. 13.) Only in the event of a permanent

layoff does plant-wide seniority govern. (Dkt. 1, Cmpl. Ex. 4 & 5, Art. 14, Sec. 1.)

4.      On September 21, 2009, ABC placed Plaintiff on a temporary layoff due to a lack of work. (Dkt. 1, Cmpl. ¶5.)

5.      On August 30, 2010, Plaintiff filed Grievance No. 11823, claiming back wages owed as a result of an alleged improper temporary layoff. (Dkt. 1, Cmpl. Ex. 7.)

6.      During a September 14, 2010 grievance meeting, ABC offered Plaintiff a Merchandising position. (Ex. A, Sept. 14, 2010 grievance meeting notes.)

7.      On September 21, 2010, Plaintiff filed Grievance No. 11824 claiming ABC terminated his seniority without cause and wrongfully discharged him. (Dkt. 1, Cmpl. Ex. 8.)

8.      On September 30, 2010, ABC made its employment offer to Plaintiff in writing. Specifically, ABC offered to convert Plaintiff's temporary layoff into a permanent layoff effective October 15, 2010 and give Plaintiff the opportunity to exercise his contractual rights to "bump by seniority" based on his plant-wide seniority. (Ex. B, ABC's Sept. 30, 2010 Correspondence.) In the offer letter, ABC stated that based on seniority the position would be a Merchandiser position. (*Id.*) ABC's offer letter required Plaintiff to respond, in writing, within 15 working days whether he intended to accept the offer. (*Id.*)

9.      On October 2 and 6, 2010, Plaintiff wrote to Local 377 and requested that the Union withdraw Grievance No. 11823. (Ex. C, Oct. 2 and 6, 2010 Correspondence.) In his October 2, 2010 correspondence, Plaintiff also stated: "This serves to advise that I am in receipt of the Company's letter date 9/30/2010, mailed via USPS Certified Mail #7002-0510-000-7491-2152, postmarked October 1, 2010." (*Id.*)

10.     On October 12, 2010, Local 377 confirmed in writing that Grievance No. 11823 had been withdrawn. (Ex. D, Oct. 12, 2010 Correspondence.)

2

11.     On October 15, 2010, Plaintiff wrote to ABC, but did not state his intention, one way or another, concerning the Merchandising position. (Ex. E, Plaintiff's July 6, 2011 Deposition (Pl. Dep.), 228:8-229:14; Ex. F, Oct. 15, 2010 correspondence).

12.     As of October 21, 2010, ABC had still not received an answer from Plaintiff concerning its employment offer (15 working days after ABC's September 30, 2010 correspondence). Therefore, ABC extended Plaintiff's deadline to respond to the offer. (Ex. G, Nov. 10, 2010 correspondence). However, ABC still received no response from Plaintiff concerning the offer.

13.     On October 22, 2010, Plaintiff wrote to the Union accusing the Union of "failing to act solely in the interest of the grievant, and refusing to protect my interest in all dealings with my Employer by way of refusing to process my grievance #11824 . . .." (Ex. H, October 22, 2010 Correspondence.)

14.     Accordingly, effective December 1, 2010, ABC terminated Plaintiff's employment pursuant to Article 14, Section 7, point D of the CBA, which provides:

> Any employee shall lose his seniority (terminated from employment):
>
> . . .
>
> D. If he fails to return to work within three (3) days after notice from the Company to return unless circumstances beyond his control prevent him from notifying the Company within three (3) days. Such notice shall be made by registered letter.

(Ex. I, Dec. 13, 2010 correspondence; Ex. 4 & 5.)

15.     During his deposition in Case No. 4:11-cv-00149-KSM, Plaintiff testified that:

- He could not identify a single employee having less seniority than he did and who was hired into the Warehouse Department during Plaintiff's temporary layoff, and conceded that, as of September 14, 2010, he remained the least seniority in the Warehouse Department. (Ex. E, Pl. Dep., 194:13-196:21; 209:20-211:21; 220:21-221:16.)

3

- He had received ABC's September 30, 2010 offer letter and never responded to ABC's offer, even though he *did* correspond with ABC after receiving the offer letter. (Ex. E, Pl. Dep. 197:11-198:1; 228:8-229:14.)

- He withdrew Grievance No. 11823. (Ex. E, Pl. Dep. 196:22-198:1; 225:2-226:10; 230:13-22; 233:8-9.)

- He knew as of November 17, 2010 that the Union had allegedly ceased acting on his behalf. (Ex. E, Pl. Dep. 243, 249-250.)

16.     On May 7, 2011, Plaintiff filed a charge with the National Labor Relations Board in which he signed a Declaration asserting, among other things, that the Union had allegedly "failed to represent him." (Ex. J, Pl. NLRB Charge.)

17.     On or about October 26, 2011, Plaintiff and ABC entered into a settlement agreement for Case No. 4:11-cv-00149-KSM, whereby Potts released all claims that he had or may have had against ABC, subject to certain specific and delineated exceptions. Specifically, only Grievances 11823 and 4956 were excluded from the release. (Dkt. 20, Settlement Agreement.) Therefore, all other grievances, including Grievance No. 11824, were waived and released by the settlement agreement.

18.     Despite the above evidence, Plaintiff (through his counsel Mr. Engler) filed the present action under 29 U.S.C. §185, alleging that ABC breached the CBA by failing to provide Plaintiff with his contractual rights to exercise his plant-wide seniority, that Plaintiff was improperly subjected to a temporary layoff and permanent layoff, and that the Union breached its duty to fairly represent him. Plaintiff bases his claims on Grievance Nos. 11823 and 11824. Plaintiff voluntarily withdrew Grievance No. 11823 and voluntarily settled Grievance No. 11824.

19.     On February 5, 2013, ABC's counsel advised Mr. Engler that Plaintiff's claims lacked a proper factual and legal basis. Further, on April 22, 2013, ABC's and the Union's counsel sent Mr. Engler letters pursuant to Rule 11 and included a copy of this joint Motion.

4

(Exs. K & L, April 22, 2013 Correspondence from C. McArdle and G. Faulkner, respectively.)

Despite counsel's receipt of this Motion, Plaintiff did not file a motion to dismiss his claims

within the requisite twenty-one days.

## ARGUMENT

20.     This Court has jurisdiction to impose sanctions under Fed. R. Civ. P. 11 against

Plaintiff and his counsel. Rule 11 provides, in relevant part:

(a)     Representations to the Court. By presenting to the court (whether by signing,
        filing, submitting, or later advocating) a petition, pleading, written motion, or
        other paper, an attorney or unrepresented party is certifying that to the best of the
        person's knowledge, information, and belief, formed after an inquiry reasonable
        under the circumstances, -

    (1) it is not being presented for any improper purpose, such as to harass or to
        cause unnecessary delay or needless increase in the cost of litigation;

    (2) the claims, defenses, and other legal contentions therein are warranted by
        existing law or by a nonfrivolous argument for the extension, modification, or
        reversal of existing law or the establishment of new law;

    (3) the allegations and other factual contentions have evidentiary support or, if
        specifically so identified, are likely to have evidentiary support after a
        reasonable opportunity for further investigation or discovery; and

    (4) the denials of factual contentions are warranted on the evidence or, if
        specifically so identified, are reasonably based on a lack of information or
        belief.

21.     Rule 11 requires that an attorney certify to the best of his or her "knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances . . . [that] the

factual contentions have evidentiary support or, if specifically so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery." FED.

R. CIV. P. 11(b).

22.     In the Sixth Circuit, the test for imposing Rule 11 sanctions is whether the

individual's conduct was reasonable under the circumstances. *Apostolic Pentecostal Church v.*

5

*Colbert*, 169 F.3d 409, 417 (6th Cir. 1999). Not only does Rule 11 measure what was reasonable conduct at the time of pleading, it imposes a "continuing responsibility to review and reevaluate . . . pleadings and where appropriate modify them to conform to Rule 11." *Merritt v. International Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (citing *Runfola & Assoc., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 374 (6th Cir. 1996)).

23.     Sanctions imposed under Rule 11 are intended to be an integral aspect of the judicial process, and the Sixth Circuit has shown no reluctance to impose them where counsel failed to properly investigate the factual basis of a client's claims after a reasonable opportunity to do so. *See Merritt*, 613 F.3d at 626; *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 835 (6th Cir. 2005); *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 960 (6th Cir. 1990) (in affirming award of sanctions, noting, "[a] reasonable pre-filing inquiry would have revealed these facts to plaintiff's counsel.").

24.     In this lawsuit, Plaintiff claims that ABC hired new employees with "less plant-wide seniority" (Dkt. 1, Cmpl. ¶ 7), but plant-wide seniority does not govern temporary layoffs, as plainly stated in Article 14 Section 1 of CBA. (Dkt. 1, Exs. 4&5). Further, even after engaging in discovery through the prior lawsuit (which concerned the same common facts), Plaintiff could not identify any employees with less seniority (either classification or plant-wide seniority) who were placed into the Warehouse Loader position during his temporary layoff. (Ex. E, Pl. Dep., 194:13-196:21; 209:20-211:21; 220:21-221:16). Plaintiff conceded that even as of September 14, 2010, he had the least seniority in the Warehouse Department. (Ex. E, Pl. Dep., 209:20-211:2). Plaintiff has no legitimate factual basis to assert that his temporary layoff was improper.

25.     Plaintiff further claims that "[ABC] failed an refused to afford Potts his contractual rights to avoid being placed on permanent lay-off by exercising his plant-wide seniority." (Dkt. 1, Cmpl. ¶ 8). This allegation also has no basis in fact. It is undisputed that ABC offered Plaintiff the opportunity to use his plant-wide seniority to "bump" into a Merchandiser position , and that Plaintiff received ABC's offer and did not act upon it.

26.     Even so, there is no active grievance supporting his claim under 29 U.S.C. §185. As to Grievance 11824, the Settlement Agreement that Plaintiff executed in Case No. 4:11-cv-00149-KSM, unambiguously provides that the only grievances that survive are Grievance Nos. 11823 and 4956. As such, Grievance 11824 is a nullity.

27.     As to Grievance 11823, Plaintiff withdrew this grievance. Indeed, in correspondence dated October 2 and 6, 2010 to the Union, Plaintiff requested that the Union withdraw this grievance, and the Union confirmed the withdrawal of this grievance in correspondence dated October 12, 2010. (Ex. C, October 2, 2010, October 6, 2010, and October 12, 2010 Correspondence.) Moreover, Plaintiff admitted under oath that he withdrew this grievance. (Ex. E, Pl. Dep., 196:22-198:1; 225:2-226:10; 230:13-22; 233:8-9). As such, Grievance No. 11823 is also a nullity.

28.     In sum, by virtue of Plaintiff's own conduct, he has no active grievances upon which he can pursue his §301 claim and therefore the claim is barred by his failure to exhaust the grievance procedure. *Delcostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163 (1983); *Winston v. General Drivers, Warehousemen & Helpers, Local 89*, 93 F.3d 251, 255 (6th Cir. 1996); *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983) ("It is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedures in a collective bargaining agreement prior to bringing a §301(a) suit against the employer."); *Aaron*

7

*v. Ford Motor Company*, 2011 WL 2149419, *2 (N.D. Ohio) (*citing Wiggins v. Chrysler Corp.*, 728 F. Supp. 463, 466 (N.D. Ohio, 1989)).

29.    Even setting aside the above facts, Plaintiff's claims are without merit for the simple fact that his claims are time barred. The statute of limitations for hybrid §301 claims is six months. It is well settled that the statute begins to run when an employee knew or should of known of the alleged acts given rise to the cause of action. *Garrish v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*, 417 F.3d 590, 594 (6th Cir. 2005).

30.    Here, Plaintiff asserts that the Union breached its duty of fair representation by failing to process his grievances and by only processing grievances for "politically favored individuals." (Dkt. 1, Cmpl. ¶11.) According to his own allegations, Plaintiff knew of this alleged conduct as early as February 2012 - eight months before he filed his Complaint. (Dkt. 1, Cmpl. ¶11.)

31.    However, Plaintiff's own admissions and conduct reveal that he actually knew of the alleged conduct long before this. On October 22, 2010, Plaintiff wrote to the Union accusing the Union of "failing to act solely in the interest of the grievant, and refusing to protect my interest in all dealings with my Employer by way of refusing to process my grievance #11824 . . .." (Ex. H, October 22, 2010 Correspondence.) Plaintiff also testified under oath that he knew as of November 17, 2010 that the Union had allegedly ceased acting on his behalf. (Ex. E, Pl. Dep., 243, 249-250.) Furthermore, on May 7, 2011, Plaintiff filed a charge with the National Labor Relations Board in which he signed a Declaration asserting, among other things, that the Union had allegedly "failed to represent him." (Ex. J, NLRB Charge.) Given these facts, Plaintiff had

8

until either May 2011 or, at the latest, October 2011, to file his action. As he did not file the Complaint until October 26, 2012, his claims are time barred.

32.     As evidenced herein, by maintaining his claims, Plaintiff and Plaintiff's counsel failed to comply with standards of legal practice in this Circuit, and thus sanctions are appropriate under Rule 11.

33.     After having made more than one unsuccessful attempt to persuade Plaintiff's counsel to voluntarily dismiss Plaintiff's claims, ABC and Local 377 jointly request that the Court impose sanctions against Plaintiff and Plaintiff's counsel pursuant to Fed. R. Civ. P. 11(c), including, but not limited to, dismissal of the Complaint. Defendants further requests that those sanctions include an award of reasonable costs and attorneys' fees associated with its efforts to resolve this without court intervention and the preparation of this motion.

WHEREFORE, Defendants The American Bottling Company and Teamsters Local 377 respectfully request that this Court impose sanctions against David L. Engler and Plaintiff for maintaining the claims in Plaintiff's Complaint, that Plaintiff's claims be dismissed in their entirety, that Defendants be awarded reasonable costs and attorneys' fees, and any other relief that the Court deems appropriate.

**DATED: May 13, 2013**                    Respectfully submitted,

                                   AMERICAN BOTTLING COMPANY


                                   By____s/ Cintra B. McArdle_____
                                           One of Its Attorneys

TEAMSTERS LOCAL NO. 377

By  s/ George H. Faulkner
    One of Its Attorneys

Richard P. McArdle (admitted pro hac vice)
Cintra B. McArdle (admitted pro hac vice)
SEYFARTH SHAW LLP
131 South Dearborn Street - Suite 2400
Chicago, Illinois 60603
rmcardle@seyfarth.com
cmcardle@seyfarth.com

Joel R. Hlavaty
Frantz Ward
2500 Key Center
127 Public Square
Cleveland, OH 44114
(216) 515-1660
jhlavaty@frantzward.com

George H. Faulkner (0031582)
Joseph C. Hoffman, Jr. (0056060)
Joseph D. Mando (0082835)
Faulkner, Hoffman & Phillips, LLC
20445 Emerald Parkway, Suite 210
Cleveland, Ohio 44135
Faulkner@fhplaw.com
Hoffman@fhplaw.com
Mando@fhplaw.com

10



EXHIBIT A

# ROBERT POTTS

4143 Jeanette Drive
Warren, Ohio 44484
(330) 856-6103

September 14, 2010

TEAMSTERS LOCAL 377
*Attn: Justin Averell*
1223 Teamster Drive
Youngstown, Ohio 44502

### RE:     *Grievance # 11823*
### *POSITION STATEMENT OF GRIEVANT*

My position is indicated hereunder:

The Company did not apply plant wide seniority for purpose of permanent lay-off.

<u>ISSUE</u>

My name is not last on the plant wide seniority list.

Respectfully submitted,

Robert Potts


EXHIBIT
34

9/14/10

Y-town grievance meeting

MB          John L
Bell Stimel   Justin A
John Teraly   Roberts Potts


Potts provides position statement

? of Merch job
          - offer verbal
          - attacking permanent
            layoff language

ABC 000259



EXHIBIT B



**To:**   Robert Potts (via certified mail)

**CC:**   Teamsters Local 377; William Stimmel, Branch Manager; John Taraba,
Distribution Supervisor (all via email)

**From:**   Mike Bobal, Associate HR Manager

**Date:**   9/30/10

**Re:**   Grievance #11823 Unjust Involuntary Layoff



EXHIBIT
33

A grievance was received claiming the Company violated Articles 14, 10, 9, 8, 7, 2 of the contract by involuntarily laying off the grievant.

A meeting was held at the Union Hall on 9/14 to discuss this matter. Present for this meeting for the Union was John Lesicko, Justin Averell, and Robert Potts (grievant). Present for the Company were William Stimmel, John Taraba and Mike Bobal.

The Company points out that the grievant was properly laid-off effective 9/21/09 as he was the least senior person in the department that was over-staffed. Specifically, that though Article 14 section 1 points out that <u>permanent layoffs</u> need to follow plant-wide seniority, Article 14, Section 1 also clearly states "<u>in the event of temporary layoffs classification seniority shall prevail.</u>" As this was, at the time, a temporary layoff and he had the least seniority, there was no contractual violation.

The process of laying off the grievant was the same method used to temporarily lay off the grievant both on 1/14/08 & 1/12/09. In both of those cases, the grievant was recalled to employment (3/31/08 & 6/8/09, respectively). None of the three layoff letters indicated he was being permanently laid-off. Each letter indicated that the layoff was for an undetermined length of time. The difference is that unlike 2008 and 2009, business needs did not pick-up enough to require a recall to work.

The Company acknowledges that with nearly a year now passing, the situation may result in a loss of seniority. To avoid this possibility (and in consideration of the fact that it has been over a year), the Company is willing to now consider this a "permanent layoff," effective 10/15/10. This will allow the grievant the opportunity to exercise his contractual rights to "bump by seniority and classifications until the least senior employee is displaced" (per Article 14, Section 1). This would, most logically be a Merchandiser position.

Should the grievant wish to pursue this course of action he needs to contact the Company <u>in writing</u> expressing the desire within the 15 working day period that this grievance answer is up for review. His letter should also contain a good phone number in order to be reached. He would then be contacted by a member of the Corporate Talent/ Recruitment team by phone so the driving record can be checked/ reviewed and proof of auto insurance obtained (qualifications).

If the grievant declines this opportunity, then the Company will deal with the grievant's time away from work and possible loss of seniority.

Therefore <u>this grievance is denied.</u>

One last item: The Company and Union Representatives have agreed to hold Grievance #11824 in abeyance until Grievance #11823 is closed. The grievant (same in both items) has **NOT** been terminated by the Employer at this point and no paperwork stating that he has been termed from employment has been sent out. Once Grievance #11823 is finalized, all parties could move onto this new grievance if it is necessary.



EXHIBIT C

# *Robert Potts*

4143 Jeanette Drive
Warren, Ohio 44484
(330) 856-6103

October 2, 2010



TEAMSTERS LOCAL 377
*Attn: JUSTIN AVERELL*
1223 Teamster Drive
Youngstown, Ohio 44502

Dear Justin:

This serves to advise that I am in receipt of the Company's letter dated 9/30/2010, mailed via USPS Certified Mail # 7002-0510-0000-7491-2152, postmarked 10/1/2010.

To begin, I hereby reiterate/assert that grievance # 11823 is only a wage claim.

Next, as evidenced, the Company's letter is dated 9/30/2010, and over a year has lapsed in time. The loss of my seniority/discharge already occurred about (10) ten days ago on 9/21/2010; defer to (CBA) Article 14, section (10) and Article 7, section (1).

Moreover, on 9/21/2010, I already had dialogue with both John Taraba and Bill Stimmel by way of my personal appearance at 1142 North Meridian Road, Youngstown, Ohio location, as I signed-in on the Company's sign-in record/log, and presented/submitted my grievance # 11824. I indicate that no union representative/steward was available at the time; defer to the Company's log or sign-in/record or "sheet" at its front door. I now herein request that my timely grievance # 11824 be processed at this time-regarding my improper layoff, discharge or loss of entitled seniority. I'm ready for our discussion.

Despite the above, at all times relevant, I assert that I was improperly laid-off in violation of the labor contract (s); defer to Company payroll records; and also at all times relevant I was not the least senior person in classification/department at any incident.

With that said, any issue regarding my lay-off (s) has never been remedied because of the past internal union matters regarding the suspension of Teamster Local 377 officials and the jurisdiction/trusteeship of Charlie Byrnes. The same issues remain at this date.

In closing, the Company's correspondence dated 9/30/2010, recorded as served via USPS Certified Mail, is pertinent evidence of my loss of seniority, termination, or discharge on 9/21/2010. I suggest we withdraw grievance # 11823, so that we may focus on and duly process my grievances (# 11824 and # 7680) at this time, as I believe the Company's letter dated 9/30/2010 was not in good faith, and is an example of fraud.

Sincerely,

Robert Potts


EXHIBIT
36

*Robert Potts*

4143 JEANETTE DRIVE
WARREN, OHIO 44484
(330) 856-6103

October 6, 2010

TEAMSTERS LOCAL 377
*Attn: JUSTIN AVERELL*
1223 Teamster Drive
Youngstown, Ohio 44502

### RE:     _Request for Status Update-REPORT_

Dear Justin:

I have assumed that you received and completed your duly review of my correspondence dated 10/2/2010 and 10/4/2010 in preservation of my right to the protection of the contract. I am available for any discussion.

As such, at this time, I hereby respectfully make request for a status update regarding the following identified/itemized grievances:

1.    *Grievance # 11823, date WITHDRAWN per my request/DISPOSITION;*

2.    *Grievance # 11824, ACTIVITY/STATUS UPDATE;*

3.    *Grievance # 7680, ACTIVITY/STATUS UPDATE;*

4.    *"NEW" Grievance, as requested-that you prepare, sign, and file on my behalf;*

5.    *ANY OTHER GRIEVANCE, filed on my behalf/STATUS UPDATE.*

In closing, thank you in advance for any duly assistance and *TEAMSTER REPRESENTATION* in this matter, as I await your informative status/report or update.

Sincerely,

Robert Potts





EXHIBIT D



# Chauffeurs, Teamsters, Warehousemen & Helpers
## Local Union No. 377

AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

**JOHN J. ANGELO MEMORIAL HALL**
PHONE: 330-743-3111 OR 1-800-783-6320   1223 TEAMSTERS DR.   YOUNGSTOWN, OHIO 44502-1348
FAX: 330-743-1821

**JOHN LESICKO**
*Secretary-Treasurer*
*Principal Officer*

**SAM PROSSER**
*President*

**KEVIN KOUBECK**
*Vice President*

**MELODY CAMPBELL**
*Recording Secretary*

**ROBERT BONHOFF**
*Trustee*

**DANIEL NODAY**
*Trustee*

**DARRELL ZEH**
*Trustee*

**JUSTIN AVERELL**
*Business Representative*

**GERALD SANDERS**
*Business Representative*

October 12, 2010

Mr. Robert Potts
4143 Jeanette Drive
Warren, OH 44484

Dear Robert,

I am in receipt of your correspondence regarding grievance # 11823, 11824, 7680 and the request of a new grievance to be filed on your behalf covering all differences between yourself and the Employer.

Also, per your request dated October 5, 2010, I will withdraw grievance # 11823 without prejudice and file the new grievance on or about October 13, 2010, at which time I will also request a meeting to bring all parties to the table to remedy contractual violations.

Fraternally yours,

Justin Averell
*ms*

Justin Averell
Business Representative
Teamsters Local No. 377

Certified Mail:  7010 0290 0003 6116 9733

095008



EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

ROBERT A. POTTS,

    Plaintiff,

    vs.            Case No. 4:11-CV-00149-KSM

AMERICAN BOTTLING CO., dba 7-UP,

aka DR. PEPPER SNAPPLE GROUP,

aka DR. PEPPER/SEVEN UP, INC.,

fka CADBURY SCHWEPPES

BOTTLING GROUP, INC.,

    Defendant.

- - - - -

DEPOSITION OF ROBERT A. POTTS

Taken on Wednesday, July 6, 2011, at 9:15 a.m.

At the offices of:

Baker Hostetler

3200 PNC Center

1900 East 9th Street

Cleveland, Ohio   44114

Before Steven H. Henschel, a Registered Professional Reporter

in and for the State of Ohio

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

# DEPOSITION OF ROBERT A. POTTS

1    APPEARANCES:
2    .
3    On behalf of the Plaintiff:
4        Guarnieri and Secrest, P.L.L., by
5        MICHAEL D. ROSSI, ESQ.
6        151 East Market Street
7        P.O. Box 4270
8        Warren, Ohio  44482
9        (330)393-1584
10       mrossi@gsfirm.com
11   On behalf of the Defendant:
12       Seyfarth Shaw, LLP, by
13       CINTRA BENTLEY MCARDLE, ESQ.
14       131 South Dearborn Street
15       Suite 2400
16       Chicago, Illinois  60603
17       (312)460-5000
18       cmcardle@seyfarth.com
19             ----
20   .
21   .
22   .
23   .
24   .
25   .

1        ROBERT A. POTTS, of lawful age,
2    called for examination, as provided by
3    the Federal Rules of Civil Procedure,
4    being by me first duly sworn, as
5    hereinafter certified, deposed and said
6    as follows:
7        EXAMINATION OF ROBERT A. POTTS
8    BY-MS.MCARDLE:
9        Q.  Good morning, Mr. Potts.  My
10   name is Cintra McArdle, we met just a
11   few minutes ago out on the lobby.  I'm
12   here today to take your deposition in a
13   case being filed against the American
14   Bottling Company, do you understand
15   that?
16       A.  Yes.
17       Q.  And I represent the
18   defendant, the American Bottling
19   Company, which I will refer to
20   interchangeably as ABC, DPSG or the
21   company, is that okay with you?
22       A.  Sure.
23       Q.  So if I use DPSG or the
24   company you'll understand that I mean
25   the American Bottling Company?

1        A.  Sure.
2        Q.  Today we're going to be
3    asking you a series of questions about
4    the claims that you filed relating to
5    your employment with ABC, the layoffs
6    that you incurred and your subsequent
7    termination of employment, okay?
8        A.  Yes.
9        Q.  Please state your full name.
10       A.  Robert A. Potts.
11       Q.  What does the A stand for?
12       A.  Anthony.
13       Q.  Have you ever gone by any
14   other name?
15       A.  No.
16       Q.  Have you ever had your
17   deposition taken before?
18       A.  No.
19       Q.  Today, since you haven't had
20   your deposition taken before, we'll go
21   over some ground rules which you may
22   have already covered with your attorney
23   but I think it's helpful to do this
24   morning as well.  You have been placed
25   under oath and you understand that means

1    you're to tell the truth under penalty
2    of perjury today, correct?
3        A.  Yes.
4        Q.  Today I'll ask you a series
5    of questions for which you will be
6    providing answers.  Since we have a
7    court reporter, not a videographer, I
8    would request that you wait until my
9    question is complete before giving your
10   answer and I will endeavor to do the
11   same, wait until your answer is complete
12   before I start another question, is that
13   fair?
14       A.  Can you repeat that, please?
15       Q.  Sure.  All I'm saying is
16   let's not step on each other, make sure
17   that I've finished asking my question
18   before you start answering.  I know
19   sometimes people think, oh, I know where
20   this question is going so they start
21   answering.  And I'll do the same, I'll
22   wait until you finish your answer until
23   I ask another question, is that fair?
24       A.  Fair enough.
25       Q.  Also, we don't have a

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

1 videographer, as I said, so the court
2 reporter will need audible responses
3 from you meaning a yes or a no if
4 appropriate to the question, not a shake
5 of the head, that won't be able to be
6 picked up by the court reporter.
7     A. Understood.
8     Q. Today I'm asking for your
9 personal knowledge about facts in this
10 case so I would request that you don't
11 speculate or guess about any
12 information, is that correct fair?
13     A. Fair enough.
14     Q. If you don't understand a
15 question I would like you to please ask
16 me as you just did earlier, but if you
17 don't ask me and you don't ask me to
18 clarify that question I'll assume you've
19 understood it, is that fair?
20     A. Fair.
21     Q. At this point I wanted to
22 ask you, are you on any medications?
23     A. No.
24     Q. Is there any reason you
25 can't answer my questions today?

1     A. I don't understand, what do
2 you mean?
3     Q. Is there anything that would
4 prevent you from providing full and
5 complete answers to my questions today?
6     A. No.
7     Q. What I'd like to do first is
8 introduce some preliminary exhibits and
9 identify them and then we'll start into
10 the line of questioning.
11     A. Sure.
12     - - - - -
13     (Thereupon, Deposition
14     Exhibit-1 was marked for
15     purposes of identification.)
16     - - - - -
17     Q. Handing you what's been
18 marked Deposition Exhibit 1, do you know
19 what this document is?
20     A. Yes.
21     Q. What is it?
22     A. The second amended complaint.
23     Q. This is the second amended
24 complaint that you filed on or about
25 March 1st, 2011 against the American

1 Bottling Company, is that correct?
2     A. Let me review the pages.
3     Q. Sure. Take whatever time
4 you need during the deposition, if I
5 give you a document, to review the
6 document.
7     A. Okay.
8     Q. Now, are you able to answer
9 the question whether this is the second
10 amended complaint that you filed on or
11 about March 1st, 2011 against the
12 American Bottling Company?
13     A. It is.
14     - - - - -
15     (Thereupon, Deposition
16     Exhibit-2 was marked for
17     purposes of identification.)
18     - - - - -
19     Q. I'm handing you what's been
20 marked Deposition Exhibit 2, have you
21 seen these documents before?
22     A. Yes, I have.
23     Q. And do you know what these
24 documents are.
25     A. Yes.

1     Q. What are they?
2     A. Intercorrespondence between
3 my counsel and yourself, and Michelle, I
4 can't pronounce her last name.
5     Q. Anselmo?
6     A. Anselmo.
7     Q. A N S E L M O?
8     A. Yes.
9     Q. Do you have an understanding
10 that these represent what are called
11 initial disclosures in this case,
12 meaning that you've set forth certain
13 individuals that you believe have
14 knowledge concerning your claims in this
15 case?
16     A. Yes.
17     - - - - -
18     (Thereupon, Deposition
19     Exhibit-3 was marked for
20     purposes of identification.)
21     - - - - -
22     Q. Showing you what's been
23 marked Deposition Exhibit 3, do you
24 recognize this document?
25     A. Yes.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 10**

1  Q. What is this document?
2  A. It's an answer to the first
3  set of interrogatories to plaintiff.
4  Q. And did you provide --
5  without telling me the substance of
6  those communications, did you provide
7  certain information to your attorney so
8  that questions from the company could be
9  answered during the course of discovery?
10  A. Yes.
11  Q. And in providing that
12  information, if we could flip to the
13  seventh page from the back, roughly,
14  it's a page that I believe bears your
15  signature?
16  A. Yes.
17  Q. Is that your signature?
18  A. Yes.
19  Q. Pursuant to Federal Rule of
20  Civil Procedure 33 you are required to
21  answer interrogatories served to you by
22  the defendant under oath under penalty
23  of perjury. I notice you have signed
24  pursuant to a notary signature but I'm
25  going to ask you, is the information

**Page 11**

1  that you provided to your attorney and
2  set forth in this document true and
3  accurate under penalty of perjury?
4  A. Yes.
5  - - - - -
6  (Thereupon, Deposition
7  Exhibit-4 was marked for
8  purposes of identification.)
9  - - - - -
10  Q. Handing you what's been
11  marked Deposition Exhibit 4, it's a
12  multiple document exhibit that appear to
13  look the same but you can tell me if I
14  understand this correctly, the first set
15  has some handwritten notes, if you flip
16  through the documents clipped together,
17  if you the flip through them there are
18  some handwritten notes. I think I've
19  clipped mine differently than yours so
20  please look at the second clipped
21  document.
22  A. Two documents clipped
23  together?
24  Q. Correct. And there's some
25  handwritten notes in that second

**Page 12**

1  document?
2  A. Okay.
3  Q. Do you see those?
4  A. Yes.
5  Q. And, again, feel free to
6  flip through the entire document but my
7  question is, are those your handwritten
8  notes?
9  A. They appear to be.
10  Q. And the information that you
11  provided in the handwriting of
12  Deposition Exhibit 4, which are your
13  handwritten notes, that is information
14  designating certain documents as
15  responsive to the American Bottling
16  Company's document request in this case,
17  is that right?
18  A. Repeat that, please.
19  Q. Sure. The handwritten notes
20  that you have set forth in a portion of
21  Deposition Exhibit 4 are your answers to
22  designate certain documents as
23  responsive to the American Bottling
24  Company's document request, is that
25  right?

**Page 13**

1  A. Appears correct.
2  - - - - -
3  (Thereupon, Deposition
4  Exhibit-5 was marked for
5  purposes of identification.)
6  - - - - -
7  Q. Showing you what's been
8  marked Deposition Exhibit 5, have you
9  ever seen this document before?
10  A. I don't think so.
11  Q. Deposition Exhibit 5 appears
12  to be a correspondence from Mike Rossi
13  to myself dated May 3rd, 2007.
14  A. Okay.
15  Q. In it it refers to certain
16  discovery issues that were presented and
17  provides some, what appears to be,
18  information about discovery. My question
19  for you is, on the second page it
20  states, item 7, request number 42,
21  "Plaintiff has not incurred any out of
22  pocket medical expenses not covered by
23  insurance. I'll let you know if and
24  when he does." Is that an accurate
25  statement as of today, this is dated May

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1 3rd, 2011, but as of today have you
2 incurred any out of pocket expenses that
3 are not covered by insurance?
4     **A.** Not at this time.
5    - - - - -
6     (Thereupon, Deposition
7     Exhibit-6 was marked for
8     purposes of identification.)
9    - - - - -
10     **Q.** Showing you what's been
11 marked Deposition Exhibit 6, have you
12 seen this document before?
13     **A.** Yes.
14     **Q.** And this document is
15 correspondence from Mr. Rossi to myself
16 this time dated May 25th, 2011, is that
17 correct?
18     **A.** Say that again, please.
19     **Q.** Sure. Deposition Exhibit 6
20 is correspondence from Mr. Rossi to
21 myself dated May 25th, 2011, is that
22 correct?
23     **A.** That's correct.
24     **Q.** There's an attachment to this
25 correspondence, if you look at the

1 attachment, is that your signature on
2 the lower right-hand portion of the
3 document?
4     **A.** Yes.
5     **Q.** We looked at Deposition
6 Exhibit 4, which were your responses to
7 document requests issued by the American
8 Bottling Company in this case. I'm not
9 going to ask you any specific questions
10 about the document but certainly feel
11 free to pull it out if you'd like to
12 look at it. My question for you is
13 more general, how did you go about
14 searching for documents to provide to
15 your attorney in this case?
16     **A.** Please expand, what do you
17 mean?
18     **Q.** How did you -- I'm assuming
19 you received some information from your
20 attorney. Again, I don't want to know
21 what the conversations were, but in
22 response to those questions or
23 information how did you go about
24 gathering documents to provide them to
25 your attorney for purposes of this case?

1     **A.** Whatever I had in my storage
2 box.
3     **Q.** And that's what I'm getting
4 at. So you had a storage box?
5     **A.** Just like a Kinko style box,
6 bunch of paperwork in it.
7     **Q.** How many storage boxes did
8 you have, just the one?
9     **A.** For this matter.
10     **Q.** Yes. And I am speaking of
11 this matter. So just for this matter
12 you had one storage box?
13     **A.** Yes.
14     **Q.** Where did you keep that
15 storage box?
16     **A.** At the residence.
17     **Q.** Is that your Jeanette
18 Drive --
19     **A.** Correct.
20     **Q.** -- residence? And in that
21 box is it fair to say that you kept
22 copies of documents that you sent to the
23 American Bottling Company in part?
24     **A.** Some.
25     **Q.** And other documents were

1 documents you received from the American
2 Bottling Company, is that correct?
3     **A.** I received some documents,
4 yes.
5     **Q.** So the box contained at
6 least correspondence that you sent to
7 the American Bottling Company and
8 correspondence you received from the
9 American Bottling Company, are there any
10 other categories of documents that
11 existed within that storage box?
12     **A.** Paperwork in general, yes.
13     **Q.** I'm sorry, paperwork in
14 general, yes, I'm not sure what you
15 mean?
16     **A.** Just paperwork in general as
17 documents, referring to documents, the
18 term documents.
19     **Q.** What type of paperwork are
20 you referring to?
21     **A.** Eight and a half by 11 and a
22 half, just papers.
23     **Q.** Did they relate to your
24 employment with the American Bottling
25 Company?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 18**

1 **A.** Yes.
2 **Q.** Did you maintain this storage
3 box because you wanted to keep a record
4 of events that occurred during your
5 employment with the American Bottling
6 Company?
7 **A.** I generally just throw stuff
8 in boxes, if it's needed I got somewhere
9 to look for it.
10 **Q.** How do you determine what
11 you will retain and what you will throw
12 away for purposes of the storage box
13 that related to documents concerning the
14 American Bottling Company?
15 **A.** Based on my opinion.
16 **Q.** And what opinion is that,
17 sir?
18 **A.** If I just decide to keep
19 something I throw it in a box. If not,
20 I don't think it's necessary to keep, I
21 just throw it away, trash.
22 **Q.** So is it fair to say that
23 you made some determination that items
24 that you did not retain were not
25 important or relevant to your employment

**Page 19**

1 at the American Bottling Company?
2 **A.** Say that again, please.
3 **Q.** Sure. Is it fair to say
4 then documents that you chose not to
5 retain and that you chose to throw away
6 as trash were not important to your
7 employment at the American Bottling
8 Company?
9 **A.** You could say that. I kept
10 whatever I thought that I should keep.
11 **Q.** And how did you decide what
12 documents to provide to your counsel
13 from that storage box?
14 **A.** I just give him everything.
15 **Q.** And I didn't ask you this so
16 I'll ask you now, were there any other
17 locations that you maintained documents
18 relating to your employment at the
19 American Bottling Company other than the
20 storage box?
21 **A.** No.
22 **Q.** Do you have an e-mail
23 account that you use?
24 **A.** No.
25 **Q.** Before we get into detail

**Page 20**

1 questions concerning your employment I
2 want to go over generally the claims
3 that you've asserted against the
4 American Bottling Company, okay?
5 **A.** Okay.
6 **Q.** My understanding is that
7 you've asserted two claims against the
8 American Bottling Company. One is an
9 Ohio Whistleblower Statute claim and one
10 relates to a COBRA notice violation, is
11 that correct?
12 **A.** I didn't hear the first
13 part.
14 **Q.** Sure. And I did notice you
15 put your hand up to your ear, please
16 let me know if at any time you cannot
17 hear the questions I've asked you. If
18 you don't let me know that I'll
19 certainly assume you have so I'd like to
20 make sure we're on the same page.
21 **A.** Sure.
22 **Q.** And I do sometimes talk
23 softly, so please let me know.
24 **A.** Absolutely.
25 **Q.** Fair?

**Page 21**

1 **A.** Fair enough.
2 **Q.** All right. My understanding
3 of the claims that you've asserted in
4 this case are that you've asserted two
5 claims, one is an Ohio Whistleblower
6 Statute claim and one is a COBRA notice
7 violation claim, is that correct?
8 **A.** Correct.
9 **Q.** You have no other claims
10 asserted against the American Bottling
11 Company in this litigation, correct?
12 **A.** At this time, no.
13 **Q.** Is there a time that you
14 anticipate adding additional claims to
15 your lawsuit against the American
16 Bottling Company?
17 **A.** Not that I know of. If my
18 attorney suggests anything I'm open to
19 any legal advice, counsel.
20 **Q.** So let's talk in a little
21 bit more detail about the two claims
22 that you've asserted against the
23 American Bottling Company. I'd like to
24 talk first about the whistleblower
25 claim, okay?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 22**

1      **A.** Okay.
2      **Q.** Your claim essentially is
3 that you engaged in certain conduct and
4 ABC took certain actions as a result of
5 that conduct, is that generally correct?
6      **A.** Define conduct.
7      **Q.** We'll get into the definition
8 of conduct, we're going to drill down a
9 little bit more but I'm looking globally
10 right now. Essentially your
11 whistleblower claim is you engaged in
12 some conduct, as a result of that
13 conduct ABC took some action?
14      **A.** I'm not understanding
15 conduct.
16      **Q.** Well, I believe you made
17 some kind of complaint, and we'll drill
18 down again and get into the specifics of
19 the complaint, but just in a very
20 general level your whistleblower act
21 claim is that you made a complaint and
22 then ABC took some kind of action in
23 retaliation for that complaint, is that
24 it?
25      **A.** Yes.

**Page 23**

1      **Q.** Specifically your claim is
2 that you made a complaint concerning the
3 operation of powered industrial vehicles
4 without operative horns or lights and
5 with slipping brakes, engine stalls or
6 cut-offs without warning and fluid
7 leaks, is that correct?
8      **A.** Yes.
9      **Q.** Any other complaint that
10 you're claiming forms the basis of your
11 whistleblower claim in this case?
12      **A.** No.
13      **Q.** Is it okay if we -- since
14 that's a lot of words, is it okay if we
15 refer to that complaint as the vehicle
16 issue?
17      **A.** If you like.
18      **Q.** But if I use the term the
19 vehicle issue you'll understand that I'm
20 referring to your complaint concerning
21 the operation of powered industrial
22 vehicles without operative horns or
23 lights and with slipping brakes, engine
24 stalls or cut-offs without warning and
25 fluid leaks?

**Page 24**

1      **A.** You said you would like to
2 say vehicle what?
3      **Q.** Issue.
4      **A.** Okay.
5      **Q.** So you'll understand when I
6 say vehicle issue, that's the complaint
7 I'm referring to?
8      **A.** Yes.
9      **Q.** To whom, and let's start
10 with a list, we'll, again, drill down
11 into details, but to whom did you
12 complain about the vehicle issue?
13      **A.** At what time?
14      **Q.** Any time.
15      **A.** Ryan Cozart, John Taraba,
16 Mike Bobal and OSHA agency and Agent
17 Janell and Agent Joe Warner.
18      **Q.** And you referred to agent
19 Janell and Agent Joe Warner, are those
20 individuals at OSHA?
21      **A.** Yes.
22      **Q.** Anyone else that you
23 complained to about the vehicle issue?
24      **A.** Just the in-house and agency.
25      **Q.** And when we say in-house

**Page 25**

1 you're referring to Ryan Cozart, John
2 Taraba and Mike Bobal, is that right?
3      **A.** Yes, even though Mike Bobal
4 is off-site.
5      **Q.** You used the term in-house,
6 any other in-house individuals that you
7 complained to about the vehicle issue?
8      **A.** Just those authorities.
9      **Q.** And, again, those authorities
10 being the individuals you identified at
11 the American Bottling Company as well as
12 OSHA, is that right?
13      **A.** Yes.
14      **Q.** With regards to Mr. Taraba,
15 and Mr. Taraba is the distribution
16 manager of the Youngstown facility for
17 the American Bottling Company, is that
18 right?
19      **A.** Vending warehouse -- vending
20 manager, warehouse manager.
21      **Q.** And you're looking at a
22 business card you just pulled out of
23 your wallet, is that Mr. Taraba's
24 business card?
25      **A.** Yes.


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 26

1      Q. And I believe you produced a
2 copy of that in discovery, correct?
3      A. Yes.
4      Q. When did you complain to Mr.
5 Taraba about the vehicle issue?
6      A. Taraba? Let's see, August
7 11th, 2010.
8      Q. Any other time you complained
9 to Mr. Taraba about the vehicle issue?
10      A. Back in 2007.
11      Q. And the 2007 complaint is
12 not part of your litigation, is that
13 right?
14      A. That's true.
15      Q. And that's a good
16 clarification, so at this point the
17 subject of this litigation or for
18 purposes of this litigation, I should
19 say, you're speaking of an August 11th,
20 2010 complaint to Mr. Taraba, correct?
21      A. That's correct.
22      Q. What form did your complaint
23 to Mr. Taraba take? And Taraba is
24 T A R A B A.
25      A. Is that a question?

## Page 27

1      Q. Yes. What form did your
2 complaint to Mr. Taraba take?
3      A. Handwritten.
4      Q. Any other form of complaint
5 to Mr. Taraba?
6      A. Not to Taraba, no.
7      Q. And when I say form of
8 complaint, I'm referring again to the
9 vehicle issue, you understood that,
10 correct?
11      A. Absolutely.
12      Q. What did you tell Mr. Taraba
13 about the vehicle issue in your written
14 complaint?
15      A. Health and safety issues
16 regarding substandard equipment, need of
17 maintenance, unsafe, no horns, no
18 lights, brake issues, maybe electronic
19 starting. I said -- I think my words
20 were something like stall and cut-off or
21 something. The electronic starting, I
22 just said that today, but I think my
23 exact words were stall, cut-off engine.
24      Q. Anything else that you said
25 to Mr. Taraba in your written complaint

## Page 28

1 of August 11th, 2010?
2      A. Not to Taraba, no.
3      Q. Did you identify any specific
4 vehicles in your written complaint to
5 Mr. Taraba of August 11th, 2010?
6      A. I believe so.
7      Q. Do you recall what those
8 vehicles were?
9      A. I know they was gas fork
10 truck towmotors.
11      Q. Anything more specific about
12 which gas truck fork towmotors -- excuse
13 me, I inverted that, gas fork truck
14 towmotors?
15      A. I think I had some numbers,
16 reference numbers.
17      Q. Anything else that you recall
18 -- strike the question, please.
19 Anything else that you said to Mr.
20 Taraba in your written complaint
21 concerning the vehicle issue of August
22 11, 2010?
23      A. Nothing else to Taraba.
24      Q. Do you know whether Mr.
25 Taraba told anyone else at the American

## Page 29

1 Bottling Company that you complained?
2      A. You'd have to ask him.
3      Q. So the answer to my question
4 is no, you don't know whether he told
5 anyone at the American Bottling Company
6 that you had complained?
7      A. I don't have any knowledge.
8 I can assume.
9      Q. So, again, the answer to my
10 question is no?
11      A. That's right.
12      Q. Do you know whether Mr.
13 Taraba had authority to lay you off?
14      A. I assume.
15      Q. Do you have any personal
16 knowledge that Mr. Taraba had the
17 authority to lay you off?
18      A. I believe so.
19      Q. What's that personal
20 knowledge based on?
21      A. Him being a manager.
22      Q. So you're assuming that
23 because he's a manager he had authority
24 to lay you off, is that correct?
25      A. Unless corporate HR advised

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

| Page 30 |
|---|

1    him otherwise.
2       Q. Again, my question was, so
3    you're assuming because Mr. Taraba was a
4    manager he had authority to lay you off,
5    is that correct?
6       A. As a manager if he has
7    authority to lay off, yes.
8       Q. And that's your assumption,
9    correct?
10      A. I assume so, yes, he's --
11      Q. Do you know whether Mr.
12    Taraba had authority to terminate your
13    employment?
14      A. I'm not sure.
15      Q. Do you know whether Mr.
16    Taraba made a decision to lay you off?
17      A. Say that again, please.
18      Q. Do you know whether Mr.
19    Taraba, in fact, made a decision to lay
20    you off?
21      A. You'd have to ask him. I
22    don't know if he made a decision or he
23    was told.
24      Q. So do you know whether Mr.
25    Taraba participated in any decision to

| Page 31 |
|---|

1    lay you off?
2       A. I know he subscribed his
3    signature to a document with layoff.
4    Other than that, you'd have to ask him.
5       Q. Do you know whether Mr.
6    Taraba made a decision to terminate your
7    employment?
8       A. Again, you'd have to ask
9    him. I don't know where his authority
10    is in the company.
11      Q. Do you know whether Mr.
12    Taraba participated in a decision to
13    terminate your employment?
14      A. I believe he did.
15      Q. What's that based on?
16      A. Him being a manager, agent
17    of the company.
18      Q. So, again, you're assuming
19    because he's a manager he participated
20    in the decision to terminate your
21    employment?
22      A. You could say that.
23      Q. You also indicated that you
24    complained to Ryan Cozart, C O Z A --
25    actually is it Cozart or Cozant, let me

| Page 32 |
|---|

1    ask you that?
2       A. I believe it's Cozart.
3      MR. ROSSI: Do you have a
4    spelling for that?
5       Q. Well, I thought it was
6    Cozant so perhaps I read that
7    incorrectly. I would think it's
8    C O Z A R T, if it's Cozart, it's in
9    your initial disclosures. Thank you.
10    When did you complain to -- we'll use
11    Ryan for ease, when did you complain to
12    Ryan about the vehicle issue?
13      A. I complained to the acting
14    supervisor, Ryan Cozart, August 11th,
15    2010.
16      Q. In what form did your
17    complaint to Ryan take?
18      A. Verbal and written.
19      Q. Well, let's start with the
20    verbal complaint about the vehicle
21    issue. What did you say to Ryan
22    verbally about the vehicle issue?
23      A. In conversation and
24    discussing my dialogue, our dialogue, I
25    stated that the problems again with the

| Page 33 |
|---|

1    fork trucks, I'd see the lights aren't
2    working, I see there's oil on the floor,
3    I see they're stalling again,
4    substandard maintenance issues, again,
5    consistent, before I returned to work
6    they need corrected and be addressed.
7       Q. You just referred to the
8    items that you complained to Mr. -- to
9    Ryan about as substandard maintenance
10    issues. So is it your understanding
11    that the items you're complaining about
12    related to the maintenance of the
13    vehicles?
14      A. Say that again, please.
15      Q. Sure. You just referred to
16    substandard maintenance issues that you
17    spoke to Ryan about. So is it then
18    your understanding that these issues you
19    were raising, the vehicle issues, were
20    maintenance issues?
21      A. Yeah, the discussion was
22    safety or unsafe, to both public and
23    employees as other vendors frequent the
24    facility.
25      Q. Anything else that you said

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 34**

1  to Ryan in your verbal complaint of
2  August 11, 2010 about the vehicle issue?
3      A. Just that dialogue and I
4  wrote him a note the same, left him a
5  note on the clipboard, that's it.
6      Q. Was anyone else present when
7  you spoke with Ryan about the vehicle
8  issue on August 11, 2010?
9      A. What do you mean present?
10      Q. Was anyone else within five
11  feet of your conversation with Ryan on
12  August 11, 2010 about the vehicle issue?
13      A. Not that I'm aware of.
14      Q. About how long would you say
15  that conversation with Ryan was on
16  August 11, 2010 about the vehicle issue?
17      A. Minutes.
18      Q. Did Ryan say anything to you
19  in response to your complaint about the
20  vehicle issue on August 11, 2010?
21      A. Just pretty much, yeah, yeah,
22  yeah.
23      Q. Do you have any specific
24  recollection of what Ryan said to you in
25  response to your complaint about the

**Page 35**

1  vehicle issue on August 11, 2010?
2      A. He just appeared to blow me
3  off.
4      Q. When you say he appeared to
5  blow you off, what was Ryan doing that
6  you interpreted as blowing you off?
7      A. Just sitting on a forklift,
8  I was out on the floor in the warehouse
9  and no conflict, just civil discussion
10  on the floor and that's it.
11      Q. You said sitting on a
12  forklift, was Ryan on a forklift?
13      A. Yes.
14      Q. And you approached him while
15  he was on the forklift?
16      A. Yes. Yes, he's the acting
17  supervisor when John is not there.
18      Q. You worked the second shift
19  at the American Bottling Company
20  Youngstown facility?
21      A. I assume so, they don't ever
22  refer to shifts.
23      Q. What time did your shift
24  start?
25      A. They changed several times.

**Page 36**

1  Pending change I guess it's fair to say
2  at one time 4:00.
3      Q. Did you ever start at 9:00
4  in the morning?
5      A. No.
6      Q. And using 4:00, would you
7  then work an eight-hour shift starting
8  at 4:00?
9      A. They're supposed to be
10  eight-hour shifts Monday through Friday.
11      Q. Not counting overtime?
12      A. Not counting overtime, breaks
13  are paid.
14      Q. So generally, if we're not
15  discussing overtime, you were working
16  4:00 p.m., starting at 4:00 p.m. and
17  then working approximately an eight-hour
18  shift?
19      A. Say that again, please.
20      Q. Sure. Not discussing
21  overtime right now, generally you were
22  starting approximately 4:00 p.m. and
23  working an eight-hour shift Monday
24  through Friday?
25      A. Monday through Friday unless

**Page 37**

1  they changed the schedule or you had to
2  come in early for something.
3      Q. Let's talk about the written
4  complaint that you gave to Ryan, that
5  was the same day, correct, August 11,
6  2010?
7      A. Yes.
8      Q. What did you place in
9  writing to Ryan on August 11, 2010?
10      A. Unsafe fork trucks,
11  towmotors, tell John to be aware of
12  this, maintenance, same problem
13  continued again as before, in the past,
14  ongoing.
15      Q. You mentioned same problem as
16  continued before ongoing, are you
17  referring to the complaint you made in
18  2007?
19      A. Referring to multiple times.
20  It was always some type of industrial
21  fork truck problem, maintenance, safety
22  issues. I mean, the workers sometimes
23  have to hit the battery with a steel
24  pole and hammer to start them.
25      Q. I'm referring to the vehicle

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 38**

1  issue though.
2      A. Yeah, that's right.
3      Q. So the specific complaint you
4  were making on August 11, 2010 was
5  something that had been ongoing for a
6  period of time?
7      A. Repeat, yes. Here and
8  there.
9      Q. Then you said a moment ago
10 that in your written complaint to Mr.
11 Cozart of August 11, 2010 that you
12 mentioned that he should let or tell
13 John to be aware of the problem, is
14 that right?
15     A. Yeah, just a reminder, the
16 note was definitely a reminder. Because
17 when John is not there Ryan is the
18 acting supervisor in charge, open,
19 close, lock, the higher rate of pay,
20 he's the authority in place of John.
21     Q. You testified earlier that
22 you issued a written complaint to Mr.
23 Taraba on that same date of August 11,
24 2010, approximately when in relation to
25 the written complaint you made to Mr.

**Page 39**

1  Cozart of that same date did you make
2  the complaint to Mr. Taraba?
3      A. About the same time.
4      Q. Was it simultaneous, were you
5  writing two letters at the same time?
6      A. Yeah.
7      Q. One to Ryan and one to John?
8      A. Yes, I sat down and grabbed
9  a paper and pen and started writing.
10     Q. Well, if you were leaving
11 Mr. Taraba a note why did you also
12 leave one for Mr. Cozart?
13     A. To remind him, plus he's the
14 acting supervisor.
15     Q. To remind him of what?
16     A. The power and practice.
17 What it is is when Ryan is in charge
18 there's a clipboard that he leaves his
19 notes for John and in good faith and a
20 courtesy, double courtesy in the
21 interest of safety I just provided him a
22 reminder.
23     Q. And I think you actually
24 testified earlier that you placed your
25 written complaint to Mr. Cozart on that

**Page 40**

1  clipboard, is that right?
2      A. There's a clipboard, yes.
3      Q. So you placed the written
4  complaint to Mr. Cozart of August 11,
5  2010 on the clipboard that Ryan leaves
6  notes for for John Taraba, is that
7  right?
8      A. That's right.
9      Q. And in addition to that you
10 also completed a written complaint to
11 Mr. Taraba that you placed where?
12     A. On his desk.
13     Q. Mr. Taraba's desk?
14     A. Yes. That's the standard
15 pattern and practice through all my
16 experience in 2007.
17     MR. ROSSI: Wait for a question.
18     Q. I'm not sure, I'm not
19 understanding, you're using a term
20 called pattern and practice, I'm not
21 understanding that term, what do you
22 mean by that?
23     A. That's the usual course of
24 business, leave notes for John.
25     Q. That's the usual course of

**Page 41**

1  your business to leave notes for John?
2      A. John's policy.
3      Q. And in your experience, times
4  you've left notes for Mr. Taraba on his
5  desk, he's responded to those notes to
6  you?
7      A. Sometimes.
8      Q. Can you think of a specific
9  occasion when he didn't respond to the
10 note that you left for him on his desk?
11     A. Vacation issues, wage issues,
12 overtime issues. He's hit or miss, got
13 to remind him a lot.
14     Q. You testified about some
15 categories. I'm looking for a specific
16 occasion that you recall leaving Mr.
17 Taraba a note and that he did not
18 respond to you?
19     A. Well, a specific occasion
20 would be maybe in 2007 misclassifying me
21 as seasonal, wrong pay rate, wrong
22 status.
23     Q. Are those different items or
24 are they all part of the classification
25 seasonal?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

1      **A.** You'd have to ask him. I
2 was hired as a warehouse employee. Just
3 the wrong pay rate was remedied upon
4 grievance in 2008, 2007, the end of 2007
5 going into January of 2008. Chris
6 Colello, Teamsters 377 remedied.
7      **Q.** I'm sorry, he remedied what?
8      **A.** Paying me my wages.
9      **Q.** Anything else that you placed
10 in your written complaint of August 11,
11 2010 to Mr. Cozart?
12      **A.** Say that again, please.
13      **Q.** Anything else that you placed
14 in your written complaint of August 11,
15 2010 to Mr. Cozart?
16      **A.** I think I covered it.
17      **Q.** You referred to Mr. Cozart a
18 number of times as an acting supervisor
19 today, do you recall that?
20      **A.** Yes.
21      **Q.** You didn't actually consider
22 Mr. Cozart to be a supervisor though,
23 correct?
24      **A.** Define supervisor.
25      **Q.** In your terms you didn't

1 consider Mr. Cozart to actually be a
2 supervisor for the American Bottling
3 Company, is that right?
4      **A.** He's a supervising authority
5 at all times at nights.
6      - - - - -
7      (Thereupon, Deposition
8      Exhibit-7 was marked for
9      purposes of identification.)
10      - - - - -
11      **Q.** Handing you what's been
12 marked Deposition Exhibit 7, this
13 appears to be a handwritten note dated
14 August 6, 2008 addressed to John G.
15 Lesicko, L E S I C K O --
16      **A.** Yes.
17      **Q.** -- Teamsters Local 377 from
18 Robert Potts. Is this your handwriting,
19 sir?
20      **A.** Yes.
21      **Q.** In this correspondence to the
22 union you say, "In short, I brought a
23 concern upon my ergonomic issue to the
24 attention of a supervisory member of
25 management or who some others call a

1 "working supervisor" (Ryan Cozart) on
2 August 5th, 2008, but this CBA defined
3 "supervisor" got out of line regarding
4 Section 2 of Article 17 conduct," and
5 then it goes on. Did I read that
6 correctly?
7      **A.** Appears so.
8      **Q.** You then in the next
9 paragraph, I guess it's fair to say
10 third paragraph that starts under
11 Section 1 of Article 1, CBA, do you see
12 that?
13      **A.** Where are you at?
14      **Q.** You have a line that says
15 "despite the above."
16      **A.** Oh, yes, yes.
17      **Q.** And then there's a paragraph
18 underneath it?
19      **A.** Yes.
20      **Q.** Okay, great. Is it fair to
21 say that you're disputing that Mr.
22 Cozart is a supervisor for purposes of
23 the collecting bargaining agreement in
24 this correspondence?
25      **A.** I never got an answer to

1 this.
2      **Q.** I'm not asking about whether
3 you got an answer. I'm asking, is it
4 fair to say in this paragraph that
5 you're disputing that Mr. Cozart is a
6 supervisor as defined in the term of the
7 collective bargaining agreement in
8 existence at that time?
9      **A.** No. It says he's a
10 supervisor. It says, "I brought the
11 concern upon my ergonomic issue to the
12 attention of a supervisory member of
13 management."
14      **Q.** Again, looking at the next
15 paragraph of the letter starting, "Under
16 Section 1 of Article 1, CBA,
17 "supervisory" is an excluded position
18 for Teamsters membership of Local 377
19 and any supervisory employee as a member
20 of the union conflicts with Article II,
21 Sections 1-2 of the IBT International
22 Brotherhood of Teamsters Constitution
23 adopted by the 27th International
24 Convention June 26 through 30, 2006."
25 Did I read that correctly?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1    **A.**  Yes.
2    **Q.**  So, in other words, you are
3  stating to your union representative
4  that as the term supervisor is defined
5  in the collective bargaining agreement
6  those individuals are not members of the
7  Teamsters, right?
8    **A.**  I believe there's a conflict,
9  yes.
10    **Q.**  Do you know, was Mr. Cozart
11  a Teamster, do you know?
12    **A.**  I only assume.  We're all
13  Teamsters, supposed to be.  I don't know
14  any private information.
15    **Q.**  Do you know whether Ryan
16  passed your complaint along to any
17  member of ABC Youngstown management?
18    **A.**  You'd have to ask him, I
19  don't know.
20    **Q.**  Do you know whether, assuming
21  Mr. Cozart did pass your complaint
22  along, whether he identified you as the
23  individual complaining?
24    **A.**  I'm sure he has because I
25  was there and it was me talking to him

1  in dialogue.  So I would say yes, I
2  would say he'd have to say me.
3    **Q.**  I understand that you believe
4  that it should have occurred.  I'm
5  asking, do you have any personal
6  knowledge of whether, assuming Mr.
7  Cozart did pass your complaint along to
8  ABC Youngstown management, he identified
9  you as the person complaining?
10    **A.**  Again, I can't answer for
11  him, you have to talk to him.
12    **Q.**  So you don't know whether he
13  did or not?
14    **A.**  I don't know what he did.
15    **Q.**  Do you know whether Mr.
16  Cozart had authority to discipline you?
17    **A.**  I assume he did.
18    **Q.**  But you don't know?
19    **A.**  He sent me home in the past.
20    **Q.**  What are you referring to?
21    **A.**  In relation to work, eight-
22  hour days.  Two separate issues, he
23  always let people go home when he felt
24  certain work was done or if his
25  authority chose to send someone home.  I

1  had a disagreement with him before and
2  he sent me home before, despite of just
3  regular work schedules, you go, he goes,
4  that person goes.  He's the boss.
5    **Q.**  I'm sorry, go ahead.
6    **A.**  He's the boss.
7    **Q.**  And what date did he send
8  you home after you had an interaction
9  with him?
10    **A.**  I can't recall.
11    **Q.**  Did you lose any pay the day
12  that he sent you home?
13    **A.**  Yeah, if he sent me home I
14  didn't get a complete eight-hour day,
15  yes.
16    **Q.**  Do you recall that being the
17  case?
18    **A.**  Of course, I didn't get paid
19  for it.
20    **Q.**  What time was left on your
21  eight-hour shift when Mr. Cozart sent
22  you home on the date you can't recall?
23    **A.**  I can't recall.
24    **Q.**  Do you know whether Mr.
25  Cozart placed any information in your

1  personnel file relating to the date that
2  you can't recall that Mr. Cozart sent
3  you home?
4    **A.**  You'd have to ask him.  I
5  don't know what he puts in, didn't put
6  it or if he can or can't, I don't know.
7    **Q.**  Do you know whether Mr.
8  Cozart had authority to lay you off?
9    **A.**  Possible.
10    **Q.**  Do you know whether Mr.
11  Cozart had authority to lay you off?
12    **A.**  I don't know, you'd have to
13  ask him.
14    **Q.**  Do you know whether Mr.
15  Cozart had authority to terminate your
16  employment?
17    **A.**  I don't believe so.
18    **Q.**  Do you know whether Mr.
19  Cozart made a decision at any time to
20  lay you off?
21    **A.**  You have to ask him, I'm not
22  sure.
23    **Q.**  Do you know --
24    **A.**  Don't know.  Sorry.
25    **Q.**  Do you know whether Mr.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 50

1  Cozart participated in any decision to
2  lay you off?
3      A. I don't know. It's
4  possible.
5      Q. But you don't know?
6      A. Don't know.
7      Q. Do you know whether Mr.
8  Cozart made a decision to terminate your
9  employment?
10      A. You have to ask him.
11      Q. You don't know?
12      A. I don't know.
13      Q. Do you know whether Mr.
14  Cozart participated in the decision to
15  terminate your employment?
16      A. Don't know, you have to ask
17  him.
18      Q. You also testified that you
19  raised the vehicle issue to Mike Bobal,
20  is that right?
21      A. Yes.
22      Q. And I think you said that
23  Mr. Bobal, he's in the human resources
24  department for the American Bottling
25  Company but not located at the

## Page 51

1  Youngstown facility, is that right?
2      A. Yes, he's not local,
3  off-site.
4      Q. And when did you complain to
5  Mr. Bobal about the vehicle issue?
6      A. August 12th, 2010.
7      Q. What form did your complaint
8  to Mr. Bobal take? B O B A L.
9      A. Say that again, please.
10      Q. What form did your complaint
11  to Mr. Bobal take?
12      A. Handwritten.
13      Q. Any other form your complaint
14  to Mr. Bobal took?
15      A. No.
16      Q. So talking about your written
17  complaint to Mr. Bobal about the vehicle
18  issue, what did you say in your
19  handwritten complaint of August 12, 2010
20  to Mr. Bobal?
21      A. Pretty much the same as the
22  others. Unsafe fork trucks, horns not
23  working, lights not working, stalls,
24  cut-off, oil leaking. Same. Repeat.
25  Duplicate.

## Page 52

1      Q. So, and I know this sounds
2  basic, but essentially you complained to
3  Mr. Cozart on August 11, 2010 both
4  verbally and then you left a note for
5  him as well, is that right?
6      A. That's correct.
7      Q. Then you also left a note
8  for Mr. Taraba on August 11, 2010, is
9  that right?
10      A. That's right.
11      Q. And then you sent a note to
12  Mr. Bobal on August 12, 2010 setting
13  forth the vehicle issue, is that right?
14      A. Yes.
15      Q. Did you mail the handwritten
16  report to Mr. Bobal?
17      A. Yeah, mailed him a letter.
18      Q. What time of day did you
19  mail the letter, do you recall?
20      A. I don't know. Late, late
21  day, after 4.
22      Q. Did you sign the handwritten
23  note to Mr. Bobal?
24      A. I always just like this,
25  referring to the document, Exhibit 7 you

## Page 53

1  showed me, handwriting.
2      Q. I'm sorry, you always what?
3      A. Always -- when I handwrite
4  this is the same form or scratch paper
5  or whatever, I don't subscribe a
6  signature upon it. I just -- when I
7  handwrite, that's the way it is. To,
8  from.
9      Q. So you put from Robert
10  Potts --
11      A. Yes.
12      Q. -- on the correspondence?
13      A. Yes.
14      Q. Do you know whether Mr.
15  Bobal passed along your August 12, 2010
16  correspondence to anyone at ABC
17  management?
18      A. You have to ask him, I don't
19  know.
20      Q. Do you know, assuming Mr.
21  Bobal did pass along your August 12,
22  2010 handwritten correspondence to
23  someone at ABC management, that he
24  identified you as the person providing
25  that information?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 54**

1    A. Can you repeat that, please?
2    Q. Assuming Mr. Bobal informed
3 somebody at ABC management that he
4 received a complaint about the
5 Youngstown vehicle issue, do you know
6 whether he identified you as the person
7 who raised the issue?
8    A. You're saying assuming, I
9 guess I don't know, you have to ask him
10 what he did.
11    Q. Do you know whether Mr.
12 Bobal had authority to discipline you?
13    A. I don't know. I assume he
14 does, he's a manager.
15    Q. But you don't know?
16    A. I don't know who's the
17 authority locally, regionally,
18 headquarters, Texas, Cleveland, I don't
19 know.
20    Q. Do you know whether Mr.
21 Bobal had authority to lay you off?
22    A. It's possible. It's fair
23 enough to say he does.
24    Q. What I'm asking is, do you
25 have any personal knowledge that Mr.

**Page 55**

1 Bobal had authority to lay you off?
2    A. Personal knowledge, I don't
3 know if he did or not.
4    Q. And, again, all the questions
5 I'm asking today, I'm looking for your
6 personal knowledge, okay?
7    A. Repeat the question, please.
8    Q. All the questions I'm asking
9 you today, I'm looking for your personal
10 knowledge, okay?
11    A. Okay. The other question
12 before you said personal.
13    Q. Sure. Do you know whether
14 Mr. Bobal had authority to lay you off?
15    A. I believe so. I don't know.
16    Q. When you say I believe so,
17 you're making an assumption that he had
18 authority, correct?
19    A. He's a manager. I can in
20 good faith say yes, he has authority.
21    Q. And, again, your basis for
22 your statement is that you assume
23 because he's a manager he has authority
24 to lay you off, is that correct?
25    A. It's possible.

**Page 56**

1    Q. What's possible, that you're
2 assuming it or that he had authority?
3    A. He's a manager, member of
4 the management team, you could say he
5 has authority to make a decision,
6 company decision, layoff.
7    Q. And I'm asking whether you
8 know that to be a factually accurate
9 statement that he does have authority to
10 lay you off.
11    A. You'd have to ask him.
12    Q. You don't know?
13    A. I don't know.
14    Q. Do you know whether Mr.
15 Bobal made any decision to lay you off?
16    A. I don't know if he's the
17 solo, I don't know if he's directed, you
18 have to ask him, I don't know.
19    Q. Do you know whether he
20 participated in any way concerning the
21 decision to lay you off?
22    A. Yeah, he participated.
23    Q. What's that based on?
24    A. A member of the management,
25 member of the company.

**Page 57**

1    Q. So, again, you're assuming
2 because he's a member of management,
3 member of company, he participated in a
4 decision to lay you off?
5    A. Yes.
6    Q. Do you know whether Mr.
7 Bobal made a decision to terminate your
8 employment?
9    A. I don't know if he's the
10 authority to terminate or someone tells
11 him or directs him. It's a corporation.
12 I don't know who the board of directors
13 or anybody is. I don't know who's the
14 authority.
15    Q. So the answer to my question
16 is no, you don't know whether Mr. Bobal
17 made the decision to terminate your
18 employment?
19    A. No, I don't know who is the
20 actual individual agent, company agent.
21    Q. So similarly you don't know
22 whether Mr. Bobal participated in any
23 decision to terminate your employment?
24    A. Sure, he participated.
25    Q. What's that based on?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1    **A.** Member of the management.
2    **Q.** So, again, it's an assumption
3    because he's a member of management he
4    participated in the decision to
5    terminate your employment?
6    **A.** Of course.
7    **Q.** Of course what, that you're
8    making an assumption?
9    **A.** That he's a member of
10   management with authority.
11   **Q.** And that's really what I'm
12   trying to get at, okay. My question
13   is, do you know whether in fact Mr.
14   Bobal, in fact, participated in a
15   decision to terminate your employment?
16   **A.** Absolutely he participated.
17   **Q.** And how do you know that,
18   what fact are you basing that on?
19   **A.** He's employed as an HR
20   assistant.
21   **Q.** So again --
22   **A.** Or associate.
23   **Q.** I apologize. Were you
24   finished?
25   **A.** Go ahead.

1    **Q.** So, again, you're assuming
2    because he's in human resources he
3    participated in the decision to
4    terminate your employment?
5    **A.** He's a member of the
6    American Bottling Company, he's got
7    authority.
8    **Q.** Mr. Potts, we can sit here
9    all day and go back and forth but my
10   question is really simple. I'm just
11   asking, do you have personal knowledge,
12   not an assumption because he's in
13   management or an assumption because he's
14   in HR, but whether you, in fact, have
15   any personal knowledge that Mr. Bobal
16   participated in a decision to terminate
17   your employment?
18   **A.** Personally, no.
19   - - - - -
20   (Thereupon, Deposition
21   Exhibit-8 was marked for
22   purposes of identification.)
23   - - - - -
24   **Q.** Handing you what's been
25   marked Deposition Exhibit 8, this is a

1    document that we received from your
2    counsel as part of your production in
3    this case. It's a multipage document
4    with handwritten notes on it and I'll
5    tell you that the front page was an
6    envelope and the subsequent pages were
7    inside the envelope. My question for
8    you is, do you recall providing this
9    information to the American Bottling
10   Company in discovery?
11   **A.** Yes.
12   **Q.** There appears to be some
13   highlights on the document, we had these
14   photocopied in color. My understanding
15   is the highlighted portions were things
16   that you yourself highlighted, is that
17   correct?
18   **A.** Sure.
19   **Q.** On the first page of the
20   document you've entitled it -- well, it
21   appears to say in your handwriting,
22   "Miscellaneous notes/reports, some
23   examples of notes/reports. This is how
24   all the workers communicate with
25   supervisor John Taraba." And then you

1    go on. Is that your handwriting?
2    **A.** Yes.
3    **Q.** And then flipping through the
4    document it looks like there are a
5    couple of items in here, one appears to
6    relate to floating holidays you were
7    requesting and one appears to relate to
8    payment of sick days, is that right?
9    **A.** Notes on a copy of a payroll
10   check, sick days, undated correspondence
11   from John, yeah, yeah, sure.
12   **Q.** And the handwriting on that
13   second page looks like a note from you
14   to Mr. Taraba, October 8, 2008. At the
15   bottom portion of that page do you
16   recognize that handwriting to be John
17   Taraba's?
18   **A.** It appears to be.
19   **Q.** Second page -- excuse me,
20   third page of the exhibit, Deposition
21   Exhibit 8, do you recognize that
22   handwriting to be Mr. Taraba's? Third
23   page, sir.
24   **A.** This one?
25   **Q.** Yes. Correct. I didn't

**Cefaratti Group**
**THE LITIGATION SUPPORT COMPANY**
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

1 realize you had taken it apart, yes.
2     **A.** Appears to be.
3     - - - - -
4     (Thereupon, Deposition
5     Exhibit-9 was marked for
6     purposes of identification.)
7     - - - - -
8     **Q.** Handing you what's been
9 marked Deposition Exhibit 9, do you know
10 what this document is?
11     **A.** Yes, it's a copy of two
12 receipts.
13     **Q.** Do you understand these
14 receipts to relate to -- well, strike
15 the question, please. My understanding
16 of this document is that this is --
17 these are receipts from the post office
18 in Warren, Ohio concerning a certified
19 mailing from you to Mr. Bobal in Maple
20 Heights on August 12, 2010, is that
21 right?
22     **A.** It's a certificate of
23 mailing.
24     **Q.** And my question is, my
25 understanding, you can tell me if I'm

1 right or wrong, is that these receipts
2 relate to a certified mailing that you
3 sent to Mr. Bobal on or about August
4 12, 2010?
5     **A.** Certificate of mailing, yes.
6     **Q.** What does this document
7 relate to, what do these receipts relate
8 to?
9     **A.** Just a receipt of my
10 mailing.
11     **Q.** What mailing?
12     **A.** Notes to Mike Bobal, the
13 company.
14     **Q.** What did those notes concern?
15     **A.** Fork trucks, defect, safety
16 issues, same thing, horns not working,
17 brakes slipping, stall off.
18     **Q.** So are you asserting that
19 this document, Deposition Exhibit 9, is
20 the receipt for the letter that you sent
21 to Mr. Bobal on August 12, 2010?
22     **A.** Yeah, I sent Mr. Bobal a
23 letter August 12, 2010, yes.
24     **Q.** And what I'm asking you is,
25 is it your testimony that Deposition

1 Exhibit 9 are the receipts for the
2 written correspondence you sent to Mr.
3 Bobal on August 12, 2010 concerning the
4 vehicle issue?
5     **A.** Appears to be, yes.
6     **Q.** Well, I'm not asking you
7 what it appears to be, I'm asking you
8 is that a fact?
9     **A.** Yes.
10     **Q.** Do you recall sending Mr.
11 Bobal any other communication around
12 that time?
13     **A.** Yes, I sent him other stuff,
14 of course.
15     **Q.** What other stuff are you
16 referring to?
17     **A.** What do you mean?
18     **Q.** You said you sent him other
19 stuff --
20     **A.** Yeah.
21     **Q.** -- around that time, what
22 other stuff are you referring to?
23     **A.** I sent him a computer typed
24 note or letter, correspondence,
25 regarding payroll.

1     **Q.** I'm sorry, anything else that
2 you were referring to?
3     **A.** That should cover it.
4     - - - - -
5     (Thereupon, Deposition
6     Exhibit-10 was marked for
7     purposes of identification.)
8     - - - - -
9     **Q.** Showing you Deposition
10 Exhibit 10, is this the correspondence
11 that you're referring to? This is a
12 document bearing, for the record, Bates
13 label ABC 5 through ABC 6. Two-page
14 document, cover sheet appears to be a
15 letter from you dated August 11th, 2010.
16 Second page appears to be an enclosure
17 to that letter dated July 16th, 2010,
18 addressed to you regarding an
19 outstanding payroll check. And, again,
20 for clarification my question is, is
21 this the correspondence you were just
22 referring to concerning a payroll issue?
23     **A.** It appears to be.
24     **Q.** You did not send this
25 document certified mail to Mr. Bobal --

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 66

1  excuse me, to Mr. Taraba?
2      A.  To Taraba?  No, I left this
3  in the warehouse.
4      Q.  And then if you look at the
5  cc on the bottom, did you -- let me ask
6  you this first: You drafted this
7  document, correct?
8      A.  Yes.
9      Q.  And the cc listed William C.
10  Stimmel, S T I M M E L, and Michael L.
11  Bobal, correct?
12      A.  Yes.
13      Q.  By this were you indicating
14  that you had sent carbon copies to each
15  of these gentlemen?
16      A.  I put the copies with the
17  originals for them.
18      Q.  And you were indicating that
19  you were providing copies of Deposition
20  Exhibit 10 to Mr. Stimmel and to Mr.
21  Bobal, is that right?
22      A.  In-house, yes.
23      Q.  And how did you send Mr.
24  Bobal his copy?
25      A.  I believe I mailed it.

## Page 67

1      Q.  Did you send Mr. Bobal's
2  copy certified mail?
3      A.  No, regular mail, ordinary
4  mail.
5      Q.  Why did you not send Mr.
6  Bobal's copy certified mail?
7      A.  Because this is a payroll
8  issue and if he didn't deal with it the
9  union can deal with it.
10      Q.  Is it possible that
11  Deposition Exhibit 10 is actually the
12  letter for which Deposition Exhibit 9 is
13  a receipt?
14      A.  Nope.
15      Q.  Because you produced no copy
16  of any written document whatsoever
17  setting forth the vehicle issue?
18      A.  Repeat that, please.
19      Q.  You've produced no document
20  concerning any correspondence, whether
21  it be to Mr. Cozart, Mr. Taraba or Mr.
22  Bobal about the vehicle issue?
23      A.  What do you mean produce?
24      Q.  You didn't provide it to us
25  during discovery, us being the American

## Page 68

1  Bottling Company?
2      A.  I don't have any.
3      Q.  So you chose not to retain
4  copies of the August 11th, 2010 and
5  August 12th, 2010 correspondence to Mr.
6  Cozart, Mr. Taraba and Mr. Bobal, is
7  that right?
8      A.  They're handwritten directly
9  to the company, they have them, they
10  should have them.
11      Q.  And you didn't retain any
12  copies for yourself?
13      A.  Handwritten, no.  I don't
14  copy everything.
15      MR. ROSSI:  Wait for a question.
16      THE WITNESS:  Sorry.
17      Q.  If you can pull out
18  Deposition Exhibit 7, it's the
19  handwritten note dated August 6, 2008.
20      A.  Yes.
21      Q.  It's a document you produced
22  to us and that's handwritten in your
23  handwriting, correct?
24      A.  Yes.
25      Q.  And you retained a copy of

## Page 69

1  that, correct?
2      A.  It looked that way because
3  it was a fax transmission before it,
4  yes.
5      Q.  So what is your practice
6  when you submit handwritten documents or
7  correspondence to the company, do you
8  retain copies or not?
9      A.  Sometimes.
10      Q.  And how do you determine
11  whether you're going to retain a copy of
12  a handwritten document you've submitted
13  to the company?
14      A.  If I'm going to fax it or if
15  I type it on the computer.
16      Q.  I asked about handwritten
17  document.
18      A.  Oh, I'm sorry.  I apologize.
19  It just depends on the circumstance.  If
20  I'm in-house, if it's there, during the
21  day if it's a note, you write it on the
22  floor, changes all the time.  And when
23  I fax I always photocopy so the fax
24  machine can take it easy.
25      Q.  Because you want to make

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 70**

1  sure that you have accurate records of
2  correspondence that you submitted?
3      A.  No.  When I fax the fax
4  machine doesn't take notebook paper and
5  other stuff and plus it looks different
6  when it's a different color so when I
7  send a fax I always copy, photocopy.
8      Q.  Oh, you're saying that you
9  photocopy the handwritten note so that
10  the fax machine can transmit the
11  document more easily?
12      A.  When my faxes, yes, if it's
13  on regular paper.
14      Q.  On August 12th, 2010, before
15  you sent the correspondence to Mr. Bobal
16  did you call Mr. Taraba and ask what
17  the status was of your written note to
18  him of August 11, 2010?
19      A.  No.
20      Q.  Before you sent the August
21  12th, 2010 correspondence to Mr. Bobal
22  did you call Mr. Cozart and ask him
23  what the status was of the verbal
24  conversation about the vehicle issue and
25  the written correspondence that you left

**Page 71**

1  for Mr. Cozart?
2      A.  No, I don't even know his
3  phone number.
4      Q.  So you didn't call, fair to
5  say you didn't call anyone at the
6  Youngstown facility prior to sending
7  your letter to Mr. Bobal on August 12,
8  2010?
9      A.  They have my phone number,
10  no.
11      Q.  You say they have my phone
12  number and that's because you were not
13  actively working at the Youngstown
14  facility in August of 2010, correct?
15      A.  I was active.
16      Q.  You were active in seniority
17  but you were not working a day-to-day
18  basis, correct?
19      A.  I didn't clock in and clock
20  out, no.
21      Q.  Were you performing work as
22  a warehouse person and you just weren't
23  clocking in and out in August of 2010?
24      A.  No.
25      Q.  No, in fact, you had been on

**Page 72**

1  layoff since September 21st of 2009,
2  correct?
3      A.  Layoff, yes.
4      Q.  How is it that you happened
5  to be at the Youngstown facility on
6  August 11, 2010 approaching Mr. Cozart
7  was while he was sitting on a forklift?
8      A.  Well, because John wasn't
9  there.
10      Q.  How were you -- why were you
11  at the Youngstown facility on August 11,
12  2010 since you had been on layoff since
13  September 21st of 2009?
14      A.  Well, several reasons.  I
15  wanted to look at the board and see if
16  they had my union dues receipts, they
17  usually post them on the board or leave
18  them there.  Drop a note off for John I
19  pretyped for payroll issues and I
20  observed the fork issues again.
21      Q.  So I want to make sure I
22  understand.  You went to the Youngstown
23  facility on August 11th, 2010 at
24  approximately what time?
25      A.  I can't recall.

**Page 73**

1      Q.  Obviously it was after Mr.
2  Taraba had left for the day?
3      A.  He wasn't there, no.
4      Q.  And you were not currently
5  working somewhere else on August 11,
6  2010, correct?
7      A.  Correct.
8      Q.  So you went to the
9  Youngstown facility on August 11, 2010
10  to look at the board to see if a union
11  dues receipt had been posted for you?
12      A.  That's one of the reasons,
13  yes.
14      Q.  And then the other reason
15  you said was to deliver a pretyped note
16  for Mr. Taraba about a payroll issue,
17  correct?
18      A.  That's another reason, yes.
19      Q.  Any other reasons other than
20  looking for the union dues receipt and
21  to deliver the pretyped note for Mr.
22  Taraba on the payroll issue that you
23  were at the Youngstown facility on
24  August 11, 2010?
25      A.  Please repeat that.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 74

1   **Q.** Any other reasons that you
2   went to the Youngstown facility on
3   August 11, 2010 other than to look at
4   the board to see if your union dues
5   receipt was posted and to deliver a
6   pretyped note to Mr. Taraba about
7   payroll issues?
8   **A.** Not really.
9   **Q.** And the pretyped note to Mr.
10  Taraba about payroll issues, that's
11  Deposition Exhibit 10, is that right?
12  **A.** Say that again, please.
13  **Q.** The pretyped note that you
14  were delivering to Mr. Taraba on August
15  11, 2010, that is Deposition Exhibit 10,
16  is that right?
17  **A.** It's a copy, yes.
18  **Q.** That's the letter that you
19  were going to Youngstown to deliver to
20  Mr. Taraba on August 11, 2010?
21  **A.** I don't see my signature
22  subscribed to it but it's the same
23  writing, correspondence, yes.
24  **Q.** I'm sorry, maybe I
25  misunderstood. Are you saying that you

## Page 75

1   didn't write this letter?
2   **A.** I didn't say that.
3   **Q.** You did write this letter?
4   **A.** Yes.
5   **Q.** When you left the note for
6   Mr. Taraba concerning the vehicle issue
7   on August 11, 2010 did you -- on his
8   desk I think is what you testified to,
9   did you leave that note together with
10  Deposition Exhibit 10?
11  **A.** Say that again, please.
12  **Q.** When you left Mr. Taraba the
13  note concerning the vehicle issue on
14  August 11, 2010, did you leave that note
15  on Mr. Taraba's desk together with
16  Deposition Exhibit 10?
17  **A.** No, I put it in his mailbox.
18  **Q.** Put which in his mailbox?
19  **A.** The Exhibit 10. I believe
20  so.
21  **Q.** So to make sure I
22  understand, you put Deposition Exhibit
23  10 in Mr. Taraba's mailbox but you put
24  the handwritten note concerning the
25  vehicle issue on his desk?

## Page 76

1   **A.** That's correct. This is
2   pretyped to save time.
3   **Q.** I'm not sure what that has
4   to do with my question. I'm just
5   asking simply, you're saying that on
6   August 11, 2010 you placed Deposition
7   Exhibit 10 in Mr. Taraba's mailbox but
8   placed the handwritten note about the
9   vehicle issue on his desk?
10  **A.** Yes.
11  **Q.** You also testified that you
12  complained to OSHA in 2010 about the
13  vehicle issue?
14  **A.** Correct.
15  **Q.** You placed a phone call to
16  OSHA on August 20th, 2010, is that
17  right?
18  **A.** Telephone communications,
19  yes.
20                  - - - - -
21                  (Thereupon, Deposition
22                  Exhibit-11 was marked for
23                  purposes of identification.)
24                  - - - - -
25  **Q.** Handing you what's been

## Page 77

1   marked Deposition Exhibit 11, I don't
2   think you've seen this document before.
3   This is a document that OSHA provided to
4   us in response to our FOIA request.
5   What I'm really looking for from this
6   is, does this document accurately
7   reflect in paragraph 1 the vehicle issue
8   that you communicated to OSHA on August
9   20th, 2010?
10  **A.** Yes.
11  **Q.** Going back to something you
12  actually said a few moments ago, I think
13  you said while you were at the
14  Youngstown facility on August 11th, 2010
15  to check to see if your unions dues
16  receipt was on the board and to deliver
17  Deposition Exhibit 10 to Mr. Taraba you
18  said you noticed the forklift issues?
19  **A.** When I went out on the
20  floor.
21  **Q.** Were the forklifts that you
22  were referring to having issues, those
23  were in use at that time?
24  **A.** Yes.
25  **Q.** Does Deposition Exhibit 11

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 78**

1 refresh your recollection about which
2 forklifts you were identifying as having
3 the issues that were in service on
4 August 11th, 2010?
5     **A.** Repeat that.
6     **Q.** Does Deposition Exhibit 11
7 refresh your recollection about the
8 forklift trucks that you were
9 complaining about that were in service
10 as you witnessed them on August 11,
11 2010?
12     **A.** Sure.
13     **Q.** And how does that refresh
14 your recollection, what trucks were
15 those?
16     **A.** Fork trucks, the gas fork
17 trucks need attention, not safe, not
18 working properly.
19     **Q.** Sir, maybe I wasn't clear,
20 maybe it was a bad question. I'm
21 looking, and I'll point to it because
22 maybe this will be helpful.
23     **A.** Sure.
24     **Q.** There's a notation there that
25 says location fork trucks number 23, 25

**Page 79**

1 and 40, do you see that?
2     **A.** Oh, yeah, yeah, yeah.
3     **Q.** Are those the trucks that
4 you were complaining of to OSHA that
5 were in service on August 11, 2010 that
6 you saw vehicle issues with?
7     **A.** One of the numbers I don't
8 believe was a correct number. I think
9 I might have used 40. I think it was a
10 bigger number, but yeah.
11     **Q.** So understanding that 40 may
12 not have been correct you were
13 identifying for OSHA the trucks that you
14 witnessed as being in service on August
15 11, 2010 that had the issues that you
16 identified to OSHA?
17     **A.** Yes, I remember and recollect
18 now. Thank you.
19     **Q.** OSHA then sent you
20 correspondence confirming that you had
21 submitted a complaint, do you recall
22 that?
23     **A.** Yes, August 20th, 2010,
24 absolutely.
25      - - - - -

**Page 80**

1     (Thereupon, Deposition
2 Exhibit-12 was marked for
3 purposes of identification.)
4      - - - - -
5     **Q.** Showing you what's been
6 marked Deposition Exhibit 12, this is a
7 document that you produced -- sorry,
8 Mike -- to us in discovery. Again,
9 there's some highlighted portions that
10 we copied as is for purposes of the
11 document, that's highlighting that you
12 placed on the document, Mr. Potts?
13     **A.** Sure, for my lawyer to look
14 at.
15     **Q.** Looking at Deposition Exhibit
16 12 that you have in front of you,
17 you've highlighted, as you said the
18 letter was dated August 20th, 2010,
19 addressed to you and it starts off by
20 saying, "The purpose of this letter is
21 to acknowledge the receipt of your
22 formal complaint and to inform you that
23 an inspection of your workplace will be
24 scheduled as soon as possible, in
25 accordance with the priorities

**Page 81**

1 established by the agency." Did I read
2 that correctly?
3     **A.** Yes.
4     **Q.** Did you tell OSHA when you
5 called on August 20th, 2010 that you
6 were on layoff status since September
7 21st of 09?
8     **A.** No.
9     **Q.** Letter goes on to say,
10 second paragraph, let's skip to -- well,
11 strike that. Second paragraph starts,
12 "Section 11(c) of the OSH Act provides
13 protection for employees against
14 discrimination because of their
15 involvement in protected safety and
16 health related activity. If you are
17 being treated differently or action is
18 being taken against you because of your
19 safety or health activity, you may file
20 a complaint with OSHA. You should file
21 this complaint as soon as possible since
22 OSHA normally can accept only those
23 complaints filed within 30 days of the
24 alleged discriminatory action." Did I
25 read that correctly?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 82**

1     **A.** Word for word.
2     **Q.** So when you received this
3  correspondence you understood that if
4  ABC engaged in some action that you
5  thought was directly related to your
6  complaint to OSHA you could file a
7  complaint with OSHA, is that right?
8     **A.** Repeat that, please.
9     **Q.** When you received this letter
10  and read it you understood that if ABC
11  took some action in relation to your
12  employment that you believed was because
13  of this complaint to OSHA, that you
14  could file a complaint with OSHA?
15     **A.** I've been informed of Section
16  11(c), yes.
17     **Q.** Did you file a complaint
18  with OSHA in relation to any conduct
19  that ABC engaged in as a result of your
20  complaint about the vehicle issue?
21     **A.** No.
22     **Q.** Do you recall that OSHA also
23  sent you correspondence informing you
24  that they had notified ABC a complaint
25  had been filed?

**Page 83**

1     **A.** Say that again, please.
2     **Q.** Do you also recall that OSHA
3  sent you correspondence informing you
4  that the agency had notified ABC a
5  complaint had been filed?
6     **A.** Yes.
7    - - - - -
8     (Thereupon, Deposition
9     Exhibit-13 was marked for
10     purposes of identification.)
11    - - - - -
12     **Q.** Deposition Exhibit 13, this
13  is correspondence from OSHA dated
14  September 17th, 2010 to you enclosing a
15  copy of what appears to be
16  correspondence of the same date,
17  September 17, 2010, to a Derick Bogard,
18  B O G A B R D, of the American Bottling
19  Company in Youngstown. Would you agree
20  with that characterization of this
21  document?
22     **A.** Clarify, repeat.
23     **Q.** I'm just asking, am I
24  accurately representing that this is a
25  letter to you dated September 17th, 2010

**Page 84**

1  that encloses a letter to ABC of that
2  same date, September 17th, 2010?
3     **A.** Yes, I received this
4  material.
5     **Q.** Looking at the first
6  paragraph of this letter to you you
7  highlighted, "In response to your
8  complaint of health and safety hazards
9  at American Bottling Company the
10  Occupational Safety and Health
11  Administration (OSHA) has notified
12  American Bottling Company requesting
13  that the appropriate action be taken to
14  correct the situation. Enclosed is a
15  copy of that letter for your
16  information." Did I read that
17  correctly?
18     **A.** Word for word.
19     **Q.** Next paragraph that you
20  didn't highlight says, "We have not
21  revealed your identity to the employer."
22  Do you see that?
23     **A.** Yes.
24     **Q.** Any reason to believe that
25  OSHA wasn't telling you the truth that

**Page 85**

1  they had not informed ABC that you had
2  filed a complaint on August 20th, 2010
3  related to ABC Youngstown
4     **A.** Repeat the question.
5     **Q.** Any reason to believe OSHA
6  wasn't telling you the truth that they
7  had not revealed your identity to ABC
8  concerning the complaint you submitted
9  on August 20th, 2010 about the
10  Youngstown facility vehicle issue?
11     **A.** Discussion with the assistant
12  area director Joseph Warner.
13     **Q.** What did Mr. Warner say to
14  you that led you to believe OSHA was
15  not telling you the truth in this
16  letter, that they had not revealed your
17  identity to ABC?
18     **A.** On August 26th, 2010 he said
19  he's not going to inspect the place.
20     **Q.** I'm sorry, I'm not sure you
21  answered my question. Maybe you have
22  and we just need to probe it a little
23  bit more, but what I'm asking you is,
24  there's a conversation you said you had
25  with Mr. Warner --

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 86

1     **A.** Yes.

2     **Q.** -- on August 26th that leads

3 you to believe that OSHA is not telling

4 you the truth in the September 17th

5 letter that they have not revealed your

6 identity to ABC?

7     **A.** True.

8     **Q.** What did Mr. Warner say on

9 August 26th that led you to believe that

10 OSHA is not telling you the truth in

11 the September 17, 2010 correspondence?

12     **A.** Again, Mr. Warner said he's

13 not going to conduct an inspection, at

14 that --

15     **Q.** Anything else? I'm sorry.

16 Go ahead.

17     **A.** At that site.

18     **Q.** Anything else Mr. Warner said

19 that leads you to believe OSHA is not

20 telling you the truth on September 17th,

21 2010 that they did not reveal your

22 identity to ABC?

23     **A.** He said my employment was

24 terminated or I was fired or terminated,

25 so obviously there's dialogue about me,

## Page 87

1 somebody is talking about me between

2 them.

3     **Q.** I'm sorry. So Mr. Warner

4 said, best as you can recall his exact

5 words about your employment status?

6     **A.** You have to ask him.

7     **Q.** Well, I'm asking what you

8 recall from that conversation. So what

9 do you recall, as best you can, were

10 Mr. Warner's exact words during the

11 August 26th, 2010 conversation you had

12 with him about your employment status?

13     **A.** What sticks out, he says I'm

14 not an employee.

15     **Q.** Did you ask him how he knew

16 that information?

17     **A.** No.

18     **Q.** Anything else Mr. Warner said

19 to you on August 26th, 2010 that led

20 you to believe OSHA was not telling you

21 the truth on September 17th, 2010 that

22 they had not revealed your identity to

23 ABC?

24     **A.** He said something about he

25 can't get a federal judge to grant him

## Page 88

1 something. You have to ask, it's

2 probably recorded, being a government

3 agency.

4     **Q.** I'm sorry. He said that he

5 couldn't get a federal judge to what?

6     **A.** You have to ask him, I don't

7 remember what he said, to get something

8 to go in there. I was shocked.

9     **Q.** Anything else that Mr. Warner

10 said to you on August 26th, 2010 that

11 leads you to believe that OSHA was not

12 being truthful in its September 17th,

13 2010 correspondence that they had not

14 revealed your identity to ABC?

15     **A.** I just find it odd that on

16 the next page he says, "On September

17 17th the Occupational Safety and Health

18 Administration received a notice of

19 safety and health hazards at your work

20 site."

21     **Q.** And you'd agree with me on

22 that page your name is nowhere

23 mentioned, correct?

24     **A.** That's correct.

25     **Q.** Do you have any knowledge of

## Page 89

1 OSHA internal operating procedures that

2 forbids them from disclosing your name?

3     **A.** I don't know.

4     **Q.** Strike the question, please.

5 Do you have any knowledge of OSHA

6 internal procedures that forbids OSHA

7 from disclosing the name of a

8 complainant?

9     **A.** Say that again.

10     **Q.** Do you have any knowledge of

11 internal procedures at OSHA that forbids

12 OSHA from disclosing the name of a

13 complainant who filed a complaint with

14 OSHA?

15     **A.** No, I don't know what their

16 policies and practices are.

17     **Q.** I don't think I asked you

18 this question, I think I asked you just

19 as it relates to that page of that

20 attachment addressed to Mr. Bogard.

21     **A.** Which --

22     **Q.** Please take the time to look

23 through it if you'd like, but would you

24 agree with me that your name is nowhere

25 mentioned in that letter to Mr. Bogard

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

1  of September 17th, 2010 that is part of
2  Deposition Exhibit 13?
3      **A.** You saying the attachment to
4  your Exhibit 13?
5      **Q.** Correct.
6      **A.** I don't see my name, no.
7      **Q.** Looking back at the first
8  page of -- actually strike the question,
9  please. You said that your recollection
10 is that Mr. Warner said to you you were
11 not an employee, right?
12     **A.** That's correct.
13     **Q.** Earlier you said that he
14 made a comment that your employment had
15 been terminated, is that something you
16 also recall Mr. Warner saying?
17     **A.** Something like that I recall.
18     **Q.** So as of at least August
19 26th, 2010 you had learned or had been
20 told from someone at OSHA that they
21 believed your employment had been
22 terminated?
23     **A.** Hearsay, yes.
24     **Q.** Correct, you didn't hear that
25 from ABC, you were hearing that from

1  someone at OSHA?
2      **A.** Third party, yes.
3      **Q.** Did you contact ABC to find
4  out what the heck he was talking about?
5      **A.** Just waited on them. Wait a
6  minute, waiting on them for the OSHA
7  stuff but let me rephrase or correct
8  that and expand. I filed a wage claim,
9  grievance number 11823, because I was
10 puzzled and surprised by his statement.
11 So if they hired anybody, if there's
12 anybody working my job I'm due to get
13 paid under any circumstances. So I
14 said, might as well get paid and sort
15 it out later. So I filed a wage claim
16 August 30th, 2010, grievance number
17 11823.
18     **Q.** So if I understand your
19 testimony, based on what Mr. Warner
20 shared with you on August 26, 2010 you
21 filed grievance 11823, is that right?
22     **A.** Repeat that.
23     **Q.** Based on what Mr. Warner
24 said to you on August 26, 2010 you
25 filed grievance number 11823?

1      **A.** After the shock set in and
2  it was a little confusing, I was
3  perplexed for a while, but reviewing the
4  contract, the collective bargaining
5  agreement looking to see what remedies
6  were available and I said, well, let's
7  do the wage claim and get paid.
8      **Q.** And why do you believe that
9  someone was working your job?
10     **A.** Well, if they said that I'm
11 -- if he instead of they, you can say
12 they also, if Mr. Warner said or alleged
13 that I've been fired, terminated or
14 whatever, I assume I'd have to be
15 replaced.
16     **Q.** So you filed a grievance
17 because you assumed someone had replaced
18 you in your position and you wanted to
19 get paid?
20     **A.** Fair enough. Even if any
21 other worker from another department
22 worked, I'm entitled to pay too.
23 Anybody already a member of the
24 bargaining unit, I'm still entitled to
25 pay if they worked my job, my place, et

1  cetera, et cetera.
2      **Q.** And your statement you're
3  entitled to get paid, you're deriving
4  that conclusion from the terms of the
5  collective bargaining agreement, is that
6  right?
7      **A.** Well, I just looked at that
8  as a vehicle to address and remedy the
9  wage issue and discussion in relating to
10 Mr. Warner saying that there's a
11 termination issue. It surprised me,
12 puzzled me, scared me, made me nervous.
13 So I'm trying to figure out, might as
14 well get paid, just look at the
15 grievance process for a wage claim.
16 Because in the past, when somebody else
17 works overtime and there's seniority
18 issues, they got to pay everybody. So
19 I says, I might as well get paid.
20     **Q.** And going back to my
21 question which is, you derived your
22 understanding about when you had a right
23 to be paid from the terms of the
24 collective bargaining agreement which
25 governs your employment, correct?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 94

1     **A.** Partially, yes. The
2 separation of company policies and
3 whatever they do.
4     **Q.** What company policies
5 dictates your wages and when you're
6 entitled to be paid that you're
7 referring to?
8     **A.** They made a mistake before
9 with pay rates or something, they didn't
10 pay people right. So, you know, with
11 the CBA it just sets wages for certain
12 employees and certain departments, kind
13 of like a guideline. Like an employee
14 works so much an hour, per hour, rate.
15     **Q.** I'm sorry. Are you saying
16 that ABC doesn't have to comply with the
17 terms of the collective bargaining
18 agreement?
19     **A.** It's a shame that they don't
20 in a lot of cases.
21     **Q.** My question is a little
22 different. Are you saying they don't
23 have to comply with the terms of the
24 collective bargaining agreement, that
25 it's just a guide?

## Page 95

1     **A.** Well, they can do -- they
2 have the opportunity to choose what they
3 want to do and what they don't.
4     **Q.** So you filed this grievance
5 11823 on August 30th, 2010?
6     **A.** Yes.
7     **Q.** But you did not file the
8 complaint with OSHA at that time
9 concerning your termination as it may
10 have related to your complaint to them
11 of August 20th, 2010?
12     **A.** Well, everything there is
13 confusing, it needs to be sorted out
14 with regard to pay rates. In other
15 words, I'm hearing hearsay, I don't know
16 if I believed the guy, I don't know
17 what to believe at that point, fired or
18 not.
19     **Q.** Well, you certainly filed a
20 grievance based on what he said,
21 correct?
22     **A.** Well, I filed a grievance
23 for wages.
24     **Q.** Based on what Mr. Warner
25 told you, correct?

## Page 96

1     **A.** Just hearsay, yes. Entitled
2 to pay.
3     **Q.** Looking back at Deposition
4 Exhibit 13, third paragraph of that
5 letter, I'm happy to read it again, I
6 think it's probably very similar to what
7 we've already seen in Deposition Exhibit
8 12, but my question to you is, you
9 understood from this correspondence that
10 if you believed some action was taken by
11 ABC against you that some way related to
12 your August 20, 2010 complaint to OSHA,
13 that you could file a complaint with
14 OSHA?
15     **A.** Same as it was on the August
16 20th, 2010 letter, yes.
17     **Q.** So you understood that from
18 receiving the September 17th, 2010
19 letter as well?
20     **A.** Correct.
21     **Q.** And you didn't file a
22 complaint with OSHA after you received
23 the September 17th, 2010 correspondence
24 either, did you?
25     **A.** Not at that time.

## Page 97

1     **Q.** Well, I think you testified
2 earlier but maybe I got it wrong, have
3 you ever filed a complaint with OSHA
4 concerning action taken by ABC that you
5 felt was a result of your August 20th,
6 2010 complaint?
7     **A.** No.
8     **Q.** Now, OSHA subsequently
9 informed you, and maybe this is the
10 phone call but I think you received
11 correspondence too, that an
12 investigation was conducted and that any
13 alleged violation had been corrected or
14 no longer existed, do you recall that?
15     **A.** Repeat that, please.
16     **Q.** Do you recall receiving
17 information from OSHA in which they
18 informed you that an investigation had
19 been conducted and any alleged violation
20 was either corrected or no longer
21 existed?
22     **A.** Yes, after the August 20th,
23 2010 --
24     MR. ROSSI: I didn't hear you,
25 Robert, speak up.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 98

1  A. Yes, after the August 20th,
2  2010 correspondence, yes. Sorry, I'll
3  get another drink.
4    - - - - -
5  (Thereupon, Deposition
6  Exhibit-14 was marked for
7  purposes of identification.)
8    - - - - -
9  Q. Showing you what's been
10  marked Deposition Exhibit 14, a document
11  produced by you to us in this
12  litigation. Again, the highlighted
13  copies, my understanding, are your
14  highlights, and this is correspondence
15  dated October 1st, 2010 to you, signed
16  by Joseph Warner with an attachment that
17  appears to be correspondence from Bill
18  Stimmel, branch manager, to Joe Warner
19  at the Department of Labor dated
20  September 23rd, 2010, is that right?
21  A. What did you say about dated
22  23rd?
23  Q. That simply this is appears
24  to be a document sent to you on August
25  1st, 2010 that has an enclosure of

## Page 99

1  correspondence sent to OSHA by Mr.
2  Stimmel on September 23rd, 2010?
3  A. Oh, yes, correct.
4  Q. So in this October 1st, 2010
5  correspondence to you from Mr. Warner he
6  states in the first paragraph, "American
7  Bottling Company has advised me that the
8  hazards you complained about have been
9  investigated. A copy of the employer's
10  letter is enclosed. With this
11  information OSHA feels the case can be
12  closed on the grounds that the hazardous
13  conditions have been corrected or no
14  longer exist." Did I read that
15  correctly?
16  A. Word for word.
17  Q. It says, "If you do not
18  agree that the hazards you complained
19  about have been satisfactorily abated,
20  please contact us by October 12, 2010."
21  Did I read that correctly?
22  A. Correct.
23  Q. So you understood at the
24  time you received Deposition Exhibit 14
25  that if you disagreed with OSHA's

## Page 100

1  findings that the hazardous conditions
2  have been corrected or no longer
3  existed, that you could let OSHA know
4  that?
5  A. Sure.
6  Q. Did you contact OSHA and let
7  them know you disagreed?
8  A. No.
9  Q. You would agree with me that
10  there's nothing in the correspondence
11  from Mr. Warner to you that references
12  your employment status with the American
13  Bottling Company, is that right?
14  A. I don't see anything, no.
15  Q. Going back to discussing your
16  claims in a little more detail,
17  specifically still the whistleblower
18  claim, who do you claim retaliated
19  against you?
20  A. The complaint says American
21  Bottling Company dba 7-Up, Dr. Pepper
22  Snapple Group aka Cadbury Schweppes fka
23  7-Up, I don't know if it say Cadbury
24  Adams, I don't have the complaint, you
25  have it. May I look?

## Page 101

1  Q. If you'd like but I think
2  maybe you're answering a different
3  question. I'm asking who within the
4  company are you claiming retaliated
5  against you, what individual?
6  A. On its face the complaint
7  says the company, American Bottling
8  Company, dba 7-Up, aka Dr. Pepper
9  Snapple Group, aka Dr. Pepper/Seven Up,
10  fka Cadbury Schweppes Bottling Group.
11  Q. I understand what the
12  complaint says but, respectfully, who
13  within the organization, what individual
14  are you claiming retaliated against you
15  for the vehicle issue complaint?
16  A. Any of the agents.
17  Q. Can you identify one person
18  at the company that you claim took some
19  conduct against you in retaliation for
20  you complaining about the vehicle issue?
21  A. Michael Bobal.
22  Q. Anyone else?
23  A. That's good.
24  Q. No one else other than Mr.
25  Bobal, is that correct?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1    **A.** Any agent in the company,
2    you can list them all.
3        **Q.** Well, for purposes of your
4    claim I need to understand who
5    specifically at the company, what
6    individual?
7        **A.** Let's see, John Taraba, Bill
8    Stimmel, Michael Bobal, any other names
9    involved with management had input.
10       **Q.** And presumably you have facts
11   upon which you're basing your assertion
12   that Mr. Bobal, Mr. Taraba and Mr.
13   Stimmel engaged in some conduct that you
14   considered retaliation for your vehicle
15   issue complaint?
16       **A.** Sure.
17       **Q.** Well, why don't we talk
18   about Mr. Bobal first. What did Mr.
19   Bobal do that you consider retaliation?
20       **A.** You know, on September 14th,
21   2010, upon entering the union hall
22   meeting he was together with John Taraba
23   and Bill Stimmel. Upon entering Taraba
24   greeted me, we shook hands. Stimmel
25   greeted me, we shook hands. I extended

1    my hand to Mr. Bobal, he didn't shake
2    my hand and I made a comment, I says,
3    oh, you don't want to shake my hand.
4    And then he says we got a harassment
5    issue to deal with.
6        **Q.** Anything else that Mr. Bobal
7    did that you consider retaliation for
8    your 2010 vehicle issue complaint?
9        **A.** Well, part of the group, you
10   got termination --
11       **Q.** No, Mr. Bobal, I'm asking
12   you, let's talk about Mr. Bobal and if
13   we could -- I'm sorry to interrupt but
14   I think we can streamline this if you
15   just tell me the specific conduct and
16   then we can flesh it out so you'll have
17   a chance to explain?
18       **A.** Participated in the
19   termination.
20       **Q.** So Mr. Bobal didn't extend
21   his hand to shake your hand and said we
22   have a harassment issue to deal with and
23   then your termination. Any other
24   conduct that you assert Mr. Bobal
25   engaged in that you considered to be

1    retaliation for your 2010 vehicle issue
2    complaint?
3        **A.** Bad demeanor and conduct in
4    the meeting that day and leaving pretty
5    angrily and mad.
6        **Q.** Any other conduct other than
7    what you've already testified to that
8    you believe Mr. Bobal engaged in that
9    you considered retaliation for your 2010
10   vehicle issue complaint?
11       **A.** Permanent layoff.
12       **Q.** Anything else?
13       **A.** Separation from employment.
14       **Q.** Is that different from
15   termination?
16       **A.** Depends.
17       **Q.** With regard to you is that
18   different from termination?
19       **A.** Well, I mean, I still have
20   certain benefits that's still ongoing.
21   I got health care coverage, so obviously
22   that's not...
23       **Q.** And the health care coverage
24   is under COBRA, is that right?
25       **A.** At this time, yes.

1        **Q.** So other than -- and maybe I
2    should list them so we know the universe
3    and you tell me if there's anything
4    else. You have stated that Mr. Bobal
5    did not shake your hand at the September
6    14th, 2010 meeting at the facility, you
7    said we have a harassment issue to deal
8    with, you said your termination, Mr.
9    Bobal's bad demeanor, conduct and
10   leaving the meeting, your permanent
11   layoff and your separation from the
12   company.
13       Other than those items are you
14   asserting Mr. Bobal engaged in any
15   conduct that you deem to be in
16   retaliation for your 2010 complaint
17   about the vehicle issue?
18       **A.** Specifically permanent layoff
19   and discharge, yes.
20       **Q.** So are we taking the other
21   items off the table or are you just
22   reasserting those two items?
23       **A.** Everything is together.
24       **Q.** So we've covered the universe
25   of conduct that you're saying Mr. Bobal



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 106

1 engaged in that you believe was
2 retaliation for your 2010 vehicle issue
3 complaint?
4         A.  Again, I repeat and I said
5 specifically, the permanent layoff and
6 the termination.
7         MS. MCARDLE:  Could you repeat my
8 question, please?
9         (Record read.)
10        A.  Is that question directed to
11 me?
12        Q.  Yes, that's the pending
13 question.
14        A.  Yes, sure, fair enough.
15        Q.  And why do you think Mr.
16 Bobal -- strike the question, please.
17 Why do you think that conduct by Mr.
18 Bobal was done in retaliation for your
19 2010 vehicle issue complaint?
20        A.  Because I'm not working with
21 American Bottling Company anymore.
22        Q.  Any other reason?
23        A.  That should cover it.
24        Q.  With regards to your
25 permanent layoff, and I believe you're

## Page 107

1 referring to the October 15th, 2010
2 date, correct?
3         A.  Yes.
4         Q.  Do you know who made the
5 decision to label that a permanent
6 layoff as of that date?
7         A.  I don't know, but Mr. Bobal
8 had part in it.
9         Q.  Okay.  And why do you
10 believe Mr. Bobal had part in it?
11        A.  He's a manager.
12        Q.  Again, so you're assuming
13 because he's a manager he had a role in
14 the October 15, 2010 permanent layoff
15 designation?
16        A.  He had the role in the
17 9-14-2010 discussions in which he left,
18 any grievances and wage claims he's got
19 roles in.
20        Q.  Okay.  But we're sticking
21 with the October 15th, 2010 designation
22 of a permanent layoff.
23        A.  Yes.
24        Q.  And you said that you don't
25 know who made that decision but you

## Page 108

1 believe Mr. Bobal was part of it, is
2 that right?
3         A.  Yes.
4         Q.  And I'm asking for the facts
5 on which you base your belief that Mr.
6 Bobal was part of that October 15, 2010
7 layoff designation decision?
8         A.  Yes, it's a fact Mr. Bobal
9 had part in it.  I don't know who he
10 answers to or who tells him to make the
11 decision.
12        Q.  And I'm asking for the basis
13 for your statement that it's a fact he
14 took part in that decision?
15        A.  Repeat that.
16        Q.  I'm asking for the basis for
17 your statement that it's a fact Mr.
18 Bobal took part in that decision?
19        A.  The union guys told me I'm
20 permanently laid off.
21        Q.  So union guys told you you
22 were permanently laid off, they didn't
23 tell you and Mr. Bobal made that
24 decision, correct?
25        A.  He's part of it, correct.

## Page 109

1         Q.  So we go back to this is an
2 assumption that he's a manager in HR
3 that you believe he must have had part
4 of that decision?
5         A.  He's in the grievance process
6 and in the wage claims he signed off on
7 it.
8         Q.  Well, I understand that
9 that's your position and that you're
10 drawing an assumption from that
11 position.  My question is very simple.
12 Do you have any personal knowledge that
13 Mr. Bobal took part in the decision to
14 designate your layoff as permanent on
15 October 15, 2010?
16        A.  Permanent knowledge, no.
17        Q.  I'm sorry?
18        A.  Permanent knowledge, no.
19        Q.  Personal knowledge?
20        A.  Personal knowledge, I'm
21 sorry.
22        Q.  That's okay.  Do you know
23 who was consulted in connection with the
24 October 15, 2010 designation of your
25 layoff as permanent?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1    **A.** Meaning consulting whom?
2    **Q.** You're right, it's a bad
3  question. Do you know who was consulted
4  in making the decision to designate your
5  layoff as permanent on October 15, 2010?
6  Personal knowledge?
7    **A.** Personal knowledge, I don't
8  know a lot of the people in the high
9  positions in the company, so no.
10   **Q.** Do you know what information
11 was considered in reaching the decision
12 to designate your layoff as permanent on
13 October 15, 2010?
14   **A.** One of the reasons is on
15 9-14-2010 he claimed a harassment issue.
16   **Q.** Do you ask Mr. Bobal what he
17 meant by that?
18   **A.** He departed from the meeting,
19 didn't finish it, they left.
20   **Q.** Did you ask Mr. Bobal what
21 he meant by a harassment issue?
22   **A.** I didn't get the opportunity
23 because he left.
24   **Q.** Did you ever contact him and
25 ask him what he meant by that issue?

1    **A.** He told me never to contact
2  him, don't write him, don't telephone
3  him, he won't accept letters from me,
4  phone calls, e-mails, everything.
5    **Q.** And do you know whether or
6  not that was in connection with
7  counsel's direction after you had filed
8  your lawsuit?
9    **A.** No, it was before he was
10 involved.
11   **Q.** What date did Mr. Bobal
12 begin telling you not to send him
13 letters and correspondence?
14   **A.** Probably October 25th, 2010.
15   **Q.** Probably?
16   **A.** Well, if you give me the
17 initial disclosures, based on my memory
18 in good faith I'll say October 25th,
19 2010.
20   **Q.** And he told you to bring
21 those issues to your union, correct?
22   **A.** I believe so, yes.
23   **Q.** Just quickly looking at
24 Deposition Exhibit 9, it's your
25 certificate of mailing for the letter to

1  Mr. Bobal on August 12th, 2010.
2    **A.** Okay.
3    **Q.** Did you ever receive a
4  confirmation of delivery for that?
5    **A.** No, it was ordinary mail.
6    I kind had messed these documents
7  up.
8    **Q.** So you paid $1.15 to the
9  post office to send something ordinary
10 mail?
11   **A.** I know, it was kind of
12 expensive, it used to be 90 cents.
13   **Q.** What purpose does a
14 certificate of mailing serve, in your
15 mind?
16   **A.** I don't know. I just know
17 that they have a certificate of mailing
18 and I used them here and there before,
19 so once in a while I'll use them.
20   **Q.** Any particular reason when
21 you decide to use them versus not use
22 the certificate of mailing?
23   **A.** I first started using them
24 maybe in the 80's, 1980's or something,
25 or 90's. I can't remember.

1    **Q.** So did you ever receive any
2  confirmation from the post office or
3  otherwise that Mr. Bobal received your
4  August 12, 2010 correspondence?
5    **A.** That's all I got for
6  confirmation, they stamped it.
7    **Q.** And they stamped that at the
8  time that you mailed the letter,
9  correct?
10   **A.** Yeah.
11   **Q.** Let's talk about Mr. Taraba,
12 you identified him as somebody that you
13 consider engaged in retaliation for your
14 2010 vehicle issue complaint. What did
15 Mr. Taraba do that you considered
16 retaliation?
17   **A.** Repeat that, please.
18   **Q.** You mentioned Mr. Taraba as
19 an individual who you believed engaged
20 in retaliation for your 2010 vehicle
21 issue complaint, what did Mr. Taraba do
22 that you considered retaliation?
23   **A.** Well, during the 9-14-2010
24 meeting, you know, we -- everybody
25 witnessed and caught him in a lie saying

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 114

1      he recalled me to work.
2        Q. Anything else that Mr. Taraba
3      did that you considered retaliation?
4        A. Misleading all on the
5      9-14-2010 meeting.
6        Q. I'm sorry, misleading what?
7        A. Misleading their positions on
8      my wage claim and...
9        Q. To what are you referring
10     when you say misleading concerning their
11     position on your wage claim at the
12     9-14-2010 meeting?
13        A. On the 9-14-2010 meeting he
14     was lying about things and I told him
15     don't do that.
16        Q. What was Mr. Taraba lying
17     about?
18        A. He said he called for me to
19     return to work.
20        Q. What else was Mr. Taraba
21     lying about, in your opinion?
22        A. He said he -- he said he
23     left messages, he said he talked to my
24     grandmother. I said, my grandmother is
25     85, she would tell me if you called,

## Page 115

1      she's been wanting me to go back to
2      work.
3        Q. I'm sorry, she doesn't want
4      you to go back to work?
5        A. She wants me to go back to
6      work, she's tired of me being around the
7      residence, thinks I'm a lazy individual
8      not working, it's a disgrace.
9        Q. So is there anything else
10     that you believe Mr. Taraba lied about
11     during the 9-14-2010 meeting that you
12     considered retaliation?
13        A. Well, like I said, he walked
14     out along with Bobal during that
15     meeting, so this is the result of it.
16        Q. Is there anything else that
17     Mr. Taraba did that you considered
18     retaliation?
19        A. He probably participated in
20     the 10-15-10 permanent layoff.
21        Q. Anything else?
22        A. And termination.
23        Q. Anything else?
24        A. That should cover it.
25        Q. And I'm not sure we actually

## Page 116

1      answered the question so let me just try
2      one more time. Anything else that you
3      are claiming Mr. Taraba lied about
4      during the September 14, 2010 meeting
5      other than you said he stated he
6      recalled you to work and he'd left
7      messages for you at your home?
8        A. At the time that was what we
9      found out.
10        Q. At the time that's what we
11     found out, who is we?
12        A. I would say I witnessed him
13     lying.
14        Q. You witnessed him making a
15     statement which you interpreted as
16     lying, correct?
17        A. That's correct.
18        Q. Do you have an answering
19     machine at the Jeanette Drive location?
20        A. Yes.
21        Q. Is it digital, what kind of
22     answering machine is it?
23        A. It's got the little micro
24     cassette tape about this big, maybe an
25     inch and a half or so, real small.

## Page 117

1        Q. Mr. Stimmel, you said that
2      you believe Mr. Stimmel engaged in some
3      conduct that you considered retaliation.
4      What conduct did you believe Mr. Stimmel
5      engaged in that you considered
6      retaliation for your 2010 vehicle issue
7      complaint?
8        A. Participating input in the
9      10-15-10 permanent layoff and
10     termination.
11        Q. Anything else you believe Mr.
12     Stimmel engaged in that you considered
13     retaliation for your 2010 vehicle issue
14     complaint?
15        A. Repeat that, please.
16        Q. Anything else that you
17     believe Mr. Stimmel did that you
18     considered retaliation for your 2010
19     vehicle issue complaint?
20        A. That covers it.
21        Q. Do you know if Mr. Stimmel
22     knew you had complained about the
23     vehicle issue?
24        A. I'm sure.
25        Q. Do you have any personal



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 118

1  knowledge that Mr. Stimmel knew you
2  complained about the vehicle issue?
3      A.  I don't have any personal
4  knowledge, I haven't seen the man.
5      MS. MCARDLE:  I'm just going --
6  I have one more line of questioning and
7  we can take a break if that's okay with
8  you?
9      MR. ROSSI:  Sure.
10     Q.  Are there any employees that
11 you believe were treated better than you
12 were who engaged in similar conduct,
13 meaning complained about a vehicle issue
14 or other type of complaint that you're
15 aware of?
16     A.  I believe I was the only one
17 who cared about safety, health and
18 safety.  None of them guys cared,
19 beating on the forks with hammers to get
20 them started with steel pipes.  They
21 don't care if the lights work, go
22 outside in the dark.  Stepping over
23 shrink wrap, they don't care.  I was
24 probably the only one that cared.
25 Cleaning up shrink wrap.  All them

## Page 120

1  say and regret to say but John's son
2  passed away, got killed in a bike
3  accident.  They're neighbors so John and
4  Ryan Cozart, John Taraba are pretty
5  close.  When Ryan had a DUI in the past
6  they used to clock him in and out years
7  ago, favorable treatment plus he gets
8  more pay than everybody else too.  It's
9  not even in the collective bargaining
10 agreement.
11     Q.  He being Ryan?
12     A.  Yes.  Couple other guys get
13 more pay too but nobody cares.
14     Q.  Who else gets more pay other
15 than Mr. Cozart?
16     A.  I think Ryan Cozart even
17 makes more money than the one guy that's
18 been there since the 60's or 70's.
19     Q.  Who's that?
20     A.  Sam Rowbottom or Rottenbottom
21 or -- I'm sorry, something with an R.
22     Q.  Sam Rowbottom,
23 R O W B O T T O M?
24     A.  Yeah.
25     Q.  Anyone other than Ryan

## Page 119

1  people out there got workers' come
2  claims, I don't have any.
3      Q.  You didn't file a workers'
4  comp claim?
5      A.  No, I never got hurt out
6  there.
7      Q.  Are there any employees at
8  Youngstown that didn't make a similar
9  type of complaint concerning a vehicle
10 issue or otherwise that you think were
11 treated better than you?
12     A.  Repeat that question.
13     Q.  Are there any employees at
14 Youngstown who did not make a similar
15 type of complaint to the vehicle issue
16 or other, I think you referred to them
17 as safety type of complaints, who were
18 treated better than you?
19     A.  Of course.
20     Q.  Who were those individuals?
21     A.  There's Tony Nicastro who's
22 friends with Danny up front, manger,
23 they golf together.  Ryan Cozart and
24 John Taraba, their sons was friends in
25 school with each other.  I feel bad to

## Page 121

1  receive more pay?
2      A.  Bill DiPiero(sic), I think he
3  gets additional pay.  I think Merl(sic)
4  Moyer, he used to get additional pay
5  too.
6      Q.  Merrill Moyer?
7      A.  M E R R I L, I think.
8      Q.  M E R R I L L, M O Y E R.
9      A.  And I think Tony too
10 actually gets more pay because he's a
11 utility guy and they give him other
12 rates.
13     Q.  And the basis for your
14 knowledge that these individuals are
15 receiving more pay is what?
16     A.  Ryan himself said he gets
17 paid more than everybody and he feels
18 bad that he gets paid more than Sam,
19 payroll records will show it.  I seen
20 some records with -- when they made an
21 incorrect pay rate, everybody got
22 additional pay, you can see on the
23 records certain people get paid more and
24 figure them out.  But Ryan, he told me
25 directly.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 122

1 **Q.** Did you see Ryan's personnel
2 file?
3 **A.** I'm not in management, how
4 am I going to see his personnel file?
5 **Q.** So similarly you didn't see
6 the personnel file of any of other
7 individuals you've referenced?
8 **A.** Say that again, please.
9 **Q.** Similarly then you didn't see
10 the personnel files of any of the
11 individuals that you just referenced?
12 **A.** I don't have that privilege.
13 **Q.** Do you know how long -- with
14 regards to pay I think you included Sam,
15 Merrill, Bill and Tony, do you know how
16 long they've been receiving, as you say,
17 more pay?
18 **A.** You'd have to ask them.
19 **Q.** So you don't have any
20 personal knowledge of how long they've
21 been receiving more pay?
22 **A.** Personal acknowledge? You
23 have to ask them, I don't know.
24 **Q.** Now, with regards to Tony
25 Nicastro, and that's N I C A S T R O?

## Page 123

1 **A.** Yeah.
2 **Q.** You said he was treated
3 better than you because he's friends
4 with Danny, is that what you said?
5 **A.** Who's Danny?
6 **Q.** I don't know. You said
7 because he's friends with -- I thought
8 it was Danny who was in front or
9 something like that, what did you --
10 **A.** There was a manager named
11 Denny --
12 **Q.** Denny, okay.
13 **A.** -- that he was friends with.
14 I think he got him hired in there, so
15 he got some influence from the front, I
16 guess.
17 **Q.** And Tony, do you know his
18 hire date?
19 **A.** Yeah, I have to look at the
20 seniority sheet.
21 **Q.** So the basis for your
22 statement that Mr. Nicastro was treated
23 better than you is because he's friends
24 with Denny or when Denny worked there he
25 was friends with Denny?

## Page 124

1 **A.** It's obviously a perk, I
2 mean, you got a problem, go see Denny.
3 **Q.** Is Denny also known as
4 Dennis Barnett?
5 **A.** No, that's a driver.
6 **Q.** Right. So Denny is no
7 longer with the company?
8 **A.** I don't know, you'd have to
9 ask the company agents.
10 **Q.** Do you recall Denny's last
11 name?
12 **A.** No, I'm sorry, I don't.
13 **Q.** And then you mentioned Ryan
14 Cozart and John Taraba being friends, so
15 are you saying that Ryan and John were
16 treated better than you because of their
17 friendship?
18 **A.** They got a history together,
19 their kids went to school together,
20 special treatment.
21 **Q.** And what's the special
22 treatment Mr. Cozart received, that was
23 the more pay?
24 **A.** Well, he can come and go as
25 he please, you know, just different

## Page 125

1 stuff that come up, little things.
2 **Q.** Do you know Mr. Cozart's
3 hire date?
4 **A.** You have to look at the
5 seniority sheet.
6 **Q.** How about Mr. Taraba, what
7 special treatment did Mr. Taraba
8 receive?
9 **A.** What do you mean?
10 **Q.** I thought that's what you
11 were saying, that Mr. Cozart and Mr.
12 Taraba both were treated better than
13 you?
14 **A.** Mr. Taraba is a manager, he
15 can do whatever he wants, he can go
16 golfing late in the day if he wants.
17 **Q.** Now, you said Mr. Nicastro
18 is a utility person?
19 **A.** Yeah.
20 **Q.** Mr. Rowbottom, warehouse
21 position?
22 **A.** The morning day turn, yes.
23 **Q.** Mr. Moyer is also a
24 warehouse position?
25 **A.** He used to be. I mean,

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 126

1 whatever, I believe so, yeah, warehouse.
2 I heard he got hurt so they put him on
3 light duty or changed his job because
4 he's got more seniority. Maybe used the
5 procedure to bump somebody out or maybe
6 they posted the job, because he's
7 probably number two so he probably
8 bumped somebody out because he can do
9 that.
10 Q. Was Mr. Moyer morning as
11 well at the time you were aware of him?
12 A. I think at that time he was.
13 I think he bumped somebody or
14 transferred or they created a special
15 job for him.
16 Q. How about Mr. DiPietro, he's
17 warehouse, was he morning as well?
18 A. He was -- excuse me, sorry,
19 he was nights just like me. He got
20 hurt too for a while, I don't know if
21 they put him on light duty.
22 Q. What about Mr. Nicastro, he's
23 warehouse -- oh, no, I'm sorry, you said
24 utility?
25 A. Yes.

## Page 127

1 Q. Morning or night?
2 A. Oh, gee, I think he -- I
3 don't know if he had a floating
4 schedule. I think he come in after
5 noon or late morning. His shift
6 interacted with mine. In other words,
7 he was earlier than my time.
8 Q. Earlier than your time of
9 employment or earlier than your start
10 time?
11 A. Start time.
12 Q. Now, let's just touch upon
13 your COBRA claim really briefly. My
14 understanding is that your COBRA claim
15 is that you claim the COBRA notice
16 issued to you by ABC was not timely?
17 MR. ROSSI: I'm sorry, was not
18 what?
19 Q. Timely.
20 A. That's true, that's a fact.
21 Q. That's the basis of your
22 claim, is that you're saying that the
23 COBRA notice issued by ABC was not
24 timely?
25 A. I got it the end of February

## Page 128

1 or something.
2 Q. So you claim that ABC should
3 have issued a COBRA notice to you within
4 44 days of your termination, is that
5 right?
6 A. Is that the law?
7 Q. Well, I'm asking what your
8 claim is.
9 A. Of course.
10 Q. Do you know why ABC didn't
11 issue a COBRA notice until February
12 18th, 2011?
13 A. Because they're dealing with
14 this situation in litigation.
15 Q. You're guessing, right?
16 A. I don't know why that they
17 did that, you have to ask hem.
18 Q. Do you know whether ABC has
19 a third party administrator that handles
20 the issuance of COBRA notices?
21 A. Yeah, we went round and
22 round with you with Hewitt Associates,
23 and you said don't call them and then
24 you said call them, so we got a lot of
25 confusion back and forth.

## Page 129

1 Q. Well, sir, I don't know what
2 your attorney imparted to you as to
3 communications that I had with him
4 because I certainly haven't talked to
5 you before today, is that right?
6 A. Sure, sure.
7 Q. Do you know whether any
8 computer system errors may have occurred
9 that impacted the issuance of the COBRA
10 notice to you?
11 A. Not that I know of.
12 Q. Do you have any personal
13 knowledge about computer error issues
14 that may have occurred in relation to
15 the issuance of your COBRA notice?
16 A. I don't work in
17 administrative computer programing, no.
18 I don't know, you have to ask them.
19 Q. A subsequent COBRA notice was
20 issued on or about March 23rd, 2011 to
21 you, correct?
22 A. I believe so.
23 Q. So just a little over a
24 month after the first notice went out
25 you received another notice, correct?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 130

1   **A.** Yes, due to all the
2   confusing phone calls back and forth.
3   **Q.** And then that notice, I
4   believe, gave you until May 29th, 2011
5   to elect COBRA, correct?
6   **A.** I not sure, the paperwork is
7   not in front of me. I assume so.
8   **Q.** And you said you're currently
9   receiving health benefits through COBRA,
10  correct?
11  **A.** Yes, I have benefits.
12  **Q.** Is that dental only?
13  **A.** At this time.
14  **Q.** Looking back at Deposition
15  Exhibit 1, the complaint.
16  **A.** You said 1? I'm sorry.
17  **Q.** Yes. Deposition Exhibit 1.
18  **A.** I got a little disorganized
19  here, I apologize. I'm sorry. After
20  the holiday weekend.
21  **Q.** Looking at that document you
22  would agree with me that that complaint
23  was filed on March 1st, 2011?
24  **A.** I have to look. I don't see
25  a time stamp. Yeah, yeah.

## Page 131

1   **Q.** And that is the first
2   complaint you asserted the COBRA notice
3   violation, correct?
4   **A.** Yes.
5   MS. MCARDLE: Let's take a break.
6   MR. ROSSI: Okay.
7   (Recess had.)
8   - - - - -
9   (Thereupon, Deposition
10  Exhibit-15 was marked for
11  purposes of identification.)
12  - - - - -
13  BY MS. MCARDLE:
14  **Q.** Mr. Potts, I'm showing you
15  Deposition Exhibit 15, this is the
16  letter that you produced and it appears
17  to be correspondence from OSHA dated
18  September 27th, 2007, addressed to you
19  from a Robin Medlock, M E D L O C K.
20  Now, again, your claim in this lawsuit
21  does not relate to the 2007 complaint to
22  OSHA, you testified earlier, correct?
23  **A.** Yes.
24  **Q.** But in looking at this
25  complaint that you made in September of

## Page 132

1   2007, recognizing this is OSHA's
2   document to you, do the complaint items
3   that OSHA has listed accurately reflect
4   the complaint you raised to OSHA on
5   September 20, 07?
6   **A.** Say that again, please.
7   **Q.** Do the complaint items that
8   OSHA has listed in its letter to you of
9   September 27th, 07 accurately reflect
10  the items that you raised to OSHA around
11  that time? And if it makes it easier
12  I'm specifically looking at how in the
13  letter it says complaint item 1 and then
14  it states something, complaint item 2
15  and then it states something, as opposed
16  to the results of the OSHA
17  investigation.
18  **A.** Appears to be, yes.
19  **Q.** Earlier in your testimony you
20  said that you had gone to the Youngstown
21  facility on August 11th, 2010 and that's
22  when you had the conversation with Mr.
23  Cozart you've already testified to,
24  correct?
25  **A.** Correct.

## Page 133

1   **Q.** Prior to August 11th, 2010
2   when was the last time you had
3   physically set foot in the Youngstown
4   facility?
5   **A.** I can't recall.
6   **Q.** Was it six months before,
7   could it have been longer than six
8   months before?
9   **A.** Maybe -- yeah, longer than
10  six months, definitely.
11  **Q.** So you hadn't -- the
12  earliest time, I guess, you had been at
13  the Youngstown facility, according to
14  your testimony then, prior to August
15  11th, 2010 was maybe sometime in January
16  or February of 2010, if not earlier?
17  **A.** Probably earlier.
18  **Q.** So how about -- let me ask
19  you this question then: Do you believe
20  between September 21st of 09 and
21  December 31st of 09 you set foot inside
22  the Youngstown facility?
23  **A.** Say that again, please.
24  **Q.** Do you believe that between
25  September 21st of 09, your layoff, and

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1 December 31st of 09 you set foot inside
2 the Youngstown facility?
3     A. December 31st, 2009?
4     Q. Correct.
5     A. No.
6     Q. Do you believe then that the
7 August 11th, 2010 date was the first
8 time you had set foot in the facility
9 since your layoff of September of 09?
10     A. That sounds about right.
11     Q. Now, you didn't file any
12 kind of complaint concerning the vehicle
13 issue with any other public agency other
14 than OSHA, is that right?
15     A. That's the only agency.
16     Q. And you didn't file a police
17 report concerning anything concerning
18 the vehicle issue either, correct?
19     A. OSHA has the authority, no.
20     Q. And do you know what
21 penalties OSHA would apply to the type
22 of issues you were raising in 2010
23 concerning --
24     A. What do you mean?
25     Q. Do you know what penalties,

1 if any, OSHA would apply or be able to
2 apply to the type of issues you raised
3 that were the vehicle issues?
4     A. Whatever they decide.
5     Q. So you don't know kind of
6 the universe of penalties OSHA may be
7 able to apply to the vehicle issues you
8 raised in 2010?
9     A. I'm not familiar with all
10 that code language.
11     - - - - -
12     (Thereupon, Deposition
13     Exhibit-16 was marked for
14     purposes of identification.)
15     - - - - -
16     Q. Handing you what's been
17 marked Deposition Exhibit 16, you have
18 seen this document before, correct?
19     A. Yes.
20     Q. And actually if you would
21 flip through Deposition Exhibit 16
22 there's some handwriting throughout the
23 document. Do you agree with me there's
24 some handwriting throughout that
25 document?

1     A. Yeah, yes.
2     Q. Is that your handwriting?
3     A. It appears to be.
4     Q. And this is a copy of the
5 agreement between Seven Up Youngstown, a
6 subsidiary of the Dr. Pepper/Seven-Up
7 Bottling Group, DPSUBG, and Teamsters
8 Local 377 for the period January 29,
9 2006 through January 28, 2010, correct?
10     A. Absolutely.
11     Q. Is it your understanding that
12 the terms of this agreement governed
13 your participation in the bargaining
14 unit for Teamsters Local 377 during
15 those dates?
16     A. What do you mean?
17     Q. If you had a question
18 concerning wages, vacation, or
19 otherwise, as a member of the bargaining
20 unit for Teamsters Local 377 you'd pick
21 up the contract and look at it, correct?
22     A. Sure, sure.
23     Q. This document for ease is
24 Bates labeled ABC 56 through ABC 77, if
25 you could turn to ABC 59 for me,

1 please, and let me know when you're
2 there.
3     A. I'm there.
4     Q. Section 1 under Article 1,
5 recognition, the last sentence of
6 Section 1 states, "Delivery drivers,
7 warehousemen, vendor special service
8 employees and merchandisers are
9 sometimes hereinafter referred to
10 collectively as 'employees'." Did I
11 read that correctly?
12     A. Word for word.
13     Q. So you understood after you
14 reviewed the contract that at times
15 during the contract when the contract
16 referred to employees that it meant
17 collectively those categories of
18 services?
19     A. Yeah, it's strange it doesn't
20 say utility. Yes. I never knew that.
21     MR. ROSSI: Wait for a question.
22     THE WITNESS: Sorry.
23     Q. Turning to the next page,
24 there's a section entitled probationary
25 employees, do you see that?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 138

1     **A.** Yes.

2     **Q.** The section, numbered Section
3 and it starts, "A new employee shall
4 work under the provision of this
5 agreement but shall be employed on a
6 trial basis until he has actually worked
7 90 days within six calendar months,
8 during which period he may be discharged
9 without further recourse," and then it
10 goes on. Did I read that portion
11 correctly?

12     **A.** Word for word.

13     **Q.** So you understood that when
14 you started with ABC that you were a
15 probationary employee until a period of
16 90 days had elapsed at which time you
17 may be retained?

18     **A.** Correct.

19     **Q.** Last sentence of that section
20 states, "During the probationary period
21 a new employee shall be paid the wage
22 rates in Article X, Section 2," and then
23 there's some handwriting.

24     **A.** Okay.

25     **Q.** Did I read the section of

## Page 139

1 the contract correctly?

2     **A.** It appears so.

3     **Q.** Then there's a section next
4 -- that follows, I should say, called
5 seasonal employees, and that's Section
6 4. And this reads in part, "Seasonal
7 employees may be hired from April 1st to
8 September 30th inclusive and November
9 1st to January 15th inclusive. Seasonal
10 employees shall be required to join the
11 union after 30 days worked for the
12 employer in any one or more seasonal
13 periods, provided, however, seasonal
14 employees will not be entitled to any
15 contractual benefits other than the
16 negotiated wage stated in Article X,
17 Section 3 of this agreement." Did I
18 read that correctly?

19     **A.** Word for word.

20     **Q.** So you understood by reading
21 this agreement that Dr. Pepper could
22 hire seasonal employees during those
23 designated time frames, correct?

24     **A.** Sure.

25     **Q.** Turning the page, let's look

## Page 140

1 at Article 3, management, Section 1.
2 This states, "It is agreed that the
3 operation of the territories and the
4 direction of the delivery drivers and
5 all other employees, including the
6 making and enforcing of rules to insure
7 orderly and efficient territory and
8 warehouse/special services operation,
9 including the increase or decrease of
10 territories, the determining of same
11 employees competency, the right to hire,
12 to transfer, to promote, to demote, to
13 discharge for cause, to lay off for lack
14 of work, are rights vested exclusively
15 in the management of the company." Did
16 I read that correctly?

17     **A.** Very good.

18     **Q.** Did I read that correctly?

19     **A.** Yes.

20     **Q.** Thank you. So you
21 understood by reading this clause that
22 there were certain employment actions
23 that management reserved exclusive right
24 to make, correct?

25     **A.** Right.

## Page 141

1     **Q.** Have you heard of this
2 clause referred to as the management
3 rights clause?

4     **A.** Yes.

5     **Q.** Turning to ABC 63.

6     **A.** Say that again, please.

7     **Q.** Sure.

8     MR. ROSSI: 63.

9     **Q.** ABC 63.

10     **A.** Got it, got it.

11     **Q.** This is Article 7 as it
12 relates to grievance procedures and I'm
13 looking specifically at Section 2-Step
14 1, do you see that section?

15     **A.** Yes.

16     **Q.** And that says in part, "If
17 an employee has a grievance he shall
18 reduce such grievance in writing and
19 present it to the company within five
20 working days after its alleged
21 occurrence." Did I read that correctly?

22     **A.** Word for word.

23     **Q.** So you understood that if
24 you did have a grievance with company
25 you could file that grievance but had to

**Cefaratti Group**
**THE LITIGATION SUPPORT COMPANY**
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

Page 142

1 do so within five working day after the
2 alleged incident had occurred?
3 A. Five working days, yes.
4 Q. Let's turn to ABC 65, a
5 section called call back pay, Section 4,
6 and I can certainly read that into the
7 record but my question for you is this,
8 please read that Section 4 and let me
9 know what you've done so.
10 A. Okay.
11 Q. So from reading the contract
12 you understood that merchandisers may
13 work up to seven days a week, the first
14 five days eight-hour shifts at regular
15 rate, sixth day one and a half times
16 their regular rate, seventh day at two
17 times their regular rate?
18 A. That's what it says, it
19 indicates it.
20 Q. Turn to ABC 67, Section 8,
21 and this is part of Article X, wages.
22 This states, "In the event any employee
23 is transferred or assigned by the
24 employer to work in a different
25 classification they shall be paid the

Page 143

1 highest prevailing rate for all hours of
2 work (any employee in a I rate shall be
3 transferred at the I rate. Any employee
4 in a II rate shall be transferred at
5 the II rate)." Did I read that
6 correctly?
7 A. Word for word.
8 Q. So you understood that in
9 the event an employee was transferred or
10 reassigned by the company to a different
11 job classification they would be making
12 the highest prevailing rate for their
13 work, correct?
14 A. Correct.
15 Q. And by job classification, I
16 think we've been referring to that
17 throughout the deposition, but that
18 includes things like drivers, vending,
19 warehouse, and merchandising, correct?
20 A. Correct.
21 Q. Let's turn to ABC 69,
22 Article 14, seniority.
23 A. Oh, sorry.
24 Q. Are you there?
25 A. Yes.

Page 144

1 Q. All right. Section 1, this
2 section states in part, "The seniority
3 rights of all employees shall be
4 determined from the last date of hiring.
5 Immediately after signing this agreement
6 a seniority list for delivery drivers, a
7 seniority list for warehousemen and a
8 seniority list for special service
9 employees, merchandisers and utility as
10 well as a plant-wide seniority will be
11 posted upon the bulletin board for a
12 period of 30 days, after which the list
13 will be deemed to be correct." Did I
14 read that correctly?
15 A. Word for word.
16 Q. So you understood that after
17 this contract was entered into and a
18 seniority list had been posted, 30 days
19 after the posting of that that seniority
20 list was correct and what the company
21 would use for purposes of any employment
22 decisions, correct?
23 A. Unless in a dispute, correct.
24 Q. Unless a dispute of what?
25 A. The next couple sentences.

Page 145

1 Q. Okay. But prior to the next
2 couple sentences, because I think we're
3 missing each other on this, that under
4 the terms of the contract, if there's no
5 challenge to that seniority list within
6 30 days of executing the contract that
7 list is deemed correct?
8 A. From the CBA 2006 to 2010.
9 Q. Yes.
10 A. Yes.
11 Q. Now, the next section that
12 you're alluding to reads, "In addition,
13 upon request from the union, the company
14 shall provide seniority lists for all
15 classifications as well as plant-wide
16 seniority every six months. In any case
17 of a dispute the records of the company
18 shall be binding unless proven
19 incorrect." Did I read that section
20 correctly?
21 A. Word for word.
22 Q. So you understood the union
23 had the ability to request from the
24 company seniority lists every six months
25 for all classifications as well as


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

Page 146

1  plant-wide seniority, correct?
2      A. Correct.
3      Q. And that if there was
4  dispute about seniority or those lists,
5  that company records were binding unless
6  there was proof they were not correct?
7      A. Yeah, if somebody chose
8  otherwise, yeah.
9      Q. The next section, "Plant-wide
10  seniority shall apply for purposes of
11  permanent layoff, recall from layoff and
12  job/annual bidding. However, in the
13  event of a permanent layoff due to
14  elimination of a position the affected
15  employees are entitled to bump by
16  seniority and qualifications until the
17  least senior employee is displaced, in
18  the event of temporary layoffs
19  classification seniority shall prevail."
20  Did I read that correctly?
21      A. Yes. May I also have a pen,
22  please?
23      Q. Did you want to write on the
24  exhibit?
25      A. Am I allowed?

Page 147

1      Q. Sure. If you'd like to.
2      A. Or a highlighter, can I use
3  a highlighter?
4      Q. So there's no confusion why
5  don't we use the blue pen --
6      A. All right.
7      Q. -- because I think there's
8  black on there currently.
9      A. Sure.
10      Q. So from this section you
11  understood that in the event of a
12  permanent layoff, recall from layoff or
13  job/annual bidding, plant-wide seniority
14  shall apply, correct?
15      A. Yes.
16      Q. Then you also understood
17  though that there was an exception that
18  stated, "In the event of a permanent
19  layoff due to elimination of a position,
20  the affected employees are entitled to
21  bump by seniority and qualifications
22  until the least senior employee is
23  displaced," correct?
24      A. Correct.
25      Q. And that temporary layoff, in

Page 148

1  the event of any temporary layoff,
2  classification seniority prevails,
3  correct?
4      A. Yes.
5      Q. Let's turn to ABC 70. I'm
6  looking at Section 9 which is still part
7  of seniority. It states in part, "Under
8  the following conditions any employee
9  shall lose his seniority (terminated --
10  " it says fro employment, close parens,
11  but you'd agree with me that probably
12  should say for -- or from employment,
13  excuse me, correct?
14      A. Sure.
15      Q. Makes more sense if it says
16  terminated from employment than
17  terminated fro employment?
18      A. Sure, a typo.
19      Q. Right. And then it lists a
20  number of these conditions under which
21  an employee shall lose seniority,
22  including subsection D on the next page,
23  ABC 71, which states, "If he fails to
24  return to work within three days after
25  notice from the company to return unless

Page 149

1  circumstances beyond his control prevent
2  him from notifying the company within
3  three days. Such notice shall be made
4  by registered letter or telegram." Did
5  I read that correctly?
6      A. Word for word.
7      Q. So you understood then if
8  the company did contact you to return to
9  work and you didn't respond in any way,
10  shape or form within three days you
11  could lose your seniority, correct?
12      A. Sure.
13      Q. And be terminated, in fact,
14  correct?
15      A. Sure.
16      Q. Section 13, still in
17  seniority, same page, ABC 71, this
18  reads, "If an employee is on an
19  involuntary layoff he will not lose his
20  seniority for a period of one year from
21  the date of layoff." Did I read that
22  correctly?
23      A. Word for word.
24      MR. ROSSI: Where is she reading?
25      MS. MCARDLE: Section 13, Mike.


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 150

1    MR. ROSSI: Thank you.
2         Q. Certainly you understood that
3    if you were placed on layoff you
4    maintained your seniority for a period
5    of one year, correct?
6         A. Yes.
7         Q. But beyond that, if you were
8    laid off for more than one year you
9    lost your seniority, correct?
10        A. Yes, lost everything, yes.
11        Q. Lost everything meaning what,
12   you were terminated at that point?
13        A. Union benefits, union wages.
14        Q. Turning to ABC 72, Article
15   16, health and welfare, do you see where
16   I am at the bottom of the page?
17        A. What page?
18        Q. The bottom of --
19   MR. ROSSI: 72.
20        Q. -- 72. Thanks, Mike.
21        A. Oh, yes, yes, yes.
22        Q. Article 16, health and
23   welfare, Section 1, health and dental
24   insurance. This section states in part,
25   "It is agreed that each seniority

## Page 151

1    employee of the company who has
2    completed his probationary period in
3    addition to the four most senior
4    merchandisers, regardless of number of
5    working hours, shall be given an
6    opportunity to enroll in the company's
7    Flex Plan in existence on January 1st,
8    1999." Did I read that correctly?
9         A. Word for word.
10        Q. Let's flip to the next page,
11   ABC 73, Section 4, health benefits,
12   merchandisers, do you see where I am?
13        A. Yes.
14        Q. It's about the middle of
15   that paragraph, the sentence begins,
16   "the company will allow," do you see
17   that?
18        A. Yes.
19        Q. "The company will allow
20   merchandisers who achieve 2,000 work
21   hours to enroll in the Flex Plan then
22   in place, up to a maximum up of six
23   over the life of this contract." Did I
24   read that correctly?
25        A. Word for word.

## Page 152

1         Q. So from reviewing the
2    collective bargaining agreement you
3    understood that up to the maximum of six
4    merchandisers who had achieved 2,000
5    work hours in a year were entitled to
6    health benefits under the plan, correct?
7         A. Yeah, those guys are lucky,
8    yeah, they're allowed.
9              - - - - -
10        (Thereupon, Deposition
11        Exhibit-17 was marked for
12        purposes of identification.)
13             - - - - -
14        Q. Showing you what's been
15   marked Deposition Exhibit 17, have you
16   seen this document before?
17        A. Yes.
18        Q. This is the agreement between
19   7-Up Youngstown and Teamsters Local 377
20   for the period January 29, 2010 through
21   January 29, 2013, correct?
22        A. Yes.
23        Q. You would agree with me that
24   the terms of this contract would govern
25   your employment with ABC from those

## Page 153

1    dates, January 29, 2010 through January
2    29, 2013, correct?
3         A. Correct.
4         Q. And without reading this into
5    the record I'd like you to -- I'm going
6    to identify certain sections and I want
7    you to read them and let me know if you
8    perceive a difference between the 2010
9    through 2013 contract verbiage versus
10   the 2006-2010 verbiage, okay? That will
11   save a little time.
12        A. Yes, that supersedes, yes.
13        Q. Let's look at ABC 285.
14   Article 3, management, section 1.
15        A. Yes.
16        Q. As you read Section 1 do you
17   perceive a difference between this
18   version of Section 1 and what we just
19   read in the prior contract?
20        A. I'll stipulate it would be
21   the same.
22        Q. How about 291, ABC 291,
23   Section 4 of Article 10, wages, same
24   question. As you read Section 4 do you
25   perceive any differences from the

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 154

1 verbiage in the 2010 to 2013 contract
2 versus the 2006 to 2010 contract?
3     A. I guess I better look at it.
4 What page is the other one on?
5     Q. Sure. The other one is on
6 ABC 67.
7     A. What are we looking at?
8     Q. In ABC 291 it's Section 4.
9     A. Okay. What am I looking at
10 on the other one?
11     Q. Section 8 on 67.
12     A. It looks different. Yeah,
13 it's different.
14     Q. And the difference is that
15 the last section or the last sentence,
16 rather, of the section is different. In
17 the 2010-2013 contract it states, "In
18 the event of a transfer or reassignment
19 by the employer the employees will not
20 be paid less than their current rate
21 unless stipulated by another section of
22 the agreement," correct?
23     A. Correct. Your previous
24 question I didn't look at the -- I
25 didn't defer to it. You want me to

## Page 155

1 look at the other one?
2     Q. You can if you want. I'll
3 represent to you it is the same but you
4 can certainly feel free to take a look
5 if you'd like.
6     A. I trust you.
7     Q. Let's look at 293 of the
8 2010-2013 contract. I'm specifically
9 looking, it's Section 1 of the seniority
10 Article 14 section, the portion that
11 begins, "in case of a dispute," do you
12 see where I am?
13     A. Yes.
14     Q. Why don't you read that
15 through seniority shall prevail and --
16 to yourself, and let me know if you see
17 any difference between that language and
18 the language from the prior contract.
19     A. Where is it at on the prior
20 contract, please?
21     Q. Sure. It is page 69.
22     A. Okay. Jumping back and
23 forth it appears to be the same.
24     Q. Let's turn the page to ABC
25 294, Section 7, and why don't we do

## Page 156

1 this in one shot? Section 7 and
2 Section 10, if you could take a look at
3 Section 7 D and please compare that, if
4 you'd like, to Section 9 D of the prior
5 contract?
6     A. What Bates number, please?
7     Q. Sure. 70.
8     A. Compare it to what?
9     Q. Compare it to Section 9 D,
10 as in David.
11     A. On 7 there's no D.
12     Q. I'm sorry?
13     A. On your Exhibit 16 I don't
14 see D on page --
15     Q. It's on the next page, that
16 section starts on that page.
17     A. Oh, you said Bates number
18 70.
19     Q. Correct. That's where the
20 section starts.
21     A. Okay. Section D? Yeah,
22 they're different, they run together
23 right off the bat, C and D.
24     Q. But the substance of D and
25 the substance of 7 D?

## Page 157

1     A. Yeah, they're different,
2 language is different.
3     Q. And what language is
4 different? It says, the prior contract
5 says, such notice shall be made by
6 registered letter or telegram,
7 whereas --
8     A. Yeah.
9     Q. -- the subsequent says just
10 by registered letter, that's the
11 difference, correct?
12     A. Yeah, I see that, it's
13 different, yeah.
14     Q. That's the difference you're
15 referring to?
16     A. Yes.
17     Q. And then Section 10 of the
18 new contract and Section 13 of the old
19 contract, new contract is 294, old
20 contract is 71.
21     A. Okay. Section 10 and
22 section what?
23     Q. 13 of the old.
24     A. Okay. Got it.
25     Q. Those are the same, correct?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 158**

1     **A.** Correct.
2     **Q.** Now, we talked kind of
3 generally about your employment with
4 ABC, I'd like to go into a little more
5 detail.
6     **A.** Sure, go ahead.
7     **Q.** You were hired July of 07 as
8 a warehouse loader, correct?
9     **A.** Correct.
10     **Q.** I think we talked about
11 this, you worked, we're calling it the
12 second shift, you said ABC really didn't
13 have a name for it but you didn't start
14 until approximately 4:00 p.m., correct?
15     **A.** True.
16     **Q.** Your duties as a warehouse
17 loader included reviewing electronic
18 orders assigned to truck routes, pulling
19 product to filling those orders and
20 placing product on trucks for shipment,
21 is that right?
22     **A.** What do you mean by
23 electronic orders?
24     **Q.** You received orders that came
25 into the warehouse or you reviewed

**Page 159**

1 orders that came into the warehouse,
2 we'll say in any form, you pulled
3 product to fill those orders and then
4 you placed product on trucks for
5 shipment?
6     **A.** We had paper documents, load,
7 unload, yeah, yeah.
8     **Q.** And generally would you agree
9 that Thursday was the warehouse's
10 busiest day because of Friday shipments
11 for the weekend?
12     **A.** Yeah, kind of doubled up.
13 Up.
14       - - - - -
15     (Thereupon, Deposition
16     Exhibit-25 was marked for
17     purposes of identification.)
18       - - - - -
19     **Q.** Showing you what's been
20 marked Deposition Exhibit 25, my
21 understanding is this is a copy of the
22 resume you submitted to the company and
23 the employment applications that you
24 filled out around the same time for
25 employment with the company, but please

**Page 160**

1 take a look and let me know if I have
2 that correct.
3     **A.** Appears to be.
4     **Q.** Looking at the first page of
5 Deposition Exhibit 25.
6     **A.** Say again, please.
7     **Q.** Sure. Looking at the first
8 page of Deposition Exhibit 25, your
9 resume?
10     **A.** Yes.
11     **Q.** Is there anything not
12 accurate in your resume?
13     **A.** It appears to be in order.
14     MR. ROSSI: Did you hear his
15 answer?
16     MS. MCARDLE: I did, thank you.
17     MR. ROSSI: Okay.
18     **Q.** Turning to the application
19 portion of Deposition Exhibit 25, same
20 question, please take the time you need
21 to review the application, but is there
22 anything contained in that application
23 that is not accurate?
24     **A.** It appears to be in order.
25     **Q.** I notice on -- I'll use the

**Page 161**

1 Bates number for those because I think
2 it's easier, ABC 137.
3     **A.** Okay.
4     **Q.** Under references you've
5 listed Michael D. Rossi, and I think
6 that says CPA, is that right?
7     **A.** No, it says LPA.
8     **Q.** Oh, LPA. What does LPA
9 stand for?
10     **A.** Licensed practicing attorney.
11     **Q.** I've never seen that acronym
12 before.
13     **A.** Really?
14     **Q.** Really.
15     **A.** Okay.
16     **Q.** I didn't realize that was
17 funny.
18     **A.** I didn't either.
19     **Q.** So you've listed your
20 attorney Mr. Rossi, who's sitting here
21 presently next to you in your
22 deposition, as a reference for
23 employment purposes at Dr. Pepper
24 Snapple Group, correct?
25     **A.** Well, they wanted references



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1 and that's all I can come up with out
2 of the phone book or whatever. Must
3 not be the phone book, I didn't remember
4 his phone number.
5     **Q.** Looking down at the bottom
6 of that same page, is that your
7 signature, sir?
8     **A.** Yes.
9     **Q.** You signed this on or about
10 June 25th, 2007?
11     **A.** Say that again.
12     **Q.** You signed this on or about
13 June 25th, 2007, is that right?
14     **A.** Yeah, I can't tell, 25th,
15 26th, 27th, 28th.
16     **Q.** Okay. Sometime in late June
17 of 07 you signed this employment
18 application?
19     **A.** Sure.
20     **Q.** Under applicant certification
21 there's some typed -- after the all caps
22 statement which actually says, "Please
23 read the following statements carefully,
24 they constitute the conditions under
25 which you might be employed with the

1 corporation."
2     It states, "I certify that all
3 the foregoing statements are true and
4 correct to the best of my knowledge. I
5 understand that misrepresentation or
6 omission of fact in this application --
7 " excuse me, "of facts in this
8 application or during interviews may
9 result in the withdrawal of an offer or
10 disciplinary action including
11 termination if I am hired." Did I read
12 that portion correctly?
13     **A.** Word for word.
14     **Q.** So you understood at the
15 time that you signed this application
16 and were certifying to this fact that
17 the statements contained in your
18 application were true and correct to the
19 best of your knowledge and you
20 understood that you could be terminated
21 for any misrepresentations contained in
22 your application, correct?
23     **A.** Sure.
24     **Q.** Skipping the paragraph to the
25 next paragraph that begins "I understand

1 that if hired," do you see where I am?
2     **A.** No -- okay, yeah, yeah,
3 yeah, yeah.
4     **Q.** "I understand that if hired
5 my employment is 'at will' which means
6 that it is not guaranteed for any period
7 of time and that my employment and
8 compensation may be terminated by the
9 corporation or myself for any reason at
10 any time with or without advance
11 notice." Did I read that correctly?
12     **A.** Wow, I never recall that,
13 yeah. At will employment, yes.
14     **Q.** Well, you have a practice of
15 reading documents before you sign them,
16 sir, right?
17     **A.** Yeah, okay. I thought it
18 was a union company. I didn't know it
19 was at will, okay.
20     MR. ROSSI: Wait for a question.
21     **A.** Sorry. I lost my pen.
22     **Q.** Turning to ABC -- off the
23 record.
24     (Discussion off the record.)
25     **Q.** Turning to ABC 143.

1     **A.** 140 what?
2     **Q.** 143. There's a section
3 entitled educational data, do you see
4 that?
5     **A.** Yes.
6     **Q.** I couldn't quite read it so
7 I wanted you to please identify, are
8 these three separate high schools that
9 you attended?
10     **A.** Yes.
11     **Q.** And what high schools were
12 these?
13     **A.** Howland High School, Warren
14 G. Harding and Warren Western Reserve
15 High School.
16     **Q.** From which of these high
17 school did you obtain your high school
18 diploma?
19     **A.** Howland High School.
20     **Q.** So was it that you took
21 classes at the other high schools or did
22 you attend them for a period of time?
23     **A.** I attend all three.
24     **Q.** I'm assuming not
25 simultaneously, you attended them for

**Cefaratti Group**
**THE LITIGATION SUPPORT COMPANY**
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1 separate periods of time?
2     **A.** Say that again, please.
3     **Q.** I'm assuming not
4 simultaneously, you attended them for
5 separate periods of time?
6     **A.** A couple of them.
7     **Q.** So, I'm sorry, that was
8 simultaneously you're saying?
9     **A.** Couple of them, yes.
10     **Q.** For what purpose were you
11 simultaneously attending schools?
12     **A.** Education.
13     **Q.** So you were taking selected
14 classes at Warren G. Harding and Warren
15 Western Reserve?
16     **A.** Yes, you got it.
17     **Q.** Of these schools, which are
18 public schools?
19     **A.** All of them.
20     **Q.** At the bottom of the same
21 page it states, "Have you ever been
22 convicted of a felony or a misdemeanor
23 other than traffic violations," and you
24 checked the no box, is that right?
25     **A.** Yeah.

1     **Q.** So at that point you were
2 certifying to ABC that you had never
3 been convicted of a felony or a
4 misdemeanor other than a traffic
5 violation?
6     **A.** Yeah.
7     - - - - -
8     (Thereupon, Deposition
9     Exhibit-26 was marked for
10     purposes of identification.)
11     - - - - -
12     **Q.** Around the same time that
13 you completed your employment
14 application you completed the document
15 or it appears you completed the document
16 that I'm handing you that has now been
17 marked as Deposition Exhibit 26.
18     **A.** Okay.
19     **Q.** Is that your signature at
20 the bottom of Deposition Exhibit 26?
21     **A.** It appears to be.
22     **Q.** And that looks like June 29,
23 2007, is that right, that you signed it?
24     **A.** Correct.
25     **Q.** Last paragraph of the

1 acknowledgment states, "Also, the
2 company cannot guarantee you a job. All
3 employment with the company is
4 terminable at will, which means you may
5 resign your employment at any time for
6 any reason. No one other than the
7 president of the company has any
8 authority to change the at will nature
9 of your employment. No statements by
10 any person shall bind the company to
11 continue your employment unless they are
12 in writing and signed by the president."
13 Did I read that correctly?
14     **A.** Word for word.
15     **Q.** So, again, in signing this
16 document above your signature which
17 reads, "I have read and understood these
18 above statements," you were certifying
19 to the company that you had read and
20 understood the statements set forth in
21 the acknowledgements on this page,
22 correct?
23     **A.** Yes.
24     **Q.** Now, we mentioned John Taraba
25 earlier in the deposition and I think

1 you even pulled out his business card
2 and read off his job title. My
3 question very basically is, as a
4 warehouse loader you reported to John,
5 is that right?
6     **A.** No, Ryan Cozart.
7     **Q.** So you had no reporting
8 relationship to Mr. Taraba?
9     **A.** In my first day hired John
10 advised me, instructed me to report to
11 Ryan Cozart.
12     **Q.** So, again, you had no
13 reporting relationship to Mr. Taraba, is
14 that your testimony?
15     **A.** Well, he's the manager but,
16 no, Ryan pretty much is the supervisor,
17 whatever, foreman.
18     **Q.** So you didn't consider Mr.
19 Taraba your supervisor then?
20     **A.** He was the manager, yes.
21     **Q.** So then again I'm confused
22 on your answer. You're saying he was
23 your supervisor but you didn't report to
24 him?
25     **A.** I didn't report to him, I

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 170

1  reported to Ryan Cozart when I got
2  hired, first day he told me report to
3  Ryan Cozart.
4      Q.  So from your first day of
5  employment you understood that you
6  reported to Mr. Cozart?
7      A.  Yeah, everybody did.
8      Q.  Everybody means --
9      A.  In the warehouse.
10      Q.  In the entire warehouse?
11      A.  At nights.
12      Q.  Even on first shift?
13      A.  No, Ryan is not on first
14  shift.
15      Q.  So your statement refers to
16  employee on the second shift or what
17  we've been calling the second shift?
18      A.  Nights.
19      Q.  Do you have any idea whether
20  at the time ABC hired you ABC considered
21  you a seasonal employee?
22      A.  No.
23      Q.  You did have an understanding
24  though that you had probationary status
25  for the first 90 days of your

## Page 171

1  employment?
2      A.  Probationary, yes.  The
3  grievance is 8291 regarding wages with
4  probation and that should satisfy that.
5      Q.  Well --
6      A.  January 3rd, I believe, 2008.
7      Q.  Sitting here today are you
8  claiming that you didn't receive wages
9  that you were entitled to for your
10  probationary period?
11      A.  Say that again, please.
12      Q.  Sitting here today are you
13  trying to claim that you did not receive
14  wages to which you were entitled to
15  during your probationary period?
16      A.  I'm not.
17      Q.  You completed your
18  probationary period sometime in
19  September of 07, is that right?
20      A.  I can't recall.
21      Q.  You were hired in July of 07
22  and you had a 90 day probationary
23  period, I guess that would put you,
24  what, in October of 07?
25      A.  Not to get picky about it,

## Page 172

1  sure.
2      Q.  Do you know who made the
3  decision to retain you upon completion
4  of your probationary period?
5      A.  You'd have to ask some
6  representative.
7      Q.  So you don't know?
8      A.  I don't know.
9      Q.  Do you know who was involved
10  in the decision to retain you after you
11  completed your probationary period?
12      A.  You'd have to contact your
13  client and see, I don't know.
14      Q.  Do you know what facts were
15  taken into consideration in deciding to
16  retain you after you completed your
17  probationary period?
18      A.  I don't have that privileged
19  information.
20      Q.  When you say privileged are
21  you trying to assert that an attorney
22  was involved in that decision?
23      A.  I'm not.
24      Q.  And after you completed your
25  probationary period you then became

## Page 173

1  eligible for certain ABC benefits, is
2  that right?
3      A.  Meaning?
4      Q.  Different employment
5  benefits, insurance, other things that
6  you became eligible for upon completion
7  of your probationary period, correct?
8      A.  Insurance, union benefits,
9  wages, yes.
10      Q.  At the time that you started
11  your employment with ABC in 2007 you
12  were aware that at least -- strike the
13  question, please.  At the time you
14  started your employment in 2007 were you
15  aware that at least one employee on the
16  day shift was splitting jobs between
17  warehouse and vending?
18      A.  Say that again, please.
19      Q.  At the time that you were
20  hired in 2007 at ABC were you aware
21  that at least one employee on the day
22  shift was splitting jobs between
23  warehouse and vending?
24      A.  When I was hired I didn't
25  know anybody, so no.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 174

1     **Q.** After you started did you
2 become aware that an employee was
3 splitting time between warehouse and
4 vending on the day shift?
5     **A.** I believe there was several
6 people splitting stuff. I can't recall.
7 I believe so.
8     **Q.** Doug Haus, do you know him?
9     **A.** Yeah, yeah, I remember him,
10 big guy.
11     **Q.** And Doug was -- H A U S.
12 And Doug was specifically splitting time
13 between vending delivery and warehouse
14 work, correct?
15     **A.** I don't know what their
16 arrangements really are. I just know he
17 would make an appearance.
18     **Q.** And that went back to the
19 beginning of your employment, you recall
20 Mr. Haus making an appearance in the
21 warehouse, correct?
22     **A.** Yeah, different people make
23 appearance on Thursdays, the heavy day.
24     **Q.** So you started your
25 employment sometime in July of 07 and

## Page 175

1 then in January of 08 were laid off,
2 correct?
3     **A.** Correct. Right after my
4 grievance settled.
5     **Q.** Which grievance are you
6 referring to?
7     **A.** Let's say it was 82
8 something, 8290.
9     **Q.** Oh, this is the wage issue
10 that you were referring to about payment
11 as a probationary employee, is that
12 right?
13     **A.** Sounds right.
14     - - - - -
15     (Thereupon, Deposition
16     Exhibit-27 was marked for
17     purposes of identification.)
18     - - - - -
19     **Q.** Handing you what's been
20 marked Deposition Exhibit 27, you've
21 seen this document before, correct?
22     **A.** Yeah, I'm familiar with it.
23     **Q.** And this document is a
24 letter dated January 11, 2008 that you
25 produced and it is addressed to whom it

## Page 176

1 may concern and indicates that you'll be
2 on temporary layoff effective January
3 14th, 2008, this will continue for an
4 undetermined length of time, correct?
5     **A.** Indicating temporary layoff,
6 yes.
7     **Q.** And it also indicates this
8 will continue for an undetermined length
9 of time, correct?
10     **A.** Separate sentence, yes.
11     **Q.** Yes, that is a separate
12 sentence and you understood this was
13 referring to your layoff, correct?
14     **A.** Sure, it's not a fragment,
15 it's two sentences, correct.
16     **Q.** Do you have personal
17 knowledge of why you were laid off at
18 that time?
19     **A.** Personal knowledge?
20     **Q.** Uh-hum.
21     **A.** No.
22     **Q.** Did you ask anyone why you
23 were laid off at that time?
24     **A.** I can assume.
25     **Q.** Did you ask anyone why you

## Page 177

1 were laid off in January of 08?
2     **A.** No.
3     **Q.** Do you know who made the
4 decision to lay you off at that time?
5     **A.** No.
6     **Q.** Do you who was involved in
7 the decision to lay you off at that
8 time?
9     **A.** Agents of the company.
10     **Q.** Do you know any individual
11 who was involved in the decision to lay
12 you off at that time?
13     **A.** At that time I'm not sure.
14     **Q.** Do you know what facts were
15 taken into consideration when you were
16 laid off or the decision was made to
17 lay you off in January of 08?
18     **A.** Say that again, please.
19     **Q.** Do you know what facts were
20 taken into consideration when the
21 decision was made to lay you off in
22 January of 2008?
23     **A.** What do you mean facts?
24     **Q.** Do you know what the company
25 considered when it made the decision to

**Cefaratti Group**
**THE LITIGATION SUPPORT COMPANY**
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 178**

1 lay you off in January of 08?
2     **A.** You have to ask them, I
3 don't know.
4     **Q.** And you were recalled
5 sometime in March of 08, is that right?
6     **A.** I don't have the papers in
7 front of me.
8        - - - - -
9     (Thereupon, Deposition
10     Exhibit-28 was marked for
11     purposes of identification.)
12        - - - - -
13     **Q.** Showing you what's been
14 marked Deposition Exhibit 28, this is a
15 letter that you produced written by you
16 on March 31st, 2008 to Teamsters Local
17 377.
18     **A.** Oh, the trustee Charlie
19 Byrnes, okay.
20     **Q.** Looking at the last -- let
21 me ask this: You wrote this letter,
22 correct?
23     **A.** Yeah, I drafted it.
24     **Q.** The information certainly you
25 wanted to set forth in the document was

**Page 180**

1 with Mr. Hoffa, yes, yes.
2     **Q.** When you were recalled in
3 March of 2008 to your
4 warehouse position, correct?
5     **A.** Yes, that's my position,
6 warehouse, yes.
7     **Q.** Do you recall that at the
8 time you were brought back in March of
9 08 several employees were on vacation or
10 leaving for vacation shortly after that?
11     **A.** I don't recall right now.
12     **Q.** It's possible, you just don't
13 recall?
14     **A.** I don't know. If you say
15 someone is on vacation, so be it, it's
16 okay.
17     **Q.** And you maintained your
18 health benefits during your recall --
19 or, excuse me, your layoff period, is
20 that right?
21     **A.** They had me on a personal or
22 a leave of absence, yeah, I don't know
23 why they did that, but yeah.
24     **Q.** You came back in March of 08
25 and then you were subsequently laid off

**Page 179**

1 true since you were writing to Teamsters
2 Local 377, right?
3     **A.** Sure. My signature isn't
4 subscribed upon this, but yeah.
5     **Q.** In the last paragraph of
6 this letter you state, "As such,
7 regarding said layoff or discharge, it's
8 been one working day since being called
9 back to work on March 31st, 2008." Did
10 I read that correctly?
11     **A.** Word for word.
12     **Q.** Does that refresh your
13 recollection that you were recalled to
14 work in March of 2008?
15     **A.** Sure.
16     **Q.** Flipping, I think there's a
17 second page to that exhibit, is there?
18     **A.** Yeah.
19     **Q.** That appears to be a letter
20 from Charlie Byrnes to yourself dated
21 April 1st, 2008. Is it your
22 understanding this is a response from
23 Mr. Byrnes, B Y R N E S, to you to your
24 March 31st, 2008 letter?
25     **A.** Yeah, because of my contact

**Page 181**

1 in January of 09 again, correct?
2     **A.** It sounds about right.
3        - - - - -
4     (Thereupon, Deposition
5     Exhibit-29 was marked for
6     purposes of identification.)
7        - - - - -
8     **Q.** Showing you what's been
9 marked Deposition Exhibit 29, another
10 letter that you produced, this one is
11 dated January 9th, 2009 addressed to
12 whom it may concern, refers to you, it
13 says you'll be on temporary layoff
14 effective January 12, 2009. Perhaps
15 there's a period missing, I don't know.
16 Then it says, "This will continue for an
17 undetermined length of time." Did I
18 read that correctly?
19     **A.** Yeah, the grammar is
20 fragle(sic) in it, you're right, yeah,
21 yeah, word for word.
22     **Q.** So you understood in the
23 sentence, "This will continue for an
24 undetermined length of time," referred
25 to your layoff, correct?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 182

1     **A.** Say that again, please.
2     **Q.** You understood in the
3 sentence, "This will continue for an
4 undetermined length of time," that the
5 word this referred to your layoff,
6 correct?
7     **A.** Defining temporary layoff
8 undetermined, yes.
9     **Q.** My question is just simply
10 from reading the sentence, "This will
11 continue for an undetermined length of
12 time," you understood "this" referred to
13 your layoff, correct?
14     **A.** Sure, the temporary layoff,
15 yes.
16     **Q.** Do you have personal
17 knowledge of why you were laid off in
18 January of 09?
19     **A.** I don't know. You have to
20 ask the company.
21     **Q.** Did you ever ask the company
22 why you were laid off in January of 09?
23     **A.** No.
24     **Q.** Do you who made the decision
25 to lay you off in January of 09?

## Page 183

1     **A.** You have to ask the company,
2 the company agent.
3     **Q.** Do you know who was involved
4 in the decision to lay you off in
5 January of 09?
6     **A.** You got signatures here,
7 these company guys right there, the
8 company, what's it say, Stimmel, Fisher,
9 Bobal and 377.
10     **Q.** Well, certainly Local 377 is
11 not part of the company, correct?
12     **A.** True.
13     **Q.** And my question is, do you
14 have any personal knowledge of who was
15 involved in the decision to lay you off
16 in January of 09?
17     **A.** No.
18     **Q.** So similarly you don't know
19 what facts were considered by those
20 individuals when they made the decision
21 to lay you off in 09, correct?
22     **A.** You have to ask them, I
23 don't know.
24     **Q.** Once again you stayed on
25 company health benefits while you were

## Page 184

1 on layoff?
2     **A.** Say that again, please.
3     **Q.** Once again you stayed on
4 company health benefits while you were
5 on layoff, correct?
6     **A.** They had me on a leave of
7 absence, yes. I don't know why they
8 did that. Yes.
9     **Q.** Do you recall that sometime
10 in April of 09 you had a conversation
11 with Mr. Taraba about when you would be
12 recalled and his response was not until
13 June of 09 because that coincided with
14 vacations?
15     **A.** I don't recall.
16     **Q.** You don't recall one way or
17 the other, correct?
18     **A.** When was it?
19     **Q.** April of 09.
20     **A.** I'm not familiar. If you
21 say, so be it.
22     **Q.** You were, in fact, recalled
23 in June of 09, is that right?
24     **A.** I don't have the paperwork
25 in front of me. If you say so, so be

## Page 185

1 it.
2     - - - - -
3     (Thereupon, Deposition
4     Exhibit-30 was marked for
5     purposes of identification.)
6     - - - - -
7     **Q.** Showing you what's been
8 marked Deposition Exhibit 30, a document
9 that appears to be from you dated June
10 3rd of 09 written to John Taraba. Does
11 this document refresh your recollection
12 that you returned to work June 8th of
13 2009?
14     **A.** It's not -- my signature
15 isn't subscribed but it appears to be.
16     **Q.** We haven't really seen any
17 typed documents that you submitted where
18 your signature was subscribed, correct?
19     **A.** Yeah, I don't know why, but
20 yes.
21     **Q.** So this does refresh your
22 recollection you were recalled June of
23 09, correct?
24     **A.** Yes. I didn't want any
25 disruption and more problems, the grief,

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

# DEPOSITION OF ROBERT A. POTTS

## Page 186

1 just trying to be a good faith, good
2 person, yes, courtesy.
3     **Q.** And you were again recalled
4 to your warehouse position, is that
5 right?
6     **A.** Excuse me. Yes, that's
7 correct.
8     **Q.** Coming back in June of 09
9 you were then subsequently laid off
10 September 21st of 09, correct?
11     **A.** Yeah, that sounds right.
12     - - - - -
13 (Thereupon, Deposition
14 Exhibit-31 was marked for
15 purposes of identification.)
16     - - - - -
17     **Q.** Handing you what's been
18 marked Deposition Exhibit 31, it's a
19 document produced by you that contains
20 -- sorry, Mike -- the highlighted
21 portions and the red writing. This is
22 a document dated September 18th, 2009,
23 to whom it may concern. It indicates
24 you'll be placed on layoff effective
25 Monday, September 21, 2009. The next

## Page 187

1 sentence, "This layoff will continue for
2 an undetermined length of time." Did
3 that I read that correctly?
4     **A.** Word for word.
5     **Q.** Do you have personal
6 knowledge of why you were laid off in
7 September of 09?
8     **A.** No.
9     **Q.** Did you ask?
10     **A.** No.
11     **Q.** Who made the decision -- or
12 strike the question, please. Do you
13 know who made the decision to lay you
14 off in September of 09?
15     **A.** A company agent.
16     **Q.** Do you know what individual
17 made the decision to lay you off?
18     **A.** I don't know, you have to
19 ask them.
20     **Q.** Do you know who was involved
21 in the decision to lay you off in
22 September of 09?
23     **A.** You have to ask the company.
24     **Q.** Do you know what was taken
25 into account when making the decision to

## Page 188

1 lay you off in September of 2009?
2     **A.** Repeat the question.
3     **Q.** I'm sorry?
4     **A.** Repeat the question.
5     **Q.** Do you know what was taken
6 into account when making the decision
7 lay you off in September of 09?
8     **A.** What do you mean account?
9     **Q.** What facts were considered
10 when whoever made the decision to lay
11 you off in September of 09 made that
12 decision?
13     **A.** No.
14     **Q.** You stayed on company health
15 benefits during this layoff as well,
16 correct?
17     **A.** Say that again, please.
18     **Q.** You stayed on company health
19 benefits during this layoff as well,
20 correct?
21     **A.** Yeah, they had me on leave,
22 private leave or something. I don't
23 know why they did that, they keep doing
24 that. Personal leave or something.
25 Yes, health benefits, yes.

## Page 189

1     **Q.** After receiving a copy of
2 Deposition Exhibit 31 did you contact
3 Mr. Taraba to discuss your layoff?
4     **A.** No.
5     **Q.** Did you contact Mr. Stimmel
6 to discuss your layoff?
7     **A.** No.
8     **Q.** When you received a copy of
9 Deposition Exhibit 31 on or about
10 September 18, 2009 did you contact the
11 union to discuss your layoff?
12     **A.** Every month.
13     **Q.** I'm sorry?
14     **A.** Every month, yes.
15     **Q.** You contacted them every
16 month beginning September 18th, 2009 to
17 discuss your layoff?
18     **A.** Yes, I had pay my dues every
19 month.
20     **Q.** Okay. So, I'm sorry, the
21 contact you're referring to was to pay
22 your dues?
23     **A.** Yeah, and small talk, banter,
24 shop talk, et cetera, et cetera.
25     **Q.** Did you also ask when you

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## Page 190

1　were going to be recalled when you
2　contacted the union?
3　　　A.　During the trusteeship I was
4　worried and understand a gray area
5　because they removed two officials,
6　Colello and DePasquale or whatever his
7　name is, for wrongdoing, quote, unquote.
8　So the union was kind of in chaos,
9　infighting, disorganized, disruption, so
10　I kind of kept going down there at the
11　hall in Youngstown.
12　　　Q.　I'm sorry, you were concerned
13　about your recall status because there
14　was chaos going on at the union and you
15　didn't want you to get lost in the
16　shuffle of that chaos?
17　　　A.　I didn't want to make them
18　pissed but I did know and felt that I
19　have to keep paying my dues, especially
20　in this time.  Plus the contract
21　negotiations was ongoing, there was no
22　contract, they got to ratify the
23　contract.  They didn't ratify it until
24　March of 2000, what is it, 11, 2011 --
25　or 2010, I'm sorry, I misspoke.  So I

## Page 191

1　made an appearance but sometimes they
2　got angry at me so I kind of shied off
3　a little bit, just try to keep in good
4　contact with them.
5　　　Q.　So once again you wanted to
6　make sure that your status, your recall
7　status, was not lost in the shuffle with
8　everything that was going on that you
9　just described with the union?
10　　　A.　Say that again, please.
11　　　Q.　Once again you wanted to
12　insure that your recall status was not
13　lost in the shuffle with everything that
14　you just recounted was going on with the
15　union?
16　　　A.　I was making sure my
17　employment was okay.
18　　　Q.　Did the union give you any
19　indication your employment was not okay
20　in response to your inquiries?
21　　　A.　No.
22　　　Q.　Did you contact -- on or
23　about September 18th, 2009 after
24　receiving Deposition Exhibit 31 did you
25　contact Mr. Bobal to discuss your

## Page 192

1　layoff?
2　　　A.　No.
3　　　Q.　Same question with regards to
4　Cindi Fisher, F I S H E R?
5　　　A.　Say it again, please.
6　　　Q.　Same question with regards to
7　Miss Fisher, did you contact Miss Fisher
8　on or about September 18th, 2009 to
9　discuss your layoff?
10　　　A.　Nothing in payroll, no.
11　　　Q.　And you say nothing in
12　payroll because you understand Miss
13　Fisher is in the company's payroll
14　department, correct?
15　　　A.　Yeah, just past experience
16　with her in 2007, payroll, December
17　31st, December whatever it was, yeah.
18　　　Q.　So other than the union
19　conversations you just mentioned did you
20　contact anyone about being recalled to
21　work after receiving the September 18,
22　2009 correspondence?
23　　　A.　Just union people.
24　　　Q.　So it's your position that
25　when you received the September 18th,

## Page 193

1　2009 correspondence that this was a
2　permanent layoff?
3　　　A.　No.
4　　　Q.　You filed a grievance on
5　August 30th --
6　　　A.　Yes.
7　　　Q.　-- 2011?
8　　　A.　That's the wage claim.
9　　　Q.　That was 11823, right?
10　　　A.　Yeah, it's 118, yeah, you're
11　correct, 23.  She has nothing to do
12　about layoff, it's just a wage claim to
13　get paid wages, union benefits.  Nothing
14　else.
15　　　　　- - - - -
16　　　　　(Thereupon, Deposition
17　　　　　Exhibit-32 was marked for
18　　　　　purposes of identification.)
19　　　　　- - - - -
20　　　Q.　Handing you what's been
21　marked Deposition Exhibit 32, it's a
22　copy of the grievance we've been
23　discussing, 11823?
24　　　A.　Yeah, I wrote it myself.
25　　　Q.　In the nature of report

## Cefaratti Group
**THE LITIGATION SUPPORT COMPANY**

1.800.694.4787　　www.cefgroup.com　　fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1 section you have a clause that states,
2 "As the company has assigned others to
3 work," do you see that?
4     **A.** Where, what are you looking
5 at?
6     **Q.** The section entitled nature
7 of report, that's where you described
8 your grievance?
9     **A.** Okay.
10     **Q.** There's a clause on the
11 third line --
12     **A.** Okay, I see it.
13     **Q.** -- that starts, "As the
14 company has assigned others to work," do
15 you see that?
16     **A.** Yes.
17     **Q.** To whom are you referring
18 when you say others to work?
19     **A.** Any worker.
20     **Q.** Did you have personal
21 knowledge that somebody had been
22 assigned to work your job?
23     **A.** What do you mean personal
24 knowledge?
25     **Q.** Well, maybe I'm making an

1 assumption and you can correct me if I
2 have this wrong, but I thought we talked
3 about this earlier in the deposition
4 that you filed this grievance because
5 you believed that you were laid off and
6 someone was performing your job?
7     **A.** Well, based on a discussion
8 with Joe Warner from OSHA on the 26th
9 of August, you know, 2010, I'm assuming
10 I had to be replaced and I'm assuming
11 that other workers are covering me if
12 they didn't hire anybody and if they
13 did, I mean, they had a lot of work so
14 I figured they got to bring somebody in.
15 So it's a good educated guess.
16     **Q.** Did you know or have
17 personal knowledge of the level of
18 orders that the company was receiving in
19 the summer of 09?
20     **A.** Say that --
21     **Q.** Did you have any personal
22 knowledge of the level of orders for
23 product the company was receiving in the
24 summer of 09?
25     **A.** What do you mean level of

1 orders?
2     **Q.** The amount of orders they
3 were receiving?
4     **A.** You mean volume?
5     **Q.** Yes.
6     **A.** I don't know. What date was
7 that to?
8     **Q.** Summer of 09.
9     **A.** Busy season, you should have
10 a lot of orders.
11     **Q.** When you say busy season are
12 you saying that summer of 09 was busy
13 or generally the summer is a busy
14 season?
15     **A.** I'm just politely saying the
16 summer is always busy. It's pop season,
17 quote, unquote.
18     **Q.** But you don't have any
19 personal knowledge of the orders the
20 company was actually receiving, correct?
21     **A.** No.
22     **Q.** Now, we talked about this
23 briefly, at least I think you mentioned
24 it before, that you attended a meeting
25 on September 14th, 2010 at ABC about

1 your grievance, correct?
2     **A.** Yes, about this wage claim
3 11823.
4     MS. MCARDLE: Off the record.
5     (Discussion off record.)
6     - - - - -
7     (Thereupon, Deposition
8     Exhibit-33 was marked for
9     purposes of identification.)
10     - - - - -
11     **Q.** Showing you what's been
12 marked Deposition Exhibit 33, this is a
13 document that you produced to us in
14 discovery with the highlighted portions
15 on there, appears to be a letter to
16 you, a copy to the Teamsters Local 377,
17 Bill Stimmel, John Taraba, and the
18 document is from Mike Bobal. It's dated
19 9-30-2010 and, as you said, it related
20 to grievance 11823?
21     **A.** Yes.
22     **Q.** You received a copy of this
23 document as you put highlighted marks on
24 it, correct?
25     **A.** Certified mail, I signed for

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 198

1    it.
2         **Q.** So we talked a little bit
3    about the meeting on September 14th
4    earlier but I have a few more specific
5    questions about that meeting.
6         **A.** Sure.
7         **Q.** What else -- to the best of
8    your recollection, how long was that
9    meeting on September 14, 2010?
10        **A.** I can't recall, you have to
11   ask the company. I'm sure they timed
12   it because I'm sure they got paid for
13   it.
14        **Q.** What subjects were discussed
15   at the September 14, 2010 meeting?
16        **A.** Collecting bargaining
17   subjects.
18        **Q.** What specific subjects as
19   they related to your employment with ABC
20   were discussed at the September 14, 2010
21   meeting?
22        **A.** This is the wage claim issue
23   regarding wages, getting paid, with
24   other workers working.
25        **Q.** And what other subjects other

## Page 199

1   than other workers working were
2   discussed during the September 14, 2010
3   meeting?
4        **A.** I believe I brought up the
5   issue that they didn't call me for
6   annual job bidding for the year, since
7   the contract was ratified and looks like
8   I got left out somewhere, I think.
9        **Q.** Did the company respond?
10        **A.** The result of that meeting,
11   they basically walked out and left.
12        **Q.** So you're saying the company
13   -- you made a statement about not being
14   called for annual job bidding and no one
15   from the company responded to you?
16        **A.** You know, there were so many
17   subjects, I mean, I just have to just
18   -- just jump into it and jump -- it was
19   all over the place, so there was a lot
20   of different subjects. Because Mr.
21   Bobal pretty much turned red in the face
22   and his demeanor changed and his conduct
23   changed and was upset and angry and they
24   decided to end the meeting, just walk
25   out, it was incomplete. Nothing was

## Page 200

1   really resolved at that point.
2        **Q.** So you're saying --
3        **A.** Union reps were pretty much
4   backing my side and certified everything
5   I'd said and says I'm going to get paid
6   my wages and...
7        **Q.** So you're saying Mr. Bobal's
8   demeanor changed from the start of the
9   meeting to the point when the company
10   people left?
11        **A.** Yeah, you could confer with
12   your client, it was pretty drastic in
13   change.
14        **Q.** Mr. Potts, we're here to
15   take your deposition --
16        **A.** Absolutely.
17        **Q.** -- so I can get the facts
18   from you. I certainly can confer with my
19   client but you filed the lawsuit against
20   ABC so I'm entitled to some answers,
21   okay?
22        **A.** That's why I'm here.
23        **Q.** Great. Thank you.
24        MR. ROSSI: Don't argue with her.
25        THE WITNESS: Oh, I'm sorry,

## Page 201

1   that's --
2        MR. ROSSI: Just answer her
3   question if she asks one.
4        **A.** I apologize.
5        **Q.** No, it's no offense.
6        **A.** I don't mean to be out of
7   line.
8        **Q.** So my question again is, are
9   you saying Mr. Bobal's demeanor changed
10   from the start of the meeting until the
11   point in time when the company people
12   left?
13        **A.** Yeah. The other company
14   reps was fine, demeanor is good, he was
15   the only one.
16        **Q.** And then you said there were
17   so many subjects discussed and that's
18   really what I'm trying to get a handle
19   on.
20        **A.** Yeah.
21        **Q.** You said that there was the
22   wage claim, that you were not called for
23   annual job bidding and then what other
24   subjects were discussed?
25        **A.** Yeah, that's why we were

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 202

1  there.  This is a wage claim, annual
2  job bidding, workers from other
3  departments working.  We got -- I got
4  the seniority list for the first time,
5  it's dated 9-14-2010.  That's when I
6  seen that there are seven or eight
7  people hired under me.  That's when we
8  seen that there's no utility
9  classification on the seniority sheet.
10  A lot of information.  Seen that another
11  guy was hired the same day I was laid
12  off.  All kind of stuff.
13      Q.  And I'm looking for the
14  subjects that were discussed at that
15  meeting.  So I have wage claim, you
16  were not called for annual job bidding,
17  that other workers were assigned to your
18  work and you received a seniority list.
19  What other subjects?
20      A.  The basis of that claim is a
21  wage claim proving that they had other
22  workers in there and doing my job.  And
23  I thought I accomplished it and
24  unfortunately the meeting ended, they
25  run out, that was it.  Then I get this

## Page 203

1  letter in the mail.
2      Q.  You thought you accomplished
3  proving that the company had someone
4  else in your position?
5      A.  I thought for my grievance
6  with proving that all those things, that
7  I thought I made a good face, you know,
8  not good -- good faith argument in
9  proving my points to prevail in the
10  grievance on 11823 so I can get paid
11  wages.
12      Q.  And, again, you're saying
13  that you feel you proved that the
14  company had someone else in your
15  position?
16      A.  Well, I thought that...
17      Q.  This is a yes or no
18  question.
19      A.  Repeat the question.
20      Q.  Are you saying that you
21  proved the company had someone else
22  working your position?
23      A.  Repeat that.
24      Q.  Are you saying that you feel
25  you proved in that September 14, 2010

## Page 204

1  meeting that the company had someone
2  else working your position?
3      A.  Working my jobs, yes.
4      Q.  Who was that?
5      A.  Many people.
6      Q.  You said that someone
7  replaced you so are you not saying that
8  now, there's not somebody who took over
9  your position in the warehouse?
10      A.  Let me clarify.  I received
11  the seniority list for the first time
12  and take notice or took notice of new
13  employees.
14      Q.  New warehouse employees?
15      A.  New warehouse, new
16  merchandisers, new drivers, there's a
17  lot of new employees on that sheet.  I
18  have taken notice and without question
19  somebody is working in the warehouse.
20      - - - - -
21      (Thereupon, Deposition
22      Exhibit-34 was marked for
23      purposes of identification.)
24      - - - - -
25      Q.  Handing you what's been

## Page 205

1  marked Deposition Exhibit 34, it's a
2  document that you produced highlighting
3  and red pen on the document with the
4  time you produced it.
5      A.  Yes.
6      Q.  Looking, this appears to be
7  a letter dated September 14, 2010?
8      A.  Yes.
9      Q.  To the local union?
10      A.  Same day pretyped, yes.
11      Q.  I'm sorry, you typed this
12  prior to arriving at the meeting?
13      A.  Yeah.
14      Q.  Didn't you just testify that
15  you received the seniority list for
16  first time at that meeting?
17      A.  That's right.  I didn't
18  attach it to this.
19      Q.  Then I guess I'm unaware how
20  you knew that your name was not last in
21  the plant-wide seniority list at that
22  time?
23      A.  I typed this letter up and
24  brought it that day, September 14, 2010.
25  That was my argument at the time and

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787      www.cefgroup.com      fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

Page 206

1  that was my position and my position was
2  stating permanent layoff.
3      Q.  Why did you believe that the
4  subject of permanent layoff was going to
5  be discussed at the September 14, 2010
6  meeting?
7      A.  Because my seniority time is
8  good for one year after date of
9  involuntary layoff, which is
10  9-21st-2010.  So cutting whatever
11  manipulations and things that they're
12  doing right to the point, laid off a
13  long time, permanent layoff, that's what
14  I jumped into at that time, is my
15  understanding of the information I got.
16      Q.  So what you're saying is you
17  were speaking of a permanent layoff
18  because the one year period under the
19  contract was about to expire on
20  September 21st, 2010 and, to use your
21  words earlier in the deposition, that
22  you'd be done for all purposes at that
23  point?
24      A.  My position was to show, to
25  prevail on that grievance, to show a

Page 207

1  prevailing case and I thought I did for
2  my grievance.
3      Q.  And my question is different.
4  You referenced permanent layoff, I asked
5  you why you even thought permanently
6  layoff would a subject to be discussed
7  at the September 14, 2010 meeting and
8  you responded because your one year
9  period was almost up and you made some
10  characterizations about the company --
11      A.  Sure.
12      Q.  -- and that's why you said
13  you raised it.  So I'm clarifying in
14  saying, so you raised the subject of
15  permanent layoff because you believed
16  under the terms of the contract one year
17  of layoff was about to expire and as of
18  September 21st, 2010 you would be, using
19  your words, done for all purposes?
20      A.  Rephrase that.
21      Q.  I really can't.
22      MS. MCARDLE:  I really can't.
23  Can you read that back, please?
24      (Record read.)
25      A.  Okay.  That's the way I

Page 208

1  think.  That's my response, that's how I
2  think and knowing that seven days of
3  seniority remains, my seniority recall
4  rights, everything else, seven days away
5  to help them get to a decision real
6  fast, pay me, discuss layoff issues and
7  everything else, union contract, the
8  trusteeship, the removal of the union
9  people, new employees, other employees
10  doing work out of classification, all
11  that, because that's how I think.
12  That's why I did that.  I pretyped this
13  letter ahead of time and came in and
14  passed it out to every one of them at
15  the table.  That was my position
16  statement.
17      Q.  So let's look at the
18  seniority list that is attached to
19  Deposition Exhibit 34 --
20      A.  Yes.
21      Q.  -- but you're saying that
22  was not part of the September 14 letter
23  that you represented?
24      A.  That's what we found out
25  that day.  I don't think they give me

Page 209

1  the list until after, the union mailed
2  it to me.
3      - - - - -
4      (Thereupon, Deposition
5      Exhibit-35 was marked for
6      purposes of identification.)
7      - - - - -
8      Q.  Let's do this then, please
9  take the list off of Exhibit 34.
10      A.  Yeah.
11      Q.  And put Exhibit 35 at the
12  bottom of the first page of the list
13  and we'll introduce these separately.
14  Showing you what's been marked
15  Deposition Exhibit 35, this is a copy of
16  the layoff -- excuse me, the seniority
17  list that you received at the September
18  14, 2010 meeting, correct?
19      A.  Say that again.
20      Q.  Showing you what's been
21  marked Deposition Exhibit 35, this a
22  copy of the seniority list that you said
23  you received on September 14, 2010,
24  correct?
25      A.  They didn't give it to me.



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 210**

1   I was able to look at it that day,
2   correct.
3          **Q.** If you need to look at this
4   list to refresh your recollection,
5   please do so.
6          **A.** Sure.
7          **Q.** But please identify all the
8   employees that you claim were performing
9   your job.
10         **A.** I can only assume, I wasn't
11  there.
12         **Q.** So you have no personal
13  knowledge of anyone on this list who was
14  performing your job while you were on
15  layoff, correct?
16         **A.** It could be any one of them.
17         **Q.** Now, you referenced also
18  earlier in your testimony that the
19  company hired other warehouse
20  individuals while you were on layoff.
21  Would you please turn to the second page
22  of the exhibit, which is the seniority
23  by department list, you are the least
24  senior employee listed under warehouse,
25  correct?

**Page 211**

1          **A.** After studying that yes,
2   correct. Interesting.
3          **Q.** And if you flip to the first
4   page of Deposition Exhibit 35, this is
5   the plant-wide seniority list and
6   numbers 21 through 30 are all identified
7   as merchandisers, correct?
8          **A.** Yes.
9          **Q.** And looking at the plant-wide
10  seniority list you are the least senior
11  warehouse person, number 19 on this
12  list, correct?
13         **A.** I would have to disagree.
14  May I separate this so I can look at
15  them side-by-side?
16         **Q.** My question is really looking
17  at the plant-wide seniority list, which
18  is the first page of Deposition Exhibit
19  35, you are the least senior warehouse
20  employee listed on this list, correct?
21         **A.** On this document, yes.
22         **Q.** Do you believe that there's
23  something on the second page that would
24  show that you were not the least senior
25  warehouse employee as of September 14,

**Page 212**

1   2010?
2          **A.** Yeah, I looked right at it.
3          **Q.** And who has less seniority
4   who holds the position as warehouse
5   loader?
6          **A.** I always been number five
7   and I count one, two, three, four, five.
8   There's Tony Nicastro who has been
9   utility, gets less pay than me, starts
10  earlier than me and on this date,
11  9-14-2010, it's a warehouse, new
12  contract ratified in March 2010,
13  supposed to have seniority updates. I
14  just don't know why he's in the
15  warehouse and no utility classification.
16  And if he did get in the warehouse his
17  classification department seniority is
18  incorrect.
19         **Q.** On what basis do you believe
20  his seniority is incorrect?
21         **A.** Well, when I was hired in
22  July of 2007 he was utility.
23         **Q.** And my question is different.
24  You said if he was in the warehouse his
25  seniority is incorrect. On what basis

**Page 213**

1   do you believe his seniority is
2   incorrect because he's in the warehouse?
3          **A.** Well, they would have to
4   post a job for him to take a warehouse
5   job. The company would have to post an
6   opening or if they -- what's the word
7   I'm looking for -- relieve a position or
8   get rid of a position they still have
9   to post for other people. Even the
10  annual bidding, everybody has to get
11  reassigned in seniority classifications.
12  For example, you can look at the
13  department seniority under Kevin
14  Sypherd, department seniority date
15  6-21st-2010, date of hire 7-21st-2003.
16  I mean, his status is incorrect.
17         **Q.** Do you know why Mr.
18  Sypherd's status shows 6-21-210 for
19  department seniority?
20         **A.** Looking at this, my educated
21  guess is --
22         **Q.** I don't want your guess, I
23  want knowledge. Do you know why Mr.
24  Sypherd's department seniority is listed
25  as 6-21-2010?

**C** **Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

Page 214

1    **A.** What department, doesn't say
2  what department he's in there.
3    **Q.** My question again is, do you
4  know why Mr. Sypherd's department
5  seniority is listed as 6-21-2010?
6    **A.** He got hired as a driver.
7  MS. MCARDLE: Mike?
8  MR. ROSSI: Yes?
9  MS. MCARDLE: Would you please
10  have your witness answer the questions?
11    **Q.** My question is really, really
12  simple, Mr. Potts.
13    **A.** Okay.
14    **Q.** Do you know why Mr.
15  Sypherd's department seniority is listed
16  as 6-21-2010?
17    **A.** Do I know why it's listed?
18    **Q.** Yes, as that date, do you
19  know why?
20    **A.** Because he's a driver,
21  obviously he's a driver.
22    **Q.** Do you have personal
23  knowledge about why Mr. Sypherd's
24  seniority date is listed as 6-21-2010?
25    **A.** Yeah.

Page 215

1    **Q.** What's that knowledge?
2    **A.** I seen him.
3    **Q.** You seen him what?
4    **A.** Out in public. I had a
5  conversation with him, engaged him in
6  dialogue.
7    **Q.** And he told you his
8  seniority date is 6-21-2010?
9    **A.** He told me he got hired as a
10  driver. I said congratulations. Same
11  at the gas station.
12    **Q.** Have you ever seen Mr.
13  Sypherd's personnel file?
14    **A.** No.
15    **Q.** And on what basis are you
16  making your statements that the company
17  would post positions that became
18  available, is that because of something
19  in the collective bargaining agreement?
20    **A.** Well, I don't see utility
21  looking at this seniority.
22    **Q.** That's not my question, Mr.
23  Potts.
24    **A.** I'm sorry.
25    **Q.** My question again is very

Page 216

1  simple.
2    **A.** Okay.
3    **Q.** You testified that if there
4  was an open position the company would
5  have to post that position?
6    **A.** Yeah.
7    **Q.** And I'm asking you where you
8  have come up with that information that
9  the company is required to post a
10  position that is open?
11    **A.** The CBA.
12    **Q.** So you would defer to the
13  terms of collective bargaining agreement
14  for whatever the company is or is not
15  supposed to do with regards to posting
16  an open position, correct?
17    **A.** Say that again, please.
18    **Q.** You would defer to the terms
19  of the collective bargaining agreement
20  as to what the company is or is not
21  supposed to do with regards to posting a
22  position, correct?
23    **A.** You can say that. And
24  annual job bidding.
25    **Q.** Looking at Deposition Exhibit

Page 217

1  33, you've highlighted a portion of the
2  first page of the document, it's within
3  a paragraph that states -- I'm sorry, do
4  you have the document in front of the
5  you?
6    **A.** I have it now, yes.
7    **Q.** It's in a paragraph that
8  states, "The company acknowledges that
9  with nearly a year now passing the
10  situation may result in a loss of
11  seniority. To avoid this possibility
12  (and in consideration of the fact it has
13  been over a year) the company is willing
14  to now consider this a 'permanent
15  layoff' effective October 15, 2010."
16  Did I read that correctly?
17    **A.** Word for word.
18    **Q.** Did you ask ABC what it
19  meant by that it is willing to now
20  consider this a permanent layoff
21  effective October 15, 2010?
22    **A.** Say that again, please.
23    **Q.** Did you ask the company,
24  after you received and read this letter,
25  what it meant by the statement it is



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

| | Page 218 |
|---|---|
| 1 | willing to now consider this a permanent |
| 2 | layoff effective October 15, 2010? |
| 3 | **A.** I only sent a letter for |
| 4 | seniority status and Mr. Bobal wouldn't |
| 5 | respond to me, he said don't talk to |
| 6 | him, so no. |
| 7 | **Q.** He said go to your union, |
| 8 | correct? |
| 9 | **A.** That was it, yes. |
| 10 | **Q.** So, again, you did not ask |
| 11 | the company what it meant by the |
| 12 | statement it is now willing to consider |
| 13 | this a permanent layoff effective |
| 14 | October 15, 2010, correct? |
| 15 | **A.** Say that again. |
| 16 | **Q.** You did not ask the company |
| 17 | what it meant by the statement it is |
| 18 | now willing to consider this a permanent |
| 19 | layoff effective October 15, 2010? |
| 20 | **A.** Yeah, the attempt was |
| 21 | referred to the union. |
| 22 | **Q.** You didn't ask the company, |
| 23 | correct? |
| 24 | **A.** In writing, yeah. |
| 25 | **Q.** You just told me you sent a |

| | Page 220 |
|---|---|
| 1 | already lost, I don't have any seniority |
| 2 | rights. |
| 3 | **Q.** Do you know whether -- I'm |
| 4 | sorry. Go ahead. |
| 5 | **A.** 9-21st-2010 I have no |
| 6 | seniority rights. |
| 7 | **Q.** Correct, as under the terms |
| 8 | of the contract as of 9-21-2010 you were |
| 9 | going to lose your seniority, correct? |
| 10 | **A.** I already lost them because |
| 11 | on this date, they determined on that |
| 12 | date that the layoff was temporary. |
| 13 | **Q.** Mr. Potts, I really would |
| 14 | ask you, if you listen then we'll get |
| 15 | through this a lot faster. |
| 16 | **A.** I'm sorry. |
| 17 | **Q.** I said as of September 21st, |
| 18 | 2010 you were losing your seniority |
| 19 | rights, correct? |
| 20 | **A.** They're gone, correct. |
| 21 | **Q.** Do you know whether ABC |
| 22 | eliminated a warehouse position around |
| 23 | that time? |
| 24 | **A.** Had to be me. |
| 25 | **Q.** Not my question. Do you |

| | Page 219 |
|---|---|
| 1 | letter to the union? |
| 2 | **A.** I didn't say that. I said I |
| 3 | sent a letter to Mr. Bobal asking him |
| 4 | what my seniority status was, what my |
| 5 | rank is on the list. |
| 6 | **Q.** And in that letter you asked |
| 7 | him what did you mean by this statement |
| 8 | the company is now willing to consider |
| 9 | this a permanent layoff effective |
| 10 | October 15, 2010? |
| 11 | **A.** That's my way of speaking |
| 12 | and communicating, that's why I even -- |
| 13 | with the grievance, I said permanent. |
| 14 | That's the way I think. |
| 15 | **Q.** So you didn't ask him that |
| 16 | question? |
| 17 | **A.** I though I was. |
| 18 | **Q.** Those words did not appear |
| 19 | in your letter, correct? |
| 20 | **A.** What words? |
| 21 | **Q.** What does the company mean |
| 22 | by the fact it's now willing to consider |
| 23 | this a permanent layoff effective |
| 24 | October 15, 2010. |
| 25 | **A.** No, because seniority is |

| | Page 221 |
|---|---|
| 1 | know whether ABC eliminated a warehouse |
| 2 | position, not an individual but a |
| 3 | position at the company around that |
| 4 | time? |
| 5 | **A.** I don't know. |
| 6 | **Q.** Do you know whether ABC |
| 7 | eliminated a warehouse position at any |
| 8 | time between September of 09 and |
| 9 | September 2010? |
| 10 | **A.** Say that again. |
| 11 | **Q.** Do you know whether ABC |
| 12 | eliminated a warehouse position at any |
| 13 | time between September of 09 and |
| 14 | September 2010? |
| 15 | **A.** No, not aware, nothing |
| 16 | posted. |
| 17 | **Q.** So with this offer of |
| 18 | converting your layoff to a permanent |
| 19 | layoff effective October 15, 2010, in |
| 20 | essence this was reviving your |
| 21 | seniority, correct? |
| 22 | **A.** No. |
| 23 | **Q.** Well, what did you understand |
| 24 | the next sentence to mean which says, |
| 25 | "This will allow the grievant the |



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 222

1 opportunity to exercise his contractual
2 rights to bump by seniority and
3 classifications until the least senior
4 employee is displaced"?
5     **A.** I don't have any contractual
6 rights to bump on seniority and
7 classifications.
8     **Q.** So the company was actually
9 extending you that right, correct?
10     **A.** No. They were -- if you
11 read, they're actually making me like a
12 new employee, a new hire to make an
13 application for a position in
14 merchandising, in which at that meeting,
15 9-14-2010, Mr. Bobal himself says I'm
16 not qualified.
17     **Q.** So with the company stating
18 in this correspondence this will allow
19 the grievant the opportunity to exercise
20 his contractual right to "bump by
21 seniority and classifications until the
22 least senior employee is displaced," you
23 did not understand that to mean that you
24 could bump a lesser senior employee?
25     **A.** I can't.

## Page 223

1     **Q.** I'm not asking what you
2 could or couldn't do, I'm asking you
3 what you understood the company was
4 offering you?
5     **A.** There is no offer. I don't
6 -- obviously, there's a lot of confusion
7 there.
8     **Q.** There apparently is because
9 you have testified as of September 21st,
10 2010 you had lost your seniority,
11 correct?
12     **A.** Yeah.
13     **Q.** However, the company is
14 willing to consider this a permanent
15 layoff effective October 15, 2010 to
16 allow you to exercise contractual rights
17 to bump by seniority?
18     **A.** Yeah.
19     **Q.** Did you ask Mike what are
20 you talking about?
21     **A.** No, because it was withdrew,
22 this agreement was withdrawn.
23     **Q.** Did you ask Mike at any time
24 how could I possibly bump a less senior
25 employee if I don't have seniority?

## Page 224

1     **A.** I sent him the letter to ask
2 where my rank is in the --
3     **Q.** Did you ever ask Mr. Bobal
4 how could I possibly bump a less senior
5 employee if I have no seniority?
6     **A.** I wish I got the
7 opportunity, no.
8     **Q.** Looking at Deposition Exhibit
9 35, first page, the individuals on the
10 first page numbered 21 through 30, you
11 would agree with me, have a hire date
12 after your hire date, correct?
13     **A.** Say that again.
14     **Q.** The individuals on page 1 of
15 Deposition Exhibit 35 are listed as 21
16 through 30, you would agree with me,
17 have a hire date after your hire date,
18 correct?
19     **A.** Yeah, 20 through 30, yes.
20     **Q.** Do you have a CDL driver's
21 license?
22     **A.** No.
23     **Q.** You filed another grievance
24 on September 21st, 2010, correct?
25     **A.** Correct. 11824, grievance

## Page 225

1 number.
2     **Q.** I'm sorry, returning to
3 Deposition Exhibit 33 for a moment.
4     **A.** Yes.
5     **Q.** So as you sit here today
6 it's your testimony that at no time did
7 you understand that the company was
8 making an offer to you to permit you to
9 exercise seniority rights past September
10 21st, 2010?
11     **A.** Correct. And that grievance
12 was withdrawn October of 2010 as well.
13     MR. ROSSI: Wait for a question.
14     THE WITNESS: I'm sorry.
15     - - - - -
16     (Thereupon, Deposition
17     Exhibit-36 was marked for
18     purposes of identification.)
19     - - - - -
20     **Q.** Showing you what's been
21 marked as Deposition Exhibit 36, this is
22 correspondence from you to Teamsters
23 Local 377 dated October 2nd, 2010, and
24 we have your signature --
25     **A.** Yeah --

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

Page 226

1 Q. -- on this one?
2 A. -- subscribed upon it, yeah.
3 Q. Did you write this
4 correspondence?
5 A. Yeah.
6 Q. Is everything contained in
7 this correspondence true and accurate?
8 A. Yeah. First time I told
9 them to withdraw it so we can go to the
10 layoff issues in 11824, absolutely.
11 Q. You then filed yet another
12 grievance on October 13th, 2010,
13 correct?
14 A. The union filed it on my
15 behalf, 49 something, 4982 or 4959.
16 That's it.
17 Q. And -- 4956?
18 A. 4956, I was close.
19 Q. And you authorized the union
20 to file the grievance on your behalf?
21 A. Yeah, they made me sign it
22 right there.
23 Q. Well, did you protest signing
24 the grievance, you didn't want to do it?
25 A. They -- Justin drafted that.

Page 227

1 Q. Did you protest signing the
2 agreement?
3 MR. ROSSI: Answer the question,
4 Robert.
5 A. No, no.
6 - - - - -
7 (Thereupon, Deposition
8 Exhibit-37 was marked for
9 purposes of identification.)
10 - - - - -
11 Q. This is Deposition Exhibit
12 37, is this a copy of that grievance?
13 A. Yes.
14 Q. And that's your signature on
15 the --
16 A. Yes.
17 Q. -- bottom left-hand corner?
18 A. Absolutely.
19 Q. Did you disagree with the
20 contents of the grievance?
21 A. It didn't raise the issue
22 about annual bidding, I wish it would of
23 because it was up and that meeting got
24 cut short on 9-14-2010, but using
25 workers out of classification and all

Page 228

1 that, yeah, I agree with it, I just
2 wish they would have had more.
3 - - - - -
4 (Thereupon, Deposition
5 Exhibit-38 was marked for
6 purposes of identification.)
7 - - - - -
8 Q. Showing you what's been
9 marked as Deposition Exhibit 38, it's a
10 copy of correspondence that you sent to
11 Mr. Mike Bobal on October 15th, 2010,
12 subject line re: Permanent layoff, is
13 that your signature?
14 A. Yeah, yeah, subscribed
15 myself.
16 Q. You say, "Dear Michael, as
17 you know, I have been provided with
18 pertinent information regarding a notice
19 of permanent layoff effective October
20 15, 2010," correct?
21 A. Correct.
22 Q. And the first time you're
23 contacting Mr. Bobal and writing about
24 the notice you received about permanent
25 layoff effective October 15, 2010 is in

Page 229

1 fact on October 15, 2010, correct?
2 A. There you go, correct.
3 Q. Then it goes on to say what
4 you said earlier that you're asking
5 about your status on the plant-wide
6 seniority list, correct?
7 A. Absolutely.
8 Q. You would agree with me also
9 that in this October 15, 2010
10 correspondence to Mr. Bobal, Deposition
11 Exhibit 38, you nowhere mention the
12 merchandising position, correct?
13 A. Correct. Mr. Bobal himself
14 said I wasn't qualified 9-14-2010.
15 Q. When did Mr. Bobal -- strike
16 the question, please. What did Mr.
17 Bobal say in the 9-14-2010 meeting about
18 your qualifications for the
19 merchandising position?
20 A. That was it, he said I
21 wasn't qualified.
22 Q. Did you ask him what he
23 meant by that?
24 A. No, the union guy was
25 arguing, he told him make me a



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

1  merchandiser and he yelled he's not
2  qualified.
3  **Q.** So you would agree with me
4  that Deposition Exhibit 33 is dated
5  September 30th, 2010 which is after
6  September 14, 2010, correct?
7  **A.** Say that again, please.
8  **Q.** Deposition Exhibit 33, you
9  would agree with me, is dated September
10 30th, 2010 which is after September 14,
11 2010?
12 **A.** Yeah.
13 **Q.** Did you ask Mr. Bobal, hey,
14 you told me I wasn't qualified on
15 September 14th but now you're telling me
16 I can have a merchandising position in
17 your 9-30 correspondence?
18 **A.** I didn't ask because I
19 withdrew the grievance, the wage claim
20 was withdrawn and --
21 **Q.** I'm not talking about the
22 grievance.
23 **A.** Oh, okay. I'm sorry.
24 **Q.** This is separate.
25 **A.** Sure.

1  **Q.** Did you ask Mr. Bobal, hey,
2  on September 14th you said I wasn't
3  qualified for a merchandiser position,
4  why are you offering me one on 9-30?
5  **A.** In Exhibit -- I can't read
6  this.
7  **Q.** 38?
8  **A.** 38, that's my way of asking
9  him.
10 **Q.** But you didn't ask that
11 question, correct, you're asking about
12 your placement on the plant-wide
13 seniority list?
14 **A.** I need to know before I
15 expand upon my inquiry. I can't inquire
16 if I don't know. And on 9-30 nobody
17 knew the layoff was temporary either
18 until that date.
19 **Q.** When is the first time you
20 believed that -- strike the question,
21 please. When you say no one knew it
22 was temporary as of that date, you're
23 referring back to your earlier testimony
24 that because your one year period was
25 about to expire on 9-21?

1  **A.** That was my only watch at
2  the time, looking for my seniority
3  rights, until 9-21st-2010. I knew I
4  didn't have to worry about anything
5  inside seniority. Whatever they done, I
6  know I got recourse, grievance
7  procedure, company counsel in Texas, I
8  got everything to address that inside
9  that date. I have protection of the
10 CBA. Outside of that, I don't have
11 anything.
12 **Q.** And in response to Deposition
13 Exhibit 38 that you sent to Mr. Bobal
14 he asked you to contact the union
15 regarding that matter?
16 **A.** Yes, he said don't call him,
17 write him, et cetera, et cetera.
18     - - - - -
19     (Thereupon, Deposition
20     Exhibit-39 was marked for
21     purposes of identification.)
22     - - - - -
23 **Q.** Showing you what's been
24 marked Deposition Exhibit 39, it's a
25 copy of a letter to the union dated

1  October 18th, 2010 from you with your
2  signature, correct?
3  **A.** Yes.
4  **Q.** You would agree with me that
5  in this correspondence to the union, no
6  mention of the merchandising position,
7  correct?
8  **A.** Correct. The grievance was
9  already withdrawn.
10 **Q.** I don't understand why you
11 keep saying the grievance is already
12 withdrawn when this is a separate
13 matter.
14 **A.** I'm sorry, I won't speak of
15 it no more. I'm new to this. I
16 appreciate your latitude. Thank you.
17     - - - - -
18     (Thereupon, Deposition
19     Exhibit-40 was marked for
20     purposes of identification.)
21     - - - - -
22 **Q.** Handing you what's been
23 marked Deposition Exhibit 40,
24 correspondence from Mr. Bobal dated
25 November 10th, 2010 to you at your

**Cefaratti Group**
**THE LITIGATION SUPPORT COMPANY**
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

**Page 234**

1  Jeanette Drive address.
2     **A.** Okay.
3     **Q.** Did you receive this
4  correspondence?
5     **A.** No.
6     **Q.** That's because you didn't
7  sign for the certified mailing, correct?
8     **A.** I didn't receive it, I
9  didn't sign for any mailing on this
10  date.
11     **Q.** Well, there were several
12  attempts made to have you sign for this
13  correspondence and you refused to sign
14  for it, correct?
15     **A.** No, I didn't know about it.
16  I was more than happy to sign for it.
17     **Q.** So you're testifying under
18  oath today that this is the first time
19  you've ever seen this document?
20     **A.** In the lawyer's office he
21  showed it to me.
22     **Q.** Were you aware of a meeting
23  that was scheduled for October 21st with
24  the company and the union and yourself?
25     **A.** No.

**Page 235**

1     **Q.** You were never aware of a
2  meeting that was scheduled for October
3  21st?
4     **A.** I wish I was.
5     **Q.** So your union didn't let you
6  know that?
7     **A.** I don't believe so, otherwise
8  I'd have been there.
9     **Q.** According to this
10  correspondence Mr. Bobal is indicating
11  that the grievance answer on grievance
12  11823 sent to you on September 30, 2010
13  gave you a 15 day review period to
14  answer us if you wish the available
15  merchandising job, do you see that?
16     **A.** I see it now.
17     **Q.** Well, it was also set forth
18  in September 30th, 2010 correspondence
19  to you as well, correct, which you did
20  receive?
21     **A.** No, not like that, after
22  review. This letter here says there's
23  an available merchandising position.
24     **Q.** Which is this letter?
25     **A.** Your Exhibit 40.

**Page 236**

1     **Q.** Yes. I'm looking at
2  Deposition Exhibit 33. After the
3  paragraph we've already read on page 1
4  about bumping by seniority it goes on to
5  say, "Should the grievant wish to pursue
6  this course of action he needs to
7  contact the company in writing
8  expressing the desire within the 15
9  working day period that this grievance
10  answer is up for review." Do you see
11  that?
12     **A.** I see that.
13     **Q.** And you did, in fact,
14  contact the company on October 15, 2010
15  and you didn't make any mention of the
16  merchandising position, correct?
17     **A.** No, because I can't bump, I
18  want to know where my plant rank is and
19  I wanted to bring up annual job bidding.
20  I never got an annual job bidding from
21  the beginning of that year in the new
22  contract, the CBA.
23     **Q.** So despite the fact the
24  company was extending you the
25  opportunity to bump you continued to

**Page 237**

1  believe that you couldn't do so?
2     **A.** That's not an extension. I
3  can't. Bobal already said I'm not
4  qualified, 9-14. In regard to this
5  letter, Exhibit 40, if I would have got
6  it I would have been more than happy to
7  sign up and fill the application out for
8  that position because I have no
9  seniority and no rights.
10     **Q.** I just want to make sure I
11  understand then.
12     **A.** Sure.
13     **Q.** Looking at Deposition Exhibit
14  33 --
15     **A.** Yeah.
16     **Q.** -- and you can read the
17  paragraph on the first page that begins,
18  "The company acknowledges --"
19     **A.** Yeah.
20     **Q.** "-- with nearly a year
21  passing now."
22     **A.** I lost seniority.
23     **Q.** Which concludes with, "this
24  would most logically be a merchandising
25  position," you did not understand that



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics